Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SHAHD ERAKAT

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAHD ERAKAT, on behalf of herself and all similarly situated persons,<br><br>    Plaintiff,<br><br>v.<br><br>PNC BANK, NATIONAL ASSOCIATION, a national banking association,<br><br>    Defendant. | Case No.: 2:26-cv-01364-DAD-JDP<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff SHAHD ERAKAT ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant PNC BANK, NATIONAL ASSOCIATION, a national banking association ("Defendant" or "PNC Bank"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.pnc.com (the "Website"), a website that Defendant provides for public access and use.

2.    Plaintiff personally used the Website during the class period and preserved an HTTP archive file (commonly known as a HAR file) of one of her own browsing sessions. Counsel caused a technical investigation to be conducted that replicated URLs and user flows presented in Plaintiff's HAR file and that documented the third-party tracking transmissions described in this Complaint. The figures and screenshots reproduced below are from that investigation and are included herein as illustrative examples of how the Website's tracking technologies operated when Plaintiff visited the Website.

3.    During her use of the Website, and as reflected in her HAR file, Plaintiff navigated to the following URLs, unaware that Defendant was causing and permitting Third Parties to intercept the content of her communications:

- https://www.pnc.com/insights/personal-finance/borrow/should-i-use-a-personal-loan-to-pay-off-my-credit-card-debt.html;
- https://www.pnc.com/insights/personal-finance/borrow/smart-ways-to-start-paying-down-debt-in-the-new-year.html;
- https://www.pnc.com/insights/tagged-results.html?tagId=pnc-thought-leadership:subhub-topic-sub-topic/personal-finance/borrow/debt-consolidation; and

2

- https://www.pnc.com/insights/search-results.html?q=Debt.

4.     Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what she was browsing, search terms, page titles and content categories associated with those URLs, and/or the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

5.     As set forth in the Specific Allegations section of this Complaint below, and as is evidenced by screenshots from a forensic audit of the Website, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are searching and browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

6.     Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631 and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously.

## II.    GENERAL ALLEGATIONS

7.     A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

8.     When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, page titles and session-level identifiers.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

9. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Pinterest Tracker
- LinkedIn Tracker
- Twitter/X Tracker

10. The Trackers are operated by distinct third parties, including Pinterest, Inc. (as to the Pinterest Conversion Tag), LinkedIn Corporation (as to the LinkedIn Insight Tag), and X Corp. (as to the Twitter Pixel) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

11. When the Plaintiff's browser navigated to the Website, the resulting communications did not consist of a single, instantaneous request and response. The browser first issued an HTTP request to PNC for the page's HTML. As the browser received and parsed that HTML, it issued numerous additional HTTP requests to PNC and to third-party servers for the resources and services used to construct, display, and operate the webpage, including style sheets, JavaScript files, images, fonts, data files, and tracking and analytics resources. The browser also executed JavaScript associated with the webpage, which caused it to issue further outbound HTTP requests. These requests occurred sequentially and concurrently over multiple seconds as part of the same webpage visit and page-loading process. The terms "page load," "page-load process," and "page-load window" as used in this Complaint refer to this multi-second collective communication process and not to the initial HTTP request and response alone.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

12. Figure 1 below shows that during the page-load process for the Website page https://www.pnc.com/insights/search-results.html?q=Debt, the user's browser remained in communication with Defendant's servers throughout a multi-second period. The user's browser received from Defendant's servers Defendant's page HTML, clientlib JavaScript libraries, design libraries, OneTrust consent-management content, and content-delivery resources all as part of the page load. During that same page-load process, the user's browser issued tracking requests to the Trackers' servers, including ct.pinterest.com (Pinterest Conversion Tag), platform.twitter.com, analytics.twitter.com, and t.co (Twitter Pixel), and snap.licdn.com, px.ads.linkedin.com, (LinkedIn Insight Tag), while Defendant's first-party transmissions to the user's browser were continuing.

/ / /

/ / /

/ / /

/ / /

5

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# Figure 1



FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

13. Defendant's Tracker partners describe this multi-step page-load process in their own published implementation documentation:

- Pinterest's published developer documentation directs Website operators to embed Pinterest's base code between the <head> and </head> tags of every page on which conversions are tracked, and states that, where a tracked action occurs at page load, placement of Pinterest's codes in the <head> "ensures that the codes run as soon as the page is loaded."[1]

- Pinterest's published base code, reproduced in Pinterest's developer documentation, dynamically creates an additional <script> element within the loaded page, marks that script asynchronous, separately requests Pinterest's "core.js" resource from s.pinimg.com, and queues Pinterest's "pintrk('load')" and "pintrk('page')" commands for execution.[2]

- LinkedIn's published Insight Tag documentation describes the Insight Tag as tracking "a single page-load conversion" each time the page loads.[3]

- Twitter/X's published X Pixel Helper documentation describes its tracking pixel as designed to fire as one of "the first things to load," indicating an ordered, multi-step page-load sequence.[4]

14. Defendant's consent management vendor, OneTrust, similarly describes the Website's page-load process as encompassing not only the initial document request but also the subsequent loading and execution of OneTrust's external script:

/ / /

---

[1] Pinterest, Pinterest Developers – Pinterest tag, available at https://developers.pinterest.com/docs/track-conversions/pinterest-tag/ (last accessed June 30, 2026).
[2] *Id.*
[3] LinkedIn Corporation, LinkedIn Insight Tag, available at https://business.linkedin.com/advertise/ads/insight-tag (last accessed June 30, 2026).
[4] X Corp., X Pixel Helper documentation, available at https://business.x.com/en/help/troubleshooting/faqs-about-pixels (last accessed June 30, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- OneTrust's published developer documentation states that the OnetrustActiveGroups data-layer variable is "re-populated on every page load once the script is executed."[5]

- OneTrust's published Web CMP Events Guide further states that the "OneTrustGroupsUpdated" event is "triggered each time the script loads, such as when the website is accessed or refreshed," and that the event may in turn cause additional analytics or tracking activity to begin.[6]

- OneTrust's published Google Tag Manager integration documentation further instructs Website operators to configure conflicting third-party tags to fire only "after the CookiePro/OneTrust script has loaded completely," indicating that OneTrust treats the loading of its own script as a step within the broader webpage-loading sequence and as a precondition to subsequent third-party tag activation.[7]

15.     Defendant's own published Terms and Conditions, applicable to the Website at all relevant times, expressly acknowledge that "Transmissions to and from this Website … are not sent in a secure form and can be intercepted by third parties."[8] Defendant's own published Privacy Policy further acknowledges that data Defendant collects through users' "internet or mobile activities" may be collected by "third parties … on [Defendant's] behalf."[9]

16.     The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent

---

[5] OneTrust, Google Tag Manager (OneTrust Developer Portal), available at https://developer.onetrust.com/onetrust/docs/google-tag-manager (last accessed June 30, 2026).

[6] OneTrust, Web CMP Events Guide (OneTrust Developer Portal), available at https://developer.onetrust.com/onetrust/docs/javascript-events-guide (last accessed June 30, 2026).

[7] OneTrust, Google Tag Manager (OneTrust Developer Portal), available at https://developer.onetrust.com/onetrust/docs/google-tag-manager (last accessed June 30, 2026).

[8] PNC Bank, Terms and Conditions, available at https://www.pnc.com/en/terms-and-conditions.html (last accessed June 30, 2026).

[9] PNC Bank, Privacy Policy, available at https://www.pnc.com/en/privacy-policy.html (last accessed June 30, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

17. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. During the Website's page rendering, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization.

18. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

19. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III.   PARTIES

20. Plaintiff SHAHD ERAKAT is a California citizen residing in Solano County, CA and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on March 2, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

21. PNC Bank, N.A. is a national banking association chartered under federal law that owns, operates, and controls the Website, an online platform through which

PNC Bank offers personal banking products, loan services, personal finance resources, and financial management tools to consumers nationwide.

22. PNC Bank is one of the largest banks in the United States, providing retail banking services, personal finance resources, loan products, and financial management tools to individual and institutional customers. PNC Bank is a national banking association chartered under federal law and maintains its principal executive offices in Pittsburgh, Pennsylvania. Through its Website and related digital platforms, PNC Bank serves millions of customers in California and throughout the United States.

23. PNC Bank conducts banking business nationwide and engages in product development, marketing, and commercial operations centered on its digital banking and financial services platform. PNC Bank's business activities include operating the Website, through which consumers browse personal finance content, research debt management and borrowing options, and access banking, loan, and financial planning products.

24. The Website, including the mobile site, serves as a core component of PNC Bank's digital presence. The Website provides users with access to banking products, personal finance articles, loan information, debt management resources, and financial planning tools, and functions as the primary consumer-facing platform through which California users access PNC Bank's personal banking and financial services. The Website is integrated into PNC Bank's broader digital infrastructure and employs web-based technologies that operate in connection with page loads, navigation, and user interaction.

## IV. JURISDICTION AND VENUE

25. PNC Bank is subject to personal jurisdiction in this District. On information and belief, PNC Bank operates retail banking branches throughout California and maintains offices across the state, including in San Francisco, Los Angeles, San Diego, San Jose, and Sacramento, that are dedicated to retail banking, commercial lending, and regional banking operations.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

26. PNC Bank has cultivated California as a significant banking market. The Website serves as a primary digital channel through which PNC Bank markets and provides banking products, loan services, and personal finance resources to California consumers. In furtherance of those operations, PNC Bank entered into and maintained commercial partnerships with California-based data companies, including Pinterest, Inc., headquartered in San Francisco, LinkedIn Corporation, headquartered in Sunnyvale, and X Corp., historically headquartered in San Francisco.

27. Through those partnerships, PNC Bank embedded third-party tracking technologies into the Website that transmit California users' communications to California-based data infrastructure and servers operated by California-rooted companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of her communications occurred on her device in California; and the intercepted data flowed to California-based servers. Plaintiff's claims arise directly from PNC Bank's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications. Accordingly, the exercise of personal jurisdiction over PNC Bank in this Court is proper.

28. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

29. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy.

30. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and the parties are minimally diverse.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

31.     Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves millions of California residents, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, as Plaintiff and other Class Members browsed the Website from within this District; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California customers in this District.

## V.     FEDERAL AND STATE PRIVACY LAWS

### 1.     *The California Invasion of Privacy Act (CIPA)*

32.     The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

33.     Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

34.     CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted "to protect the right of privacy of the people of this state."  CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

35.     Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2.     *The Federal Wiretap Act***

36.     The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

37.     The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce."   That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

38.     In *In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589 (9th Cir. 2020), the Ninth Circuit held that plaintiffs plausibly alleged Facebook was not a "party" to the relevant communications for purposes of the Wiretap Act and Cal. Penal Code § 631(a) party exemption, where Facebook's plug-in code allegedly caused users' browsers, without their knowledge, to duplicate referer-header information from GET requests sent to third-party websites and transmit that information to Facebook through a separate, simultaneous channel. The court concluded that this type of simultaneous, unknown duplication did not entitle Facebook to the party exemption as a matter of law at the pleading stage. In distinguishing cases involving IP addresses and basic site-level URLs, the court further recognized that the alleged full-string URLs and referer headers

there could reveal the particular documents viewed, search terms, and other information about users' interests and browsing activity, and therefore were materially different from bare routing information. The court expressly limited its holding to the sufficiency of the allegations and declined to decide the other statutory elements.

39.   A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI.   SPECIFIC ALLEGATIONS

40.   During her use of the Website, Plaintiff navigated to pages identifying personal and private subject matter, including the specific URLs identified above. Each Tracker section below shows what occurs during live browser access to those pages; Plaintiff alleges on information and belief that the same tracking mechanisms depicted below operated on the Website during Plaintiff's visit on March 2, 2026.

41.   Plaintiff suffered concrete and particularized injuries as a direct and proximate result of Defendant's conduct. When Plaintiff visited the pages of the Website identified above, the URL contents of her communications with the Website were intercepted in real time and transmitted, together with persistent visitor identifiers associated with her browser, to Pinterest, Inc., LinkedIn Corporation, and X Corp., where the contents were incorporated into those entities' commercial profile and audience-targeting systems.

42.   The URL contents intercepted from Plaintiff's communications with the Website revealed substantive information about Plaintiff's personal financial circumstances and her active research into debt-related topics, including her search query for the term "Debt," her review of an article addressing whether to use a personal loan to pay off credit-card debt, her review of an article on strategies for paying down debt,

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

her accessing of a debt-consolidation calculator, and her browsing of pages categorized under Defendant's own personal-finance-and-borrowing taxonomy on a national consumer-banking website.

43.     The information intercepted here is materially different in character from mouse movements, scrolling, click positions, and other non-substantive browsing data characterized as non-sensitive. The interception and disclosure to three commercial advertising platforms of an individual's research into her personal debt circumstances on a national consumer bank's website is closely analogous to the harms recognized at common law by the torts of intrusion upon seclusion and eavesdropping.

44.     The injuries Plaintiff suffered include the invasion of her privacy in the contents of her electronic communications, the loss of control over the substantive content of her browsing activity, the commercial exploitation of her browsing data without compensation or consent, and the irreversible disclosure of those contents to three separate third-party commercial entities for advertising targeting and behavioral profiling. Plaintiff's injuries are ongoing and continue to occur each time the Trackers acquire and process the contents of communications between users and the Website.

### 1.     The Pinterest Tracker

45.     Defendant embedded and deployed a Pinterest Conversion Tag on the Website, a behavioral analytics and advertising platform operated by Pinterest, Inc. The Pinterest Conversion Tag monitors website visitor activity, transmits the full URL of pages visited together with a persistent visitor identifier to Pinterest's servers in real time, and enables cross-session visitor profiling and interest-based advertising targeting. During Plaintiff's session, Pinterest received the full URL of each debt-related page Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound requests.

46.     Figure 2 shows a Fiddler Classic raw request capture of a POST request to ct.pinterest.com. The request body contains the parameter ad, which carries a JSON payload including the field loc set to the complete URL of one of the debt-related pages

Plaintiff viewed as identified above. The Fiddler session list reflects Pinterest Conversion Tag requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to PNC Bank's server.

**Figure 2**

47.    Likewise, Figure 3 shows a Chrome DevTools Network capture of the POST request payload transmitted to ct.pinterest.com. The payload contains the ad parameter encoding the loc field with the complete page URL, together with pin_unauth, a persistent Pinterest visitor identifier. The page URL and the persistent visitor identifier appear together in the same outbound tracker request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 3**



48.    Pinterest's servers at ct.pinterest.com returned an HTTP 200 OK response to the POST request, confirming that Pinterest received the intercepted communications in real time, during transmission, before the page request completed. On information and belief, the pin_unauth identifier is a persistent, cross-session identifier that links each visit to the same Pinterest advertising profile. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions.

49.    Plaintiff's HAR file preserves the executable JavaScript that the Pinterest Conversion Tag ran inside Plaintiff's browser (served from s.pinimg.com). That code reads the browser's then-current location.href and document.referrer, assigns those values to the Pinterest request's loc and ref fields, and dispatches the resulting request to ct.pinterest.com. Because the code reads those values and copies them into the request before the request is transmitted, the Pinterest Conversion Tag read the URL and referrer contents of Plaintiff's communications with the Website before transmitting them, and did so while PNC Bank's page-load transmissions to Plaintiff's browser were still continuing; that is, it read and learned the contents of those communications while they were in transit, and not from any record created after the communication ended.

17

50.    Pinterest, Inc. and its operators used the intercepted browsing data, including the URLs identifying Plaintiff's personal financial circumstances and debt-related research interests, to build behavioral profiles and enable interest-based advertising and audience targeting. This commercial use of intercepted content is precisely what the Pinterest Conversion Tag is designed and marketed to accomplish.

51.    Pinterest's developer documentation, "Track conversions with Pinterest Tag,"[10] establishes the relevant timing sequence. Pinterest instructs website operators that both the base code and event code must be added to pages where conversions are tracked, and that "[t]he base code must run before the event code." Pinterest further states that, where an action is known to have occurred when a page loads, the base code and event code should be placed between the page's <head> and </head> tags.

52.    Pinterest's Business Help article, "Add event codes,"[11] confirms that page-placed event code fires during the page-load event. Pinterest distinguishes page-load firing from events triggered only after a later user action, such as clicking a button or submitting a form.

53.    Pinterest's Business Help article, "View tag parameters and cookies,"[12] identifies the resulting browser transmission to Pinterest. Pinterest states that "[t]he query string parameters in the URL of a Pinterest tag network request contain data sent to Pinterest from advertiser websites," and instructs users to verify those transmissions in the browser's Network tab by filtering for ct.pinterest. Pinterest identifies automatic data in that network request, including loc: location URL, ref: referrer URL, and cb, the "current timestamp."

54.    Pinterest, Inc. is not a party to the communications between Plaintiff and

[11] Pinterest, Add event codes, available at https://help.pinterest.com/en/business/article/add-event-codes (last accessed June 30, 2026).
[12] Pinterest, View tag parameters and cookies, available at https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies (last accessed June 30, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the Pinterest Conversion Tag on the Website, and Plaintiff never consented to it.

55. By causing Pinterest, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### 2. *The LinkedIn Tracker*

56. Defendant embedded and deployed a LinkedIn Insight Tag on the Website, a behavioral analytics and advertising platform operated by LinkedIn Corporation. The LinkedIn Insight Tag monitors website visitor activity, transmits the full URL of pages visited together with a persistent user identifier to LinkedIn's servers in real time, and enables cross-session visitor profiling and professional interest-based advertising targeting. During Plaintiff's session, LinkedIn received the full URL of each debt-related page Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound requests.

57. LinkedIn Corporation's own published Insight Tag documentation directs deploying websites not to install the tag on "pages that collect or otherwise handle health, financial, or other sensitive data of individual users," and instructs: "Never add the JavaScript code to any such pages."[13] Defendant nonetheless installed the LinkedIn Insight Tag on its debt and personal-finance pages and caused the URL contents of Plaintiff's communications on those pages to be transmitted to LinkedIn.

58. Figure 4 shows a Fiddler Classic raw request capture of a GET request to px.ads.linkedin.com/collect. The request contains the query parameter url set to the complete URL of a debt-related page on the Website that is one of the debt-related pages Plaintiff viewed as identified above. The Fiddler session list reflects LinkedIn Insight

---

[13] LinkedIn Corporation, LinkedIn Insight Tag product page, available at https://business.linkedin.com/advertise/ads/insight-tag (last accessed June 30, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Tag requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to PNC Bank's server.

**<u>Figure 4</u>**



59.     Likewise, Figure 5 shows a Chrome DevTools Network capture of the same request. The request contains the parameter url set to the complete page URL, together with li_adsId, a persistent LinkedIn advertising identifier. The page URL and the persistent advertising identifier appear together in the same outbound tracker request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 5**



60.      LinkedIn Corporation's servers at px.ads.linkedin.com returned an HTTP 200 OK response to the request, confirming that LinkedIn received and used the intercepted communications in real time, during transmission, before the page request completed. On information and belief, the li_adsId identifier is a persistent, cross-session identifier that links each visit to the same LinkedIn advertising profile. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions or to their LinkedIn profile.

61.      Plaintiff's contemporaneous browser-session capture preserves the executable JavaScript that the LinkedIn Insight Tag ran inside Plaintiff's browser, served from snap.licdn.com. In LinkedIn's /collect process, that code reads the browser's then-current location, encodes its complete URL into the request's url parameter, and dispatches the request to px.ads.linkedin.com/collect. The capture preserves those requests for each of the debt-related pages Plaintiff viewed and establishes that each was initiated during the page-load process described above, while PNC-hosted requests comprising that same page-load process remained outstanding and continued to be issued or completed. LinkedIn's code therefore read, copied, and transmitted the URL

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

contents of Plaintiff's communications during the continuing page-load process, rather than retrieving those contents from storage after that process ended.

62.    The preserved LinkedIn code also reads window.location.href and document.title, assigns those values to the url and pageTitle fields of a PAGE_VISIT event bearing a contemporaneous Date.now() timestamp, and dispatches that event to LinkedIn's /wa/ endpoint. The capture preserves the actual PAGE_VISIT events transmitted during Plaintiff's session, including events containing the complete URL and page title of each debt-related page she viewed. Together, the preserved code and events establish that LinkedIn's code read and copied both the URL and page title from Plaintiff's browser state before transmitting them during her live browser session.

63.    LinkedIn Corporation and its operators used the intercepted browsing data, including the URLs identifying Plaintiff's personal financial circumstances and debt-related research interests, to build behavioral profiles and enable interest-based advertising and professional audience targeting. This commercial use of intercepted content is precisely what the LinkedIn Insight Tag is designed and marketed to accomplish.

64.    LinkedIn's official Marketing Solutions page, "LinkedIn Insight Tag,"[14] states that the LinkedIn Insight Tag is JavaScript code used to track visitor activity on the advertiser's website. LinkedIn further states that, "[b]y default, the Insight JavaScript Tag will track visits to your website, including the URL, buttons clicked, referrer, IP address, device and browser characteristics (User Agent), and timestamp."

65.    LinkedIn's Help article, "LinkedIn Insight Tag FAQs,"[15] identifies the categories of information transmitted through the tag. In response to "What data does my website send through this tag?," LinkedIn states that the Insight Tag enables collection of data regarding users' visits to the website, "including the URL, referrer, IP

---

[15] LinkedIn Corporation, LinkedIn Insight Tag FAQs, available at https://www.linkedin.com/help/linkedin/answer/a427660 (last accessed June 30, 2026).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

address, device and browser characteristics (User Agent), and timestamp."

66.    Taken together, LinkedIn's own materials support the narrow timing proposition that, when the LinkedIn Insight Tag is installed on a webpage, the user's browser loads LinkedIn's tag code during the website's own loading process; the code calls window.lintrk() each time it loads to automatically track a page-load conversion; and LinkedIn receives a contemporaneous signal containing the URL, referrer, IP address, User-Agent/device/browser characteristics, and timestamp. Thus, LinkedIn receives a duplicated transmission of the URL through the LinkedIn Tracker's own network request during the same page-load process in which the user's browser is loading or visiting the Website.

67.    LinkedIn Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the LinkedIn Insight Tag on the Website, and Plaintiff never consented to it.

68.    By causing LinkedIn Corporation to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### 3.    The Twitter/X Tracker

69.    Defendant embedded and deployed a Twitter Pixel on the Website, a behavioral analytics and advertising platform operated by X Corp. The Twitter Pixel monitors website visitor activity, transmits the full URL and page title of pages visited together with a persistent visitor identifier to X Corp.'s servers in real time, and enables cross-session visitor profiling and interest-based advertising targeting. During Plaintiff's session, X Corp. received the full URL and page title of debt-related pages Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound requests.

70.    Figure 6 shows a Fiddler Classic raw request capture of a POST request to

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

analytics.twitter.com. The request contains the parameters tw_document_href, set to the complete URL of one of the debt-related searches also made by Plaintiff on the Website as identified above, and pt, set to the corresponding page title, both carrying content from a page of the kind identified above. The Fiddler session list reflects Twitter Pixel requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to PNC Bank's server.

**Figure 6**



71.    X Corp.'s servers at analytics.twitter.com returned an HTTP 200 OK response to the POST request, confirming that X Corp. received and used the intercepted communications in real time, during transmission, before the page request completed. On information and belief, the twpid identifier is a persistent, cross-session identifier that links each visit to the same X Corp. advertising profile. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions.

72.    X Corp. and its operators used the intercepted browsing data, including the URLs identifying Plaintiff's debt-related research interests, to build behavioral profiles and enable interest-based advertising and audience targeting. This commercial use of

24

intercepted content is precisely what the Twitter Pixel is designed and marketed to accomplish.

73.    X Corp. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the Twitter Pixel on the Website, and Plaintiff never consented to it.

74.    By causing X Corp. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

75.    The Trackers' interceptions described above occur during the page-load process. When Plaintiff's browser issues an HTTP request to PNC Bank's servers, PNC Bank's servers return HTML markup that includes the JavaScript code Defendant has embedded for each of the Trackers. The Tracker JavaScript executes in the browser as the page is being rendered and, before the page-load process completes, causes the browser to issue separate outbound HTTP requests to the Trackers' servers carrying the URL contents of Plaintiff's communications together with persistent visitor identifiers. Each Tracker's server returns an HTTP response within the sub-second window in which the page-load process is still in progress. The Trackers' acquisition and processing of the URL contents accordingly occurs within and during the same continuous transmission window as Plaintiff's underlying communications with PNC Bank's servers, that is, in real time, contemporaneously with the user-server communication, and not from any record stored or assembled after that transmission ended.

76.    Each of the Trackers has deployed its tag on tens of thousands of websites and apps; the data captured from each deployment is combined into a unified profile system that the Trackers monetize across entire ad networks.  PNC's deployment of the Trackers is one of many data inputs the Trackers stitch together. The Plaintiff and Class Members' captured data has cross-property commercial value to the Tracker that is

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

independent of any PNC-related function.

77.    Each of the Trackers is operated as an advertising platform with a primary business model of selling targeted advertising inventory. The Trackers are deployed for each Tracker's commercial benefit, i.e., to feed user data into the Tracker's advertising platform; the Trackers offers them free of charge to deploying websites like PNC precisely because the data the Tracker receives is itself the consideration.

## VII.    CLASS ALLEGATIONS

78.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members"), defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between March 2, 2025 and the present.

79.    NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

80.    COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to restitution.

81. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

82. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

83. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII.    FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

#### *By Plaintiff and the Class Members Against All Defendants*

84. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

85. Plaintiff brings this cause of action on behalf of herself and the Class.

86. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose,

any information so obtained.

87.    The full human readable URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, at the moment Plaintiff's browser transmitted each page request to the Website, the tracking code Defendant embedded and configured caused a duplicate of those URL contents to be transmitted to each Tracker contemporaneously with, and during, the transmission of Plaintiff's communications with the Website, and before the page request completed. The Trackers thereby acquired the contents of those communications in transit, by means of a contemporaneous duplicate transmission, and not from any stored or reassembled record created after transmission. In the alternative, and in any event, each Tracker read and processed the contents of Plaintiff's communications in real time, during the same page-load and transmission window in which those communications were transmitted between Plaintiff's browser and the Website.

88.    Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL contents for audience segmentation and ad targeting, and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website.

89.    In the alternative, and to the extent Defendant is itself deemed a party to the communications at issue, Defendant aided, agreed with, employed, and conspired with the Trackers to read, attempt to read, and learn the contents of Plaintiff's and Class members' electronic communications with the Website while those communications were in transit, in real time, and to use the information so obtained, within the meaning of Cal. Penal Code § 631(a).

90.    Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

91.    Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX.    SECOND CAUSE OF ACTION

## Violations of 18 U.S.C. § 2511(1)(a)

### *By Plaintiff and the Class Members Against All Defendants*

92.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

93.    Plaintiff brings this cause of action on behalf of herself and the Class.

94.    18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

95.    The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the tracking code Defendant embedded and configured caused those URL contents to be duplicated and transmitted to each Tracker contemporaneously with, and during, the transmission of Plaintiff's communications with the Website, in real time and before the page request completed, such that the Trackers acquired the contents while the communications were in transit, and not from storage.

96.    In the alternative, and in any event, each Tracker read and processed the contents of Plaintiff's communications in real time, during the same page-load and transmission window in which those communications were transmitted between Plaintiff's browser and the Website.

97.    Defendant intentionally configured its website to transmit Plaintiff's and

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. In the alternative, and to the extent Defendant is itself deemed a party to the communications at issue, Defendant aided, agreed with, employed, and conspired with the Trackers to intercept the contents of Plaintiff's and Class members' electronic communications with the Website while those communications were in transit, in real time, within the meaning of 18 U.S.C. § 2511(1)(a). Plaintiff and Class members did not consent to this interception, and no other exception applies.

98. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X.   THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### *By Plaintiff and the Class Members Against All Defendants*

99. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

100. Plaintiff brings this cause of action on behalf of herself and the Class.

101. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

102. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under §

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

17200.

103. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' visitors' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members.

104. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Each Tracker enabled by Defendant used that intercepted URL content to build behavioral profiles and to participate in real-time bidding auctions in which advertisers pay measurable clearing prices for access to audiences identified by precisely this kind of browsing activity.

105. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

106. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California

31

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Code of Civil Procedure § 1021.5.

## XI.    FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### *By Plaintiff and the Class Members Against All Defendants*

107.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

108.    Plaintiff brings this cause of action on behalf of herself and the Class.

109.    Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

110.    Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

111.    Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a personal banking and financial services website does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

112.    Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff's and Class Members' electronic communications and their transmission to Pinterest, Inc., LinkedIn Corporation, and X Corp., where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the personal banking and financial services website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

113.    As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII.    FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

#### *By Plaintiff and the Class Members Against All Defendants*

114.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

115.    Plaintiff brings this cause of action on behalf of herself and the Class.

116.    The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

117.    Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding three third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to Pinterest, Inc., LinkedIn Corporation, and X Corp. without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

33

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

118.   The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing on a personal banking and financial services website and transmitted it to three separate third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

119.   As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII.   SIXTH CAUSE OF ACTION

### Unjust Enrichment

### *By Plaintiff and the Class Members Against All Defendants*

120.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

121.   Plaintiff brings this cause of action on behalf of herself and the Class.

122.   Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

123.   Defendant received a benefit by permitting Pinterest, Inc., LinkedIn Corporation, and X Corp. to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value.

34

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

124.   Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

125.   It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

126.   Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;

3. An order enjoining Defendant from continuing the conduct alleged herein;

4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

violation;

5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6. Punitive damages pursuant to 18 U.S.C. § 2520;

7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9. Compensatory and nominal damages for intrusion upon seclusion;

10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;

12. Reasonable attorney's fees and costs; and

13. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   July 1, 2026        **LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

/ / /

/ / /

36

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED