JONES DAY

Amanda Fitzsimmons*, Bar No. 258888
*Designation of Counsel for Service
amandafitzsimmons@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, CA 92121.3134
Telephone: +1.858.314.1200
Facsimile: +1.844.345.3178

Nathaniel P. Garrett, Bar No. 248211
ngarrett@jonesday.com
555 California St., 26th Floor
San Francisco, CA 94104.1503
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700

Rebekah B. Kcehowski
*Pro hac vice* application forthcoming
rbkcehowski@jonesday.com
500 Grant St., No. 4500
Pittsburgh, PA 15219.2514
Telephone: +1.412.391.3939
Facsimile: +1.412.394.7959

Attorneys for Defendant
PNC BANK, NATIONAL ASSOCIATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SHAHD ERAKAT, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PNC BANK, NATIONAL ASSOCIATION,

Defendant.

Case No. 2:26-cv-01364

**DEFENDANT PNC BANK, N.A.'s NOTICE OF MOTION AND MOTION TO DISMISS**

Date: September 21, 2026
Time: 1:30 p.m.
Dept: Zoom conference
Judge: Hon. Dale A. Drozd

Amended Complaint filed: July 1, 2026

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE THAT on September 21, 2026 at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Dale A. Drozd, United States District Judge, Eastern District of California, during his standing Zoom motions hearing, Defendant PNC Bank, N.A. will, and hereby does, move for an order dismissing the First Amended Complaint (FAC) and each of the claims therein of Plaintiff Shahd Erakat under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing, Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief may be granted. The Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, all pleadings and papers on file in this matter, and such other and further evidence and argument as may be presented at the time of the hearing or otherwise.

PNC moves to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(1) on the ground that Plaintiff fails to allege a concrete injury-in-fact sufficient to confer Article III standing.

PNC moves to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(2) on the ground that the Court lacks personal jurisdiction over PNC because there is no general jurisdiction over PNC, an out-of-state corporation, and there is no specific jurisdiction because the FAC fails to allege facts demonstrating that the relevant behavior was knowingly aimed at this State.

PNC moves to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff fails to state: (1) a violation of Cal. Penal Code § 631(a); (2) a violation of 18 U.S.C. § 2511(1)(a); (3) a violation of Cal. Bus. & Prof. Code § 17200, *et seq.*; (4) a violation of California Constitution Art. I § 1; (5) a claim for intrusion upon seclusion; and (6) a claim for unjust enrichment. For each of these reasons, PNC's Motion should be granted.

Pursuant to the Court's standing order, Defendant submits this certification that meet and confer efforts have been exhausted. The parties met and conferred on several occasions regarding the allegations in the Complaint and the substance of contemplated motion practice but were unable to reach agreement on the issues addressed herein.

Dated: July 31, 2026

JONES DAY

By: */s/ Nathaniel P. Garrett*
Amanda Fitzsimmons
Nathaniel P. Garrett
Rebekah B. Kcehowski

Attorneys for Defendant
PNC BANK, NATIONAL ASSOCIATION

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

III. THE FAC SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING ..... 5

A. Plaintiff Has Not Alleged a Concrete Injury ..... 5

B. The Ninth Circuit's Decision in *Popa v. Microsoft* Confirms That Generic Browsing Data Does Not Confer Standing ..... 6

C. Plaintiff Lacks Standing to Seek Injunctive Relief ..... 9

IV. THE FAC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION ..... 10

A. PNC Has Not Purposefully Directed The At-Issue Conduct At California ..... 10

B. Multiple Courts Have Dismissed Pixel Cases for Lack of Jurisdiction ..... 11

C. Plaintiff Fails To Plead Any Other Basis For Personal Jurisdiction ..... 12

V. THE FAC FAILS TO STATE A CLAIM ..... 13

A. Count 1 (CIPA § 631(a)) Fails to State a Claim ..... 13

1. PNC Is a Direct Party to the Communications And Did Nothing to Aid or Abet Any Alleged Third-Party Violation ..... 14

2. The First Clause Does Not Apply to Internet Communications ..... 15

3. Plaintiff Fails To Allege Any Underlying Violation Of Clause Two ..... 15

4. The Rule of Lenity Requires Narrow Construction ..... 20

B. Count 2 (Federal Wiretap Act (18 U.S.C. § 2511)) Fails to State a Claim ..... 21

C. Count 3 (UCL (Cal. Bus. & Prof. Code § 17200)) Fails to State a Claim ..... 21

D. Count 4 (State Constitutional Privacy (Art. I, § 1)) Fails to State a Claim ..... 22

1. No Legally Protected Privacy Interest in Browsing Data ..... 22

2. No Reasonable Expectation of Privacy ..... 23

3. PNC's Conduct Does Not Constitute a "Serious Invasion" ..... 23

E. Count 5 (Intrusion Upon Seclusion) Fails to State a Claim ..... 24

F. Count 6 (Unjust Enrichment) Fails to State a Claim ..... 25

VI. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abuelhawa v. Santa Clara Univ.*,
529 F. Supp. 3d 1059 (N.D. Cal. 2021) .......... 25

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) .......... 8

*Archer v. United Rentals*,
195 Cal. App. 4th 807 (2011) .......... 22

*Arndt v. Gov't Emps. Ins. Co.*,
750 F. Supp. 3d 518 (D. Md. 2024) .......... 7, 8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 13

*Birdsall v. PNC Bank, N.A.*,
No. 2:26-cv-00078 (W.D. Pa. Mar. 23, 2026) .......... 1, 7

*Briskin v. Shopify, Inc.*,
135 F.4th 739 (9th Cir. 2025) .......... 1, 10, 11

*Bristol-Myers Squibb Co. v. Superior Ct.*,
582 U.S. 255 (2017) .......... 12

*Bunnell v. Mot. Picture Ass'n*,
567 F. Supp. 2d 1148 (C.D. Cal. 2007) .......... 19

*Butler v. U.S. Bancorp*,
2026 WL 883904 (D. Minn. Mar. 31, 2026) .......... 7

*Byars v. Hot Topic, Inc.*,
656 F. Supp. 3d 1051 (C.D. Cal. 2023) .......... 9, 13, 14

*Byars v. Sterling Jewelers, Inc.*,
2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) .................... 9

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................... 9

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) .................... 17

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .................... 10

*Dawidzik v. Tesla, Inc.*,
2025 WL 3786963 (C.D. Cal. Dec. 29, 2025) .................... passim

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) .................... 25

*Doe v. Eating Recovery*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) .................... 19, 20, 23, 25

*Erakat v. Skechers U.S.A., Inc.*,
No. 2:25-cv-03374 (E.D. Cal. Nov. 20, 2025) .................... 3

*Erakat v. U.S. Bank*,
No. 2:26-cv-01370 (E.D. Cal. Apr. 6, 2026) .................... 3

*Erakat v. Wells Fargo & Co.*,
No. 2:26-cv-01353 (E.D. Cal. Apr. 6, 2026) .................... 3

*Hale v. Morgan*,
22 Cal. 3d 388 (1978) .................... 20

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .................... 16, 17, 22

*Harrott v. County of Kings*,
25 Cal. 4th 1138 (2001) .................... 20

*Heiting v. Marriott Int'l, Inc.*,
743 F. Supp. 3d 1163 (C.D. Cal. 2024) .................... 11, 12

*Heiting v. Taro Pharms. USA, Inc.*,
709 F. Supp. 3d 1007 (C.D. Cal. 2023) .................................................................... 15

*Heiting v. Taro Pharms. USA, Inc.*,
728 F. Supp. 3d 1112, 1125 (C.D. Cal. 2024) ............................................................ 21

*Hernandez v. Hillsides*,
47 Cal. 4th 272 (2009) .............................................................................................. 24

*Herzer v. Redstone*,
2018 WL 5094933 (C.D. Cal. 2018)........................................................................... 21

*Hill v. NCAA*,
7 Cal. 4th 1 (1994) ............................................................................................. 22, 23

*Hughes v. Ben & Jerry's Homemade, Inc.*,
2025 WL 2306840 (Cal. Sup. Ct. Aug. 1, 2025) ..................................................... 11, 12

*In re Apple Processor Litig.*,
2023 WL 5950622 (9th Cir. Sept. 13, 2023) .............................................................. 25

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ....................................................................... 21

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) ....................................................................... 22

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2014)................................................................................... 16

*Jones v. Critchfield*,
803 F. Supp. 3d 1078 (D. Idaho 2025)........................................................................ 4

*Jones v. Tonal Sys., Inc.*,
751 F. Supp. 3d 1025 (S.D. Cal. 2024) ................................................................ 18, 22

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ................................................................. 21, 22

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ....................................................................... 8

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994) .......... 5
*Konop v. Hawaiian Airlines*,
302 F.3d 868 (9th Cir. 2022) .......... 17
*Melchior v. New Line Prods., Inc.*,
106 Cal. App. 4th 779 (2003) .......... 25
*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (C.D. Cal. 2024) .......... 9, 17
*Mitchener v. CuriosityStream*,
815 F. Supp. 3d 845 (N.D. Cal. 2025) .......... 7, 23
*Moody v. Textron Inc.*,
2025 WL 2828109 (C.D. Cal. Sep. 24, 2025) .......... 11
*Nacarino v. KSF Acquisition Corp.*,
642 F. Supp. 3d 1074 (N.D. Cal. 2022) .......... 25
*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... passim
*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .......... 14
*Rodriguez v. Autotrader.com*,
2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) .......... 9
*Rodriguez v. Ford Motor Co.*,
722 F. Supp. 3d 1104 (S.D. Cal. 2024) .......... 15
*Rodriguez v. Google*,
2022 WL 214552 (N.D. Cal. Jan. 25, 2022) .......... 20
*Rounds v. Case-Mate, Inc.*,
2025 WL 1873999 (C.D. Cal. July 2, 2025) .......... 11
*Shah v. Hilton Worldwide Holdings Inc.*,
2025 WL 1683577 (N.D. Cal. June 11, 2025) .......... 11

*Sisti v. Bosley*,
2026 WL 1223927 (C.D. Cal. Apr. 27, 2026) .... 8

*Smith v. YETI Coolers, LLC*,
754 F. Supp. 3d 933 (N.D. Cal. 2024) .... 14

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) .... 25

*Thomas v. Papa Johns Int'l, Inc.*,
2024 WL 2060140 (S.D. Cal. May 8, 2024) .... 23, 24

*Torres v. Prudential Fin.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) .... 19

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .... 1, 5, 6

*United States v. Rosenow*,
50 F.4th 715 (9th Cir. 2022) .... 24

*United States v. Steiger*,
318 F.3d 1039 (11th Cir. 2003) .... 17

*Williams v. DDR Media, LLC*,
757 F. Supp. 3d 989 (N.D. Cal. 2024) .... 19

*Williams v. What If Holdings, LLC*,
2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) .... 15

*Wooten v. BioLife Plasma Servs. L.P.*,
807 F. Supp. 3d 1139 (E.D. Cal. 2025) .... 8

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .... 16, 22, 24

**STATUTES**

18 U.S.C. § 2510 .... 16

18 U.S.C. § 2511 .... 1, 4, 21

Cal. Bus. & Prof. Code § 17200 .... 1, 4, 21

Cal. Bus. & Prof. Code § 17204 ........................................................................ 21

Cal. Penal Code § 631 ........................................................................................ passim

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Shahd Erakat ("Plaintiff") read four free articles on a bank's website—and now presses six causes of action and seeks sweeping relief for a statewide class. This is her second attempt to turn that non-event into a class-action lawsuit against PNC Bank, N.A. ("PNC"), and the First Amended Complaint ("FAC") fares no better than the original. It fails on at least three independent grounds, and the Court should dismiss it in its entirety.

***First***, Plaintiff has no standing to sue. The FAC alleges only that, while she browsed publicly available articles about debt consolidation on PNC's website, standard analytics tools transmitted page URLs and generic identifiers about her visit to third-party platforms. That is not an injury—it is the digital equivalent of a store clerk observing which aisle a customer walked down. Under *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025), "monitoring of [a plaintiff's] interactions with [a defendant's] website," without more, does not cause "harm that is remotely similar" to what was "actionable at common law," and it does not confer standing—least of all for a serial plaintiff like Erakat. She never logged into an account, never submitted personal information, and never filled out a form. She read articles that anyone on the internet could read, the online equivalent of picking up a pamphlet at a bank branch. Crediting her theory would hand Article III standing to virtually every person who has ever visited a commercial website, a result no court has ever countenanced. *See id.* at 792 (such a "broad theory … does not align with" the Supreme Court's instruction in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)). A federal court in Pennsylvania already rejected standing for the same claims against PNC—and this Court should do the same. *See Birdsall v. PNC Bank, N.A.*, No. 2:26-cv-00078 (W.D. Pa. Mar. 23, 2026), Dkt. 21 (attached).

***Second***, the Court lacks personal jurisdiction over PNC. The Ninth Circuit's en banc decision in *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025), requires proof that PNC purposefully directed the at-issue conduct at California—for example, by using geolocation technology to identify a user's location in California and then deploying additional online tools knowing the user is in California. *Id.* at 745–47, 756. PNC did none of that, and the FAC alleges

otherwise. PNC is headquartered in Pennsylvania. (FAC ¶ 22.) By the FAC's own telling, the at-issue analytics code fired "before the requested page finished rendering" (FAC ¶ 17)—that is, before PNC could have known where the visitor was located. The FAC's new "page-load process" allegations (FAC ¶ 11) only confirm that the tools fire automatically and uniformly for every visitor, everywhere. Nothing suggests PNC used geolocation or *ever* actually learned that Plaintiff was in California in order to aim its conduct there. That is the opposite of the purposeful direction *Briskin* requires, and courts have dismissed materially identical claims.

***Third***, even if the Court had jurisdiction, every cause of action fails on the merits. None can overcome two basic facts: Plaintiff voluntarily browsed public webpages, and the only data allegedly transmitted was generic routing information—URLs, session identifiers, and visitor tags—that reveals nothing private about anyone. The CIPA claim (Count 1) fails five times over: PNC is a party to communications on its own website and cannot "eavesdrop" on itself; the data transmitted is routing information, not "contents"; there is no "in transit" interception and no "reading" of any contents "in transit"; and the rule of lenity forecloses Plaintiff's expansive reading of a decades-old criminal statute. The Federal Wiretap Act claim (Count 2) fails for the same reasons and, independently, because one-party consent defeats it as a matter of law. The UCL claim (Count 3) fails for the same reasons, and also because Plaintiff lost no money or property. The California constitutional privacy (Count 4) and intrusion upon seclusion (Count 5) claims both fail because no reasonable person expects anonymity while browsing a public website, and using industry-standard analytics tools is neither "highly offensive" nor an "egregious breach of social norms." The unjust enrichment claim (Count 6) fails because California does not recognize it as a standalone cause of action.

Crediting Plaintiff's theories would criminalize the way nearly every commercial website in America operates. The Court should dismiss this action.

## II. BACKGROUND

Strip away the rhetoric and the key allegations in this case are simple: a California resident spent a few minutes reading free articles on a bank's website—content anyone could access without creating an account, entering a password, or handing over a shred of personal information—and

now presses six claims seeking sweeping relief because that website used standard online analytics tools. The facts below, drawn from the FAC and accepted only for purposes of this Motion, confirm that this lawsuit belongs nowhere near federal court and fails on the merits regardless.

**A. The Parties**

PNC is a banking association headquartered in Pittsburgh, Pennsylvania. (FAC ¶ 22.) Its website, www.pnc.com, is open to anyone with an internet connection, and offers a range of information about banking products, personal finance, and financial management tools. (FAC ¶¶ 21–24.)

Plaintiff Shahd Erakat is a California citizen (FAC ¶ 20) and a serial litigant in digital privacy cases. In November 2025, Plaintiff sued Skechers U.S.A., Inc. alleging that Skechers "surreptitiously installs and operates tracking software on [its] Website without providing users … adequate notice," with dozens of paragraphs in her complaint about website "pixel trackers" and their use across the internet. *See Erakat v. Skechers U.S.A., Inc.*, No. 2:25-cv-03374 (E.D. Cal. Nov. 20, 2025), Dkt. 1. The same day she sued PNC, Plaintiff filed a materially identical complaint against Wells Fargo, alleging a visit to debt-related pages on its website five weeks before she visited PNC's site. *See Erakat v. Wells Fargo & Co.*, No. 2:26-cv-01353 (E.D. Cal. Apr. 6, 2026). And another Erakat family member represented by the same lawyers filed a cut-and-paste lawsuit against U.S. Bank, alleging a visit to its website roughly a week before Plaintiff's visit to PNC's site. *See Erakat v. U.S. Bank*, No. 2:26-cv-01370 (E.D. Cal. Apr. 6, 2026). Plaintiffs voluntarily dismissed each of those lawsuits less than three months after filing.

**B. Plaintiff's Alleged PNC Website Visit**

On a single occasion—March 2, 2026—Plaintiff visited PNC's public website and browsed four pages of generic personal finance content. (FAC ¶¶ 3, 20.) She did not log in, create an account, apply for a loan, or access any banking service. She entered no name, Social Security number, financial information, or any other personal data. She simply accessed free articles available to anyone on earth at the URLs below:

- https://www.pnc.com/insights/personal-finance/borrow/should-i-use-a-personal-loan-to-pay-off-my-credit-card-debt.html

- https://www.pnc.com/insights/personal-finance/borrow/smart-ways-to-start-paying-down-debt-in-the-new-year.html
- https://www.pnc.com/insights/tagged-results.html?tagId=pnc-thought-leadership:subhub-topic-sub-topic/personal-finance/borrow/debt-consolidation
- https://www.pnc.com/insights/search-results.html?q=Debt

(FAC ¶ 3.) That is the entirety of Plaintiff's interaction with PNC. She communicated nothing private or personal—she simply visited a few webpages.

**C. The Alleged Online Technologies**

The FAC identifies three third-party analytics tools allegedly deployed on PNC's website: (1) the Pinterest Conversion Tag; (2) the LinkedIn Insight Tag; and (3) the Twitter/X Pixel—standard, widely deployed online measurement tools used by millions of websites across every industry. (FAC ¶¶ 9–10, 16, 76.) Plaintiff alleges that when she loaded PNC's webpages, these tools automatically transmitted technical data—URLs, titles, session-level identifiers, and persistent visitor identifiers—to the respective third-party platforms. (*Id.* ¶¶ 45–77.) The FAC claims that PNC's website displayed no consent banner (FAC ¶ 18), but fails to allege that Plaintiff ever *rejected* cookies, configured her browser to block tracking, or took any step to signal an objection to everyday website analytics.

Critically, the FAC's own allegations assert that these tools deploy automatically and uniformly to every visitor, regardless of location. The pixels' code "executed contemporaneously with each page load" and fired "before the requested page finished rendering." (FAC ¶ 17.) Plaintiff herself thus alleges that the tools activated automatically when any person, anywhere, requested a page—before PNC could possibly know the visitor's location.

**D. Procedural Background**

Purportedly concerned that the collection of these four URLs was an "invasion of privacy," Plaintiff filed this putative class action on April 6, 2026 in her own name—without any attempt to hide her identity—alleging publicly that she visited those URLs. *See Jones v. Critchfield*, 803 F. Supp. 3d 1078, 1087 (D. Idaho 2025) (noting the Ninth Circuit's "lenient approach to pseudonyms").

She asserts six causes of action: (1) violation of California Penal Code § 631 (CIPA); (2) violation of 18 U.S.C. § 2511(1)(a) (Federal Wiretap Act); (3) violation of California Business &

Professions Code § 17200 (UCL); (4) violation of the California Constitution, Article I, § 1; (5) intrusion upon seclusion; and (6) unjust enrichment. The parties then "met and conferred regarding the allegations in the Complaint and the substance of contemplated motion practice." *See* Dkt. 11 at 2 (Stipulation). On July 1, 2026, "and as a result of those meet-and-confer discussions," *id.*, Plaintiff filed the FAC, realleging the same six causes of action and adding allegations—a conclusory assertion of Article III standing (FAC ¶ 34), additional injury allegations (FAC ¶¶ 41–44), a new alternative aiding-and-abetting theory (FAC ¶¶ 89, 97), and more technical detail about the pixels' JavaScript code (FAC ¶¶ 49–50, 61–62). None of these amendments fix the fundamental defects in Plaintiff's claims. Each claim still rests on the same core allegation: that standard analytics tools transmitted generic data to third-party platforms. The FAC seeks statutory damages of $5,000 per violation under CIPA and up to $10,000 per violation under the Wiretap Act—all for routine operation of a commercial website. (FAC, Prayer ¶¶ 4–5.)

## III. THE FAC SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING

This Court lacks subject matter jurisdiction because Plaintiff has failed to allege a concrete injury. "Federal courts are courts of limited jurisdiction," and the "party asserting jurisdiction" bears the burden of establishing it. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Article III standing requires "(i) . . . an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) . . . would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. A statutory violation alone "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm." *Id.* at 426. "[A]n injury in law is not an injury in fact." *Id.* at 427.

### A. Plaintiff Has Not Alleged a Concrete Injury

The concreteness inquiry is demanding. The "central" question is "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* at 424. A plaintiff must identify a "close historical or common-law analogue for their asserted injury." *Id.* at 424–25. Privacy claims like these are measured against the traditional common law privacy torts that require a "highly offensive" invasion into the privacy of a "reasonable person." *See Popa*, 153 F.4th at 791 (discussing intrusion

upon seclusion and public disclosure of private facts) (citing Restatement (Second) of Torts §§ 652D).

Plaintiff's allegations fail that test. She does not allege disclosure of any intimate or offensive personal fact—only that she voluntarily visited a public website about debt management and read content available to anyone on the internet. *Id.* (no "embarrassing, invasive, or otherwise private information"). Allegedly transmitting URLs and other generic data to third parties is not a harm "'traditionally' recognized as … a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424.

The FAC's new, conclusory assertion that "CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing" (FAC ¶ 34) is wrong as a matter of law. A statutory violation is never enough on its own, no matter how "substantive" Plaintiff calls the statute. The Ninth Circuit said as much: such arguments "find[] no support in *TransUnion*." *Popa*, 153 F.4th at 794; *Dawidzik v. Tesla, Inc.*, 2025 WL 3786963, at *3 (C.D. Cal. Dec. 29, 2025) (same). Because the FAC adds no claimed facts beyond the same routine analytics allegations addressed throughout this brief, this new label changes nothing.

### B. The Ninth Circuit's Decision in *Popa v. Microsoft* Confirms That Generic Browsing Data Does Not Confer Standing

*Popa* controls, and it forecloses standing here. *Popa* held that "monitoring of [a Plaintiff's] interactions with [a] website" by itself is not the "highly offensive" injury standing requires. 153 F.4th at 791. The *Popa* plaintiff alleged something far more invasive than this case: session-reply technology that tracked not just "URLs of web pages visited," but mouse movements, clicks, scrolls, and keystrokes—"recreat[ing]" the "entire visit to the website," down to where "her mouse [was] hover[ing]." *Id.* Even that did not confer standing. Here, Plaintiff alleges only the transmission of less revealing and less intrusive page URLs and generic identifiers. (FAC ¶ 41.) If granular behavioral tracking could not create an injury in *Popa*, the alleged generic URL logging cannot create one here.

District courts have followed *Popa*'s lead and dismissed similar pixel claims for lack of standing. In *Dawidzik*—brought by Plaintiff's counsel against another website operator deploying the same Twitter pixel—the court held that IP addresses, browser metadata, and URL page-visit data implicate no cognizable privacy interest under *TransUnion* and *Popa*. 2025 WL 3786963 at *5. Similarly, in *Birdsall v. PNC*, No. 2:26-cv-00078 (W.D. Pa. Mar. 23, 2026), Dkt. 21 (attached), the court found no Article III standing on claims against PNC arising from the use of the same LinkedIn Insight Tag at issue here. Numerous courts agree.[1] The mere logging of publicly accessible web addresses cannot support standing.

To avoid that conclusion, the FAC (at ¶ 43) argues that this case is different because the articles Plaintiff visited on March 2 concerned debt consolidation. This case is not different. The subject matter here does not transform the alleged routine website monitoring into a "highly offensive" intrusion. *Popa* rejected a "broad theory [of] common law protected privacy rights—pitched at a high level of generality" as inconsistent with *TransUnion*, and instead demanded a comparison to specific common law privacy torts. 153 F.4th at 792. Applying that comparison, the court found that "tracking of [plaintiff's] … interactions with the … website" was not "remotely similar" to a "'highly offensive'" interference "actionable at common law." *Id.* at 791. That conduct, the court explained, "seems most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular"—an ordinary feature of commercial life that inflicts no cognizable injury. *Id.* at 791. It is not "remotely" close to the offensive intrusions that create a concrete privacy harm—for example, "taking intimate pictures" through a bedroom window. *Id.* (quoting Restatement (Second) of Torts § 652B cmt. b, illus. 2).

Reading publicly available debt-management advice reveals nothing stigmatizing or sensitive about Plaintiff—not whether she has debt, let alone its amount or nature. (FAC ¶ 43.)

[1] *See, e.g.*, *Arndt v. Gov't Emps. Ins. Co.*, 750 F. Supp. 3d 518, 528 (D. Md. 2024) ("Plaintiff cannot establish a concrete injury based on Defendant's alleged collection of mere website activity, such as mouse movements, keystrokes and clicks, search terms, or content viewed by Plaintiff on Defendant's website," comparing this to "public shopping behavior in the physical world"); *Butler v. U.S. Bancorp*, 2026 WL 883904, at *4 (D. Minn. Mar. 31, 2026) (no standing without some allegations of "personal information they inputted"); *see also Mitchener v. CuriosityStream*, 815 F. Supp. 3d 845, 851 (N.D. Cal. 2025) (no standing for claims based on TikTok software capture of, *inter alia*, "referral tracking, and URL tracking").

She could have visited those pages for any reason unrelated to her own finances—research for a friend or relative, or simple curiosity. *See Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780, 801–02 (N.D. Tex. 2024) (rejecting argument that visiting healthcare website transforms visit metadata into "individually identifiable health information"). And even if Plaintiff were looking for herself, there is nothing stigmatizing about debt consolidation. Approximately 77.4% of Americans have debt, the undersigned included. Board of Governors of the Federal Reserve System, *Changes in U.S. Family Finances from 2019 to 2022* at 25 (Oct. 2023), *available at* https://www.federalreserve.gov/publications/files/scf23.pdf. Debt consolidation and other financial approaches can be a responsible method of paying down the debt that most of us carry; that is why PNC publishes articles about it. Plaintiff's visit to PNC's publicly accessible debt-management pages cannot establish the type of "highly offensive" intrusion required to demonstrate concrete harm under *Popa* and *TransUnion*.

*Sisti v. Bosley* demonstrates the point. 2026 WL 1223927, at *3 (C.D. Cal. Apr. 27, 2026). There, the plaintiff alleged pixels captured the submission of a scheduling form on a surgical hair-loss website. *Id.* at *1. The plaintiff did not allege that any personal information was captured, just "'the fact' that [the plaintiff] filled out [the] scheduler form." *Id.* at *3. *Sisti* rejected out of hand that the submission of the form itself (or speculative inferences drawn from that submission) was sensitive "health data" about a plaintiff sufficient for concrete harm and standing. *Id.* The URLs visited by Plaintiff here similarly provide no information about her at all, *see Arndt*, 750 F. Supp. 3d at 528 ("[C]ollection of … content viewed by Plaintiff on Defendant's website … does not convey any personal, private, or identifying information.")—let alone a "highly offensive" intrusion on the level of "intimate pictures" through a bedroom window. *Popa*, 153 F.4th at 791; *see also Wooten v. BioLife Plasma Servs. L.P.*, 807 F. Supp. 3d 1139, 1144 (E.D. Cal. 2025) (dismissing case related to blood donations as not "highly offensive"); *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1182 (N.D. Cal. 2025) (no "disclosure of information that implicates a legally protected privacy interest" in visiting a political news site).

The FAC's characterization of the debt-related URLs as "materially different in character from mouse movements, scrolling, click positions, and other non-substantive browsing data" and

"closely analogous to the harms recognized at common law by the torts of intrusion upon seclusion and eavesdropping" (FAC ¶¶ 42–43) changes nothing. It is a legal conclusion dressed up as fact. The underlying facts remain the same as in the original complaint: Plaintiff read publicly available articles about debt management and a debt-consolidation calculator, content available to any visitor without logging in or submitting any information. (FAC ¶¶ 3, 20.) Reading generic advice about debt management reveals nothing about Plaintiff's actual finances, and it is not "closely analogous" to any common law tort recognized in *Popa*.

All of this is particularly true for a serial privacy plaintiff like Erakat. That she filed other pixel-related claims—against Skechers based on an earlier website visit, and against Wells Fargo the same day she sued PNC—"casts doubt on any suggestion that she was surprised" by the alleged operation of PNC's website upon her later visit. *Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686, at *3 n.4 (C.D. Cal. Apr. 5, 2023); *see also Byars v. Hot Topic, Inc.*, 656 F. Supp. 3d 1051, 1059 (C.D. Cal. 2023) (describing plaintiff and her counsel as "serial litigants bringing numerous 'cookie cutter' lawsuits under CIPA"). Publicly filing multiple cases alleging visits to debt-related websites in her own name also casts doubt on the suggestion that she had a reasonable expectation of privacy in those facts. Indeed, a plaintiff who interacts with websites "expecting the information to be accessed . . . cannot claim injury when her expectations are ultimately met." *Rodriguez v. Autotrader.com,* 2025 WL 1085787, at *1 (C.D. Cal. Apr. 4, 2025).

### C. Plaintiff Lacks Standing to Seek Injunctive Relief

Plaintiff also lacks standing to seek injunctive relief. That requires a "real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Plaintiff does not allege she intends to return to PNC's website, and even if she did, "continued use of [PNC's] website, now that Plaintiff has notice of" PNC's analytics tools, "would constitute consent" to those practices. *Mikulsky v. Bloomingdale's, LLC*, 713 F. Supp. 3d 833, 846 (C.D. Cal. 2024). Absent a showing of likely future harm, injunctive relief is off the table. Any such requested relief should be dismissed with prejudice.

## IV. THE FAC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

Even if Plaintiff had standing, the FAC fails for a second, independent reason: the Court lacks personal jurisdiction over PNC. PNC is not "at home" in California for general jurisdiction—it is headquartered in Pittsburgh, Pennsylvania (FAC ¶ 22). *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Plaintiff must therefore establish *specific* jurisdiction, which requires: (1) that PNC "purposefully direct[ed]" its activities at California; (2) that the claim arises out of or relates to those forum-related activities; and (3) that jurisdiction would be reasonable. *Briskin*, 135 F.4th at 750–51. For tort claims, the "purposeful direction analysis" asks whether the defendant committed (1) an intentional act (2) "expressly aimed at the forum state," (3) causing harm "the defendant knows will be suffered in the forum state." *Id.* at 751. And in the context of the internet, "'something more' than just a foreseeable effect" in the state is required. *Id.* at 753. Plaintiff bears the burden of demonstrating "purposeful direction," *id.* at 751, and Plaintiff does not clear that bar.

### A. PNC Has Not Purposefully Directed The At-Issue Conduct At California

*Briskin* governs personal jurisdiction in digital privacy cases in this Circuit, and it compels dismissal here. *Briskin* held that courts "do not look only to where [a plaintiff] was located at the time" of a website visit, but must also ask whether the defendant's conduct at issue was "expressly aimed at California or its residents" or was "mere happenstance arising from the California consumers' choice" to interact with a widely accessible website. *Id.* at 752, 756 & n.12 ("mere passive nationwide accessibility" insufficient). The Ninth Circuit found jurisdiction over Shopify on a specific and unusual set of facts: Shopify operates as a hidden intermediary in purchase transactions and sells data on "consumers for its own commercial gain." *Id.* at 756. The moment a person "first view[s]" an item on a merchant's website, Shopify "install[s] tracking cookies …, enabling it to track" a consumer, including with "geolocation data." *Id.* at 747–48. At that point, based on the geolocation data, Shopify "kn[ows] that the consumer is in California." *Id.* at 756 n.13. Then, later, when a consumer actually buys the item, Shopify processes the payments and gathers additional personal information, all while "knowing [the] device was in California." *Id.* at 756 n.12. Because—and only because—Shopify "knew the location of consumers" before transacting payments did the court find express aiming sufficient for jurisdiction. *Id.* at 756 & n.13.

PNC's circumstances are the opposite of *Briskin*'s in every material respect. PNC is not alleged to use geolocation technology to identify visitors' locations at any point. Instead, the FAC's own allegations seal the jurisdictional deficiency: the pixels' code "executed contemporaneously with each page load" and fired "before the requested page finished rendering." (FAC ¶ 17.) That means the tools activated *automatically* and uniformly to *every visitor anywhere*—before PNC had any opportunity to learn the visitor's location, let alone aim conduct at them knowing they were in California. *Briskin*'s jurisdictional finding turned on Shopify's use of geolocation technology to pinpoint the plaintiff's California location *before* payment processing and subsequent data use. *See* 135 F.4th at 756 & nn.12–13. Here, the reverse is alleged to be true: the analytics code fired before it could know anything about Plaintiff's whereabouts. A defendant cannot "expressly aim" alleged online conduct at California before knowing the user was in California.

**B. Multiple Courts Have Dismissed Pixel Cases for Lack of Jurisdiction**

Courts before and after *Briskin* have dismissed nearly identical pixel claims for lack of personal jurisdiction. *See, e.g., Shah v. Hilton Worldwide Holdings Inc.*, 2025 WL 1683577, at *2 (N.D. Cal. June 11, 2025) (no personal jurisdiction where "[t]here are no allegations that Hilton Holdings knew the location of particular devices"); *Rounds v. Case-Mate, Inc.*, 2025 WL 1873999, at *7–8 (C.D. Cal. 2025) (no jurisdiction over TikTok pixel claims); *Moody v. Textron Inc.*, 2025 WL 2828109 (C.D. Cal. Sep. 24, 2025) (similar); *Heiting v. Marriott Int'l, Inc.*, 743 F. Supp. 3d 1163, 1171–72 (C.D. Cal. 2024) (similar); *Hughes v. Ben & Jerry's Homemade, Inc.*, 2025 WL 2306840, at *4 (Cal. Sup. Ct. Aug. 1, 2025) ("Nothing in the Complaint suggests that Defendant's contact with California did not merely arise when a California consumer sought information from Defendant….").

*Shah* is particularly instructive. Distinguishing *Briskin*, the court explained that "[t]here are no allegations that Hilton Holdings knew the location of particular devices" and "no allegations that Hilton Holdings compiled data on any particular California consumer and 'marketed' that profile to California merchants." 2025 WL 1683577, at *2 (noting that even references to California in a privacy statement on the Hilton website did not "establish … jurisdiction"). That reasoning applies with full force here. PNC is a Pennsylvania-based bank that is not alleged to use

geolocation data or operate a business model around extracting and exploiting California consumers' personal website-related information. Its alleged use of standard analytics tools on a publicly accessible banking website is indistinguishable from the conduct that *Shah*, *Rounds*, *Moody, Heiting*, and *Hughes* all found insufficient for personal jurisdiction.

**C. Plaintiff Fails To Plead Any Other Basis For Personal Jurisdiction**

The FAC attempts to bootstrap personal jurisdiction by pointing to unrelated banking activity and third-party vendor relationships. Neither supports personal jurisdiction here.

PNC's other California activities do not create the requisite specific personal jurisdiction. Plaintiff alleges that "PNC Bank has cultivated California as a significant banking market" and "operates retail banking branches through California." (FAC ¶¶ 25–26.) That is beside the point. Specific jurisdiction requires a connection between "'the forum and the underlying controversy,' not all of [PNC's] conduct in California." *Heiting*, 743 F. Supp. 3d at 1170–71 (quoting *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017)). "[T]he contacts from which the alleged harm arose" here are PNC's alleged "role in operating the website," not its retail banking market or bank branches. *Id.* at 1171.

Nor do third-party vendor relationships create jurisdiction. Plaintiff points to the California headquarters of Pinterest (San Francisco), LinkedIn (Sunnyvale), and X Corp. (historically San Francisco). (FAC ¶ 26; *see also id.* ¶ 27 (alleging these companies use infrastructure and have servers in California).) This argument has been squarely rejected. In *Rounds*, the court held that "jurisdiction must arise out of the contacts that 'defendant himself creates with the forum state,' and not defendant's contacts with entities that do business or reside there." 2025 WL 1873999, at *7; *see also Hughes*, 2025 WL 2306840, at *4 ("Defendant's only real nexus to California is the fact that TikTok is a California-based company, but this fact alone is insufficient to show purposeful availment by Defendant."). The defendant's jurisdictional contacts must be its *own*, not those of its vendors. The fact that PNC's vendors happen to be headquartered and have servers in California does not subject PNC to jurisdiction there any more than a company's use of a California-based cloud provider would. *See Rounds*, 2025 WL 1873999, at *7 (third-party pixel company's headquarters "irrelevant to the jurisdictional inquiry").

## V. THE FAC FAILS TO STATE A CLAIM

Even if the Court had both subject matter and personal jurisdiction—it has neither—the FAC fails to state a plausible claim on any of its six causes of action. A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Count 1 (CIPA § 631(a)) Fails to State a Claim

Section 631(a) is a criminal statute enacted in 1967 to stop surreptitious telephone wiretapping. It was never designed for, and does not reach, the routine operation of analytics tools on a commercial website. The relevant provision contains four clauses. Cal. Penal Code § 631(a). The first three clauses require plaintiffs to show a defendant: (1) "intentionally taps, or makes any unauthorized connection … with any telegraph or telephone wire, line, cable or instrument"; (2) "willfully and without the consent of all parties … reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit …"; or (3) "uses, or attempts to use … information so obtained" through activity prohibited in clauses one and two. Cal. Penal Code § 631(a). But a party to the at-issue communication is not liable under these three clauses based on the well-established "direct party exemption." *See Byars*, 656 F. Supp. 3d at 1066–67. And, while the fourth clause creates some aiding-and-abetting liability, such claims fail without an underlying violation of the first three clauses. *Id.* (citing § 631(a)).

Plaintiff's CIPA claim thus fails multiple times over. First, PNC is a direct party to the communications so cannot "eavesdrop" on messages sent to itself, and the FAC fails to plausibly allege any facts demonstrating aiding and abetting. The Court's analysis can and should end there. But the FAC likewise fails to allege any underlying violation of the first three clauses. The first clause of § 631(a) does not apply to internet communications, and Plaintiff's claim under clauses two or three has multiple fundamental flaws, including: **(a)** the information allegedly transmitted is routing and addressing data, not protected "contents," and **(b)** the FAC's conclusory allegations do not establish that any third party read, attempted to read, or learned any contents of the relevant URL communications while they were "in transit" to their intended recipient (here, PNC). Finally,

CIPA is a criminal statute, and the rule of lenity compels narrow construction of its ambiguous provisions. Each ground independently warrants dismissal.

### 1. PNC Is a Direct Party to the Communications And Did Nothing to Aid or Abet Any Alleged Third-Party Violation

Section 631(a) targets "eavesdropping, or the secret monitoring of conversations by *third parties*." *Ribas v. Clark*, 38 Cal. 3d 355, 359 (1985) (emphasis added). It does not prohibit a *party* to a communication from processing that communication. PNC is the intended recipient of every HTTP request a visitor makes to www.pnc.com. The FAC itself alleges that Plaintiff navigated to PNC's website and browsed its pages (FAC ¶¶ 3, 20)—in other words, she communicated *with PNC*. Deploying analytics tools on its *own* website to analyze traffic directed *to PNC* is not "eavesdropping" any more than a homeowner reading mail delivered to her own mailbox is. *See Byars*, 656 F. Supp. 3d at 1065 (C.D. Cal. 2023) (acknowledging a "direct party exemption" from § 631). Any claim under the first three clauses fails to the extent it targets PNC's own actions. *Id.*

Anticipating this defect, the FAC pivots to an alternative aiding-and-abetting theory under clause four: that "to the extent Defendant is itself deemed a party to the communications at issue, Defendant aided, agreed with, employed, and conspired with the [third parties] to read, attempt to read, and learn the contents of Plaintiff's and Class members' electronic communications with the Website while those communications were in transit." (FAC ¶ 89; *see also id.* ¶ 97 (same, for the Wiretap Act).) That is a bare legal conclusion that recites the elements of aiding-and-abetting liability without a single supporting fact. Aiding-and-abetting liability under CIPA requires that "the defendant must be acting with the third party *in order to* have the third party perform acts that violate the statute." *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 942 (N.D. Cal. 2024) (dismissing CIPA claims). The FAC alleges nothing beyond PNC configuring its own website with third-party analytics tags—no agreement, no common design, no active step by PNC to help the third parties read communications for their own benefit, rather than PNC's traffic-measurement purposes. (*Cf.* FAC ¶ 88 (alleging the legal conclusion that PNC "permitted" third parties to use information for other purposes, without any active steps).) Courts reject aiding-and-abetting CIPA theories built on nothing more than the use of a third-party program, absent some plausible

allegation that the defendant acted "with knowledge or intent" to aid in CIPA violations. *See Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1017 (C.D. Cal. 2023) ("While the Complaint alleges that Defendant paid Genesys to intercept messages, it does not allege facts demonstrating Defendant acted with the requisite knowledge or intent to aid and abet Genesys's purported CIPA violation."); *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1124 (S.D. Cal. 2024) (dismissing aiding and abetting theory for failure to demonstrate with facts "knowledge of the unlawful purpose of the perpetrator"). The FAC claims PNC uses third-party software to "itself receive[] and use[] those URL contents for audience segmentation and ad targeting." (FAC ¶ 88.) No allegations of fact suggest PNC intended any other use. (FAC ¶¶ 88–89.)

PNC thus cannot be held liable as a party to the communications who has knowingly or intentionally aided any third party's violation of CIPA, but in any event, as the following sections show, Plaintiff has not alleged any underlying substantive violation in the first place.

**2. The First Clause Does Not Apply to Internet Communications**

The first clause of § 631(a) prohibits unauthorized connections to "any telegraph or telephone wire, line, cable, or instrument." Cal. Penal Code § 631(a). By its terms, "the first clause … concerns telephonic wiretapping specifically, which does not apply to the context of the internet." *Williams v. What If Holdings, LLC*, 2022 WL 17869275, at *2 (N.D. Cal. Dec. 22, 2022). Plaintiff's CIPA claim cannot proceed under the first clause.

**3. Plaintiff Fails To Allege Any Underlying Violation Of Clause Two**

Without a viable clause one claim, a substantive clause two violation is a necessary prerequisite to any remaining CIPA claim here. *See* Cal. Penal Code § 631(a) (clause three applies to information "so obtained" in clauses one and two; clause four prohibits aiding "any of the acts … mentioned above in this section"). The FAC's clause two claim fails for several reasons.

**(a) The Information Disclosed Is Record/Routing Information, Not "Contents"**

The second clause of § 631(a) applies only to the interception of "contents"—not to "record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (Federal Wiretap

Act). "Contents" means the "substance, purport, or meaning" of a communication—what the person *said*. "[R]ecord information" means the addressing and routing data that delivers the message without revealing its substance. *Id.*; *see also* 18 U.S.C. § 2510(8) (defining "contents" as "information concerning the substance, purport, or meaning of that communication").

The data Plaintiff alleges was transmitted—basic URLs, session identifiers, and persistent visitor identifiers—is record/routing information that does not disclose any communication's substance. The FAC alleges that the at-issue tools transmitted "the page URLs identifying what she was browsing, search terms, page titles and content categories associated with those URLs, and/or the referrer URLs reflecting prior navigation." (FAC ¶ 4.) A URL is an *address*—it tells a server which page to serve. *Zynga*, 750 F.3d at 1108–09 ("the address of the … webpage the user was viewing" "does not constitute the contents of a communication"). It is the digital equivalent of an envelope's address: it conveys which links were clicked, not the substance of any communication. The Ninth Circuit has held that "referer" URLs of this kind are "basic identification and address information"—"record information," not protected "contents"—because they do not include "communication[s] by the user." *In re Zynga*, 750 F.3d at 1108–09; *cf. Dawidzik*, 2025 WL 3786963, at *5 (holding that "referer" URLs "do not per se implicate a privacy interest" and constitute "record information" under *Zynga*). Session identifiers and persistent visitor identifiers are even more clearly routing data—arbitrary alphanumeric strings that identify a browser session, not the substance of any communication. *See Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092 (N.D. Cal. 2022) ("customer information such as a person's name, address, and subscriber number … is record information").

Courts consistently hold that this kind of navigational and behavioral metadata is not "contents." "Clicks" and "pages viewed" are not "contents" because they do not "constitute message content in the same way that the words of a text message or an email do." *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1082-83 (C.D. Cal. 2021). A click on a link has no "substance, purport, or meaning." *In re Zynga*, 750 F.3d at 1105; *see also Hammerling*, 615 F. Supp. 3d at 1092–93 ("URLs are record information" unlike "personal search engine queries" that "could provide 'significant information regarding the user[]'"); *Mikulsky*, 713 F. Supp. 3d at 845

("'[B]utton clicks, mouse movements, scrolling, resizing, . . . [and] network requests' are more akin to record information [than] the contents of an online communication."). Plaintiff's contrary theory would make *every* click and *every* HTTP request to *any* website a "communication" with protected "contents"—criminalizing the internet's basic functionality.

The FAC's allegation that a one-word query ("?q=Debt") was embedded in a URL does not change the analysis. There is no allegation that the contents of a search box were captured as such, only that a search-term artifact appeared at the end of a single URL. (*See* FAC ¶¶ 3–4 ("page URLs identifying… search terms").) A URL "search" like this is functionally identical to clicking a link for a page titled "Debt"—it tells the server which pages to serve. It does not convey any substantive communication between the user and the website. While some "search terms" for "specific information" may rise to "contents," *In re Zynga*, 750 F.3d at 1106–09, this one-word entry is more like browsing a website than sending a substantive communication. *See Hammerling*, 615 F. Supp. 3d at 1093 (requiring "significant information" about the user for a search to become "contents"); *Dawidzik*, 2025 WL 3786963, at *5 (similar).

**(b) Plaintiff Does Not Allege "In Transit" Interception**

The second clause of § 631(a) also requires that a third party "reads, or attempts to read … any … communication *while the same is in transit*"—an independent, dispositive requirement Plaintiff cannot satisfy. Her original Complaint alleged interception "in transit" only in conclusory form. (Compl. ¶¶ 36, 38, 43, 45, 50, 52.); *see Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1001 (N.D. Cal. 2024) (dismissing where allegations simply restated CIPA's requirement without specific facts showing real-time interception between sender and recipient). The FAC's attempted fix backfires: its new technical detail shows affirmatively that the relevant URLs *were not* intercepted "while … in transit" between Erakat and PNC. "In transit" plainly means "contemporaneous" with the communication—*i.e.*, between "being sent" and "received." *Cody*, 718 F. Supp. 3d at 1001; *see also Konop v. Hawaiian Airlines*, 302 F.3d 868, 878 (9th Cir. 2022) ("[I]t must be acquired during transmission, not while it is in electronic storage," applying identical Wiretap Act standard); *United States v. Steiger*, 318 F.3d 1039, 1048–50 (11th Cir. 2003) ("a contemporaneous interception—*i.e.*, an acquisition during 'flight'"). Strip away the technical jargon, and the FAC's own allegations

show that the relevant communications between Plaintiff and PNC—requests for "page URLs" related to debt (FAC ¶¶ 3–4)—started and completed before any pixel or tag did anything at all.

The FAC alleges that a single page load involves not one request and response but many separate "communications" that occur "sequentially." (FAC ¶ 11.) There is first a request for the page itself, then "numerous additional … requests" for "images," "fonts," and "analytics," such as the pixels and tags. (*Id.*) Figure 1 lists those communications. Line 1 shows the URL request for the relevant debt-related webpage, https://www.pnc.com/insights/search-results.html?q=Debt, and that communication finishes in "384 ms [milliseconds]." (FAC, Fig. 1, Line 1.) Under the commonsense meaning of the word, nothing that happens after that captures the URL "in transit" between Plaintiff and PNC. *See Jones v. Tonal Sys., Inc.*, 751 F. Supp. 3d 1025, 1036 (S.D. Cal. 2024) ("once a [communication] has been received by the destination server, a communication becomes 'stored' and contemporaneous interception is no longer possible").

After that communication is complete, the sequence continues: Separate requests for "fonts," "style sheets," and other resources (FAC ¶ 11), continue for line after line in Figure 1, but the at-issue third-party tools do not appear until line 31—almost a full second after the relevant page URL request fired and completed. (FAC, Fig. 1.) The FAC alleges the third-party software "read[s]" data like the location.href (*see* FAC ¶ 49), but by then the relevant communication is already complete, as Figure 1 shows. (FAC, Fig. 1, Line 1 (showing activity box for line 1 completes in "384 ms," with other communication boxes separately continuing thereafter).) The third-party code allegedly "reads the browser's *then-current*" URL and referrer URL information, "copies" it, and submits a request to third-party servers with that copy—in other words, they copy information from a completed communication and send that to third-party servers. (*See, e.g.*, FAC ¶ 49 (emphasis added).)[2] If a person has an ongoing text message conversation with a friend and her husband peeks at the phone, he has not read the first message in the chain "in transit."

[2] Paragraph 49 uses the technical names for where URL and referrer information is stored ("location.href" and "document.referrer") but makes clear that those values amount to "URL and referrer" information. (FAC ¶ 49; *see also* FAC ¶ 62 (noting that, for example, the LinkedIn code assigns "window.location.href" to the "url … field").)

Plaintiff tries to escape this problem by relabeling the page URL and every subsequent resource request as one "page-load process." (FAC ¶ 11.) But she never alleges that fonts, images, or anything else were transmitted to the third parties—only requests for "the page URLs identifying what she was browsing." (FAC ¶ 4; *see also id.* ¶¶ 45–47 & Figs. 2–3 (Pinterest allegedly "received the full URL" of the page plus "visitor identifier"); *id.* ¶¶ 57–59, 69–75 & Figs. 4–6 (same for LinkedIn and Twitter).) Only the URL at line 1 was ever transmitted—a "communication" that was not intercepted "while the same [was] in transit." Cal. Penal Code § 631(a).

Plaintiff's "in transit" argument ultimately depends on recasting the 99 separate communications in Figure 1 as a single "page load process." (FAC ¶ 61 (alleging LinkedIn tag reads the "then-current location" that has already fired as occurring "during the continuing page-load process"); *id.* ¶ 49 (similar for Pinterest); *id.* ¶ 75 (X).) But Plaintiff's "page load process" allegations say nothing about "how the technology works"; they merely assert legal conclusions about "how it should be characterized." *Doe v. Eating Recovery*, 806 F. Supp. 3d 1109, 1117 (N.D. Cal. 2025). On the FAC's own account, the third-party software unambiguously captures page URLs after the relevant communication is complete, not "in transit." *Id.* (transmission "0.2 seconds after the visitor's action" not "in transit"); *Bunnell v. Mot. Picture Ass'n*, 567 F. Supp. 2d 1148, 1154 (C.D. Cal. 2007) ("[F]orward[ing] messages in milliseconds or days, it makes no difference.").

**(c) Plaintiff Does Not Allege Any Third Party Attempted To Understand The Contents Of Her Communications "In Transit"**

Even adopting Plaintiff's "page-load process" for argument's sake, the clause two claim still fails. Whatever happens in that "page-load" window is not reading or an "attempt[] to read, or . . . learn the contents or meaning" of the communications—an independent element of a clause two claim that requires "some effort at understanding the substantive meaning of the message" during the "in transit" window. *Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989, 995 (N.D. Cal. 2024); *see also Torres v. Prudential Fin.*, 2025 WL 1135088, at *7 (N.D. Cal. Apr. 17, 2025) (even where a third party receives data contemporaneously, liability requires that it read, attempt to read, or learn the contents or meaning of the communication while in transit—not merely store it for later

analysis); *Eating Recovery*, 806 F. Supp. 3d at 1119 (same). The FAC alleges only that the pixels mechanically "cop[ied]" values from certain fields and "transmit[ted]" URL strings to Pinterest, LinkedIn, and X Corp. (FAC ¶ 49.) While Plaintiff mimics the legal standard by describing this as "read[ing]" and "learn[ing] contents," *id.*, copying values from certain fields "can't fairly be characterized as an effort at understanding the meaning of the communication." *Eating Recovery*, 806 F. Supp. 3d at 1117; *Rodriguez v. Google*, 2022 WL 214552, at *2 (N.D. Cal. Jan. 25, 2022) ("Using the word 'intercept' repeatedly is simply not enough without the addition of specific facts that make it plausible [the software] is intercepting the data in transit."). Indeed, the FAC alleges these data are later used for "audience segmentation and ad targeting" (FAC ¶ 88)—a description of downstream, after-the-fact commercial use, not an effort to understand the "substantive meaning" of Plaintiff's communications with PNC while those communications were still traveling to their destination. Because the FAC does not plausibly allege that any third party read or attempted to learn the substance of Plaintiff's communications while they were in transit—as opposed to receiving and later analyzing already-delivered URL strings—this independent element of Section 631(a) is not satisfied either.

**4. The Rule of Lenity Requires Narrow Construction**

CIPA is a criminal statute carrying imprisonment and fines. Cal. Penal Code § 631(a). "When courts are called upon to interpret ambiguous criminal statutes in California, the rule of lenity applies—even when the statute is being invoked in a civil action." *Eating Recovery*, 806 F. Supp. 3d at 1112 (citing *Harrott v. County of Kings*, 25 Cal. 4th 1138, 1154 (2001)). A similar principle applies to civil statutes that impose punitive civil penalties. *Hale v. Morgan*, 22 Cal. 3d 388, 401 (1978) ("narrowly constru[ing]" statutes that require civil penalties). "Did the Legislature really intend to subject companies … to criminal liability for using third-party software to track website activity? Did it really mean to criminalize the use of web traffic data?" 806 F. Supp. 3d at 1119. Under the rule of lenity, the answer is no—particularly since "[t]he Legislature has never, in over four decades, amended Section 631 to adapt its language to the digital age" and has instead enacted the California Consumer Privacy Act to address data sharing through separate, more tailored legislation. *Id.* "[U]sing a third-party company to perform data analytics for web traffic is

worlds different from … eavesdropping." *Id.* That is all Plaintiff alleges PNC did. Any ambiguity in CIPA's application must be read in PNC's favor.

**B. Count 2 (Federal Wiretap Act (18 U.S.C. § 2511)) Fails to State a Claim**

Plaintiff's Federal Wiretap Act claim fails based on the statute's one-party consent standard. It also fails for the same reasons as her CIPA claim, since the Wiretap Act claim "mirrors" CIPA on several issues, including the "in transit" requirement. *Heiting v. Taro Pharms.*, 728 F. Supp. 3d 1112, 1125 (C.D. Cal. 2024).

Unlike CIPA, the Federal Wiretap Act is a one-party consent statute. 18 U.S.C. § 2511(2)(d) ("one of the parties to the communication has given prior consent"). Consent is a "complete defense to a Wiretap Act claim." *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023). PNC is a *party* to every communication a user makes with www.pnc.com—the FAC alleges Plaintiff "accessed and used" PNC's website (FAC ¶ 1), making PNC the intended recipient of each HTTP request. PNC consented to the processing of communications on its own website through its allegedly chosen analytics tools. (*See* FAC ¶ 88.) That consent satisfies § 2511(2)(d). *See In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020) (dismissing Wiretap Act claim based on consent exception). Plaintiff has not invoked the "crime-tort" exception, 18 U.S.C. § 2511(2)(d), nor would it matter if she did. *See also id.* (exception does not apply without "secondary" tortious acts beyond the alleged wiretapping); *Katz-Lacabe*, 668 F. Supp. 3d at 945 (rejecting crime-tort exception where parties only intended "to make money"). Moreover, the exception requires a viable underlying tort, and if the Court dismisses Plaintiff's privacy tort claims—as it should—the crime-tort exception has no predicate. As to the new aiding-and-abetting theory, such "secondary liability is not recognized under the [Wiretap Act]." *Herzer v. Redstone*, 2018 WL 5094933, at *7 (C.D. Cal. 2018) (dismissing § 2511 claims).

**C. Count 3 (UCL (Cal. Bus. & Prof. Code § 17200)) Fails to State a Claim**

Plaintiff's UCL claim fails at the threshold because she lacks statutory standing. Private UCL plaintiffs must show they "suffered injury in fact and … lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. This requirement is "over and above the demands of Article III." *Katz-Lacabe*, 668 F. Supp. 3d at 940. "[C]ourts in this Circuit have not

extrapolated from the fact that a user's data has economic value to *someone* that its collection constitutes an economic loss to the user." *Jones*, 751 F. Supp. 3d at 1041 (dismissing with prejudice, collecting cases); *Katz-Lacabe*, 668 F. Supp. 3d at 940 ("mere misappropriation of personal information" is insufficient). Plaintiff does not allege she paid any money to PNC, parted with anything of tangible value, or suffered any economic loss. Browsing of free, publicly available articles involves no exchange of money or property. She cannot satisfy the UCL's economic injury requirement. *See Archer v. United Rentals*, 195 Cal. App. 4th 807, 816 (2011) (loss of privacy does not "translate[] into a loss of money or property").

In any event, Plaintiff's UCL claim would fail because it is based on the CIPA and Federal Wiretap Act claims (FAC ¶ 102) and fails with them. *See Hammerling*, 615 F. Supp. 3d at 1094.

**D. Count 4 (State Constitutional Privacy (Art. I, § 1)) Fails to State a Claim**

A claim under the California Constitution's right to privacy requires: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) conduct constituting a "serious invasion" amounting to an "egregious breach of the social norms." *Hill v. NCAA*, 7 Cal. 4th 1, 35–37 (1994). Plaintiff's allegations fail all three elements—as many courts in similar privacy-related cases have held. *See Hammerling*, 615 F. Supp. 3d at 1090 ("Courts in this district have held that data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy"; collecting cases).

**1. No Legally Protected Privacy Interest in Browsing Data**

Courts recognize two categories of constitutionally protected privacy interests: informational privacy (sensitive or confidential personal data) and autonomy privacy (intimate personal decisions). *Hill*, 7 Cal. 4th at 35. Courts have consistently rejected the notion "that users have a cognizable privacy interest in browsing data collected only while users interact with the website of the defendant company." *See Yoon*, 549 F. Supp. 3d at 1086 (dismissing constitutional claim); *In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 199 (N.D. Cal. 2019) (dismissing along similar lines). Plaintiff has no legally protected privacy interest in information she willingly transmitted to PNC while on its website. *See Popa*, 153 F.4th at 791 (no interest in "monitoring of … interactions with [a] website"). Her California Constitution claim fails accordingly.

### 2. No Reasonable Expectation of Privacy

No reasonable person who browses publicly available content on the internet expects complete privacy over the URLs they visit. It is common knowledge that commercial websites use analytics tools and advertising technologies. *See Dawidzik*, 2025 WL 3786963, at *5 (finding no objectively reasonable expectation of privacy in browsing data transmitted to third-party pixels on defendant's website). Plaintiff never alleges she took any step to protect her privacy—such as using a VPN, clearing cookies, enabling browser tracking protection, or browsing in incognito mode. Her expectation of privacy in *publicly available* articles on a commercial website is not objectively reasonable. *See Thomas v. Papa Johns Int'l, Inc.*, 2024 WL 2060140, at *2 (S.D. Cal. May 8, 2024) ("Given the inherent nature of the internet, a number of courts have found that consumers do not have a reasonable expectation of privacy over their activity in that space."); *Mitchener*, 815 F. Supp. 3d at 851 ("Internet users have no expectation of privacy in ... the IP addresses of the websites they visit.") (citation omitted).

### 3. PNC's Conduct Does Not Constitute a "Serious Invasion"

Finally, the alleged conduct does not rise to the level of a "serious" invasion amounting to an "egregious breach of the social norms." *Hill*, 7 Cal. 4th at 37. As Plaintiff herself admits, using analytics tools on a commercial website is a near-universal practice. (*See* FAC ¶ 76 ("Each of the [so-called] Trackers has deployed its tag on tens of thousands of websites and apps").) Virtually every major American website—banks, retailers, news organizations, governmental bodies, and even the federal courts—uses these tools. As Judge Chhabria observed: "[U]sing a third-party company to perform data analytics for web traffic is worlds different from wiretapping and eavesdropping." *Doe*, 806 F. Supp. 3d at 1119; *see also Popa*, 153 F.4th at 791 (comparing website tracking to "a store clerk's observing shoppers in order to identify aisles that are particularly popular"); *Dawidzik*, 2025 WL 3786963, at *5 (finding collection of browsing data by third-party pixels was not "highly offensive" as a matter of law). What is ubiquitous cannot be "egregious." What is industry-standard cannot breach "social norms."

### E. Count 5 (Intrusion Upon Seclusion) Fails to State a Claim

"Given the inherent nature of the internet, a number of courts have found that consumers do not have a reasonable expectation of privacy over their activity in that space." *Thomas*, 2024 WL 2060140, at *2 (dismissing with prejudice, collecting cases). Intrusion upon seclusion requires (1) an "intru[sion] into a place, conversation or matter as to which plaintiff has a reasonable expectation of privacy," and (2) "in a manner highly offensive to a reasonable person." *Hernandez v. Hillsides*, 47 Cal. 4th 272, 286 (2009). The intrusion must invade a place where the "expectation of privacy" is "objectively reasonable," and the intrusion must be an "egregious breach of the social norms." *Id*. at 295. Plaintiff's claim fails both prongs.

***First***, there is no expectation of privacy in website interactions. Internet users have "'no expectation of privacy in … IP addresses' or basic subscriber information because internet users 'should know that this information is provided to and used by internet service providers.'" *United States v. Rosenow*, 50 F.4th 715, 738 (9th Cir. 2022); *see also Popa*, 153 F.4th at 791 (monitoring a user's website interactions "seems most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales"); *Dawidzik*, 2025 WL 3786963, at *5 (same). No reasonable consumer expects complete anonymity in a retail store—and no one expects anonymity when browsing a public commercial website. Indeed, courts have been especially unwilling "to find that users have a cognizable privacy interest in browsing data collected only while users interact with the website of the defendant company." *Yoon*, 549 F. Supp. 3d at 1086. Plaintiff voluntarily visited PNC's public website and took no steps to protect her anonymity. There was no "intrusion" into any "private" matter.

***Second***, none of the alleged conduct was "highly offensive." That demanding standard is reserved for truly egregious invasions of private life—secretly recording intimate activities, intercepting medical records, or surveilling private spaces. *Hernandez*, 47 Ca. 4th at 290, 294–95 ("covert … video recording" in "dressing room"). Deploying industry-standard analytics tools is categorically different from those invasions—worlds apart from peeping into a neighbor's window with "a telescopic lens" or publishing pictures of a mother "nursing [a] child." *Popa*, 153 F.4th at 791 (citing Restatement (Second) of Torts § 652B cmt. b, illus. 2, and § 652D cmt. c, illus. 10); *cf.*

*Eating Recovery*, 806 F. Supp. 3d at 1119 ("[U]sing a third-party company to perform data analytics for web traffic is worlds different from … eavesdropping."). The simple logging of which publicly accessible URLs a visitor viewed cannot plausibly be characterized as an egregious breach of social norms that would be highly offensive to a reasonable person. If it could, every website operator in America would be liable for intrusion merely for running a web server.

**F. Count 6 (Unjust Enrichment) Fails to State a Claim**

Plaintiff's final claim fails because "there is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003); *see also Abuelhawa v. Santa Clara Univ.*, 529 F. Supp. 3d 1059, 1070 (N.D. Cal. 2021) (collecting many California state cases on this point). Unjust enrichment is a "general principle, underlying various legal doctrines and remedies," not an independent cause of action. *Melchior*, 106 Cal. App. 4th at 793. Plaintiff's unjust enrichment claim must be dismissed for this reason alone.

Even if unjust enrichment were an independent claim, it would be barred because Plaintiff has not "alleged that [she] lack[s] an adequate remedy at law." *See Nacarino v. KSF Acquisition Corp.*, 642 F. Supp. 3d 1074, 1087 (N.D. Cal. 2022) (dismissing unjust enrichment claim under the Ninth Circuit's binding opinion in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)); *In re Apple Processor Litig.*, 2023 WL 5950622, at *2 (9th Cir. Sept. 13, 2023) (plaintiff "'fail[ed] to explain' how the money they seek through restitution is any different than the money they seek as damages"). An equitable remedy is available only when legal remedies are inadequate.

To the extent unjust enrichment is treated as a quasi-contractual remedy, it requires a showing that the defendant obtained a benefit "through mistake, fraud, coercion, or request." *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 849 (N.D. Cal. 2024). The FAC alleges none of this. Plaintiff's unjust enrichment theory is entirely derivative of her statutory and tort claims. If those claims fail—as they must—this claim fails with them. *Id.*

## VI. CONCLUSION

For these reasons, PNC respectfully requests that the Court dismiss the FAC in its entirety with prejudice. Plaintiff's theory—built from reading a few free articles on a public website—finds no support in Article III, the Due Process Clause, or the substantive elements of her claims.

Dated: July 31, 2026

JONES DAY

By: */s/ Nathaniel P. Garrett*

Amanda Fitzsimmons
Nathaniel P. Garrett
Rebekah B. Kcehowski

Attorneys for Defendant
PNC BANK, NATIONAL ASSOCIATION