Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SHAHD ERAKAT

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

SHAHD ERAKAT, on behalf of herself and all similarly situated persons,

Plaintiff,

v.

PNC BANK, NATIONAL ASSOCIATION, a national banking association,

Defendant.

Case No.: 2:26-cv-01364-DAD-JDP

**SECOND AMENDED CLASS ACTION COMPLAINT**

1) Cal. Penal Code § 631
2) 18 U.S.C. § 2511(1)(a)
3) Cal. Bus. & Prof. Code § 17200, *et seq.*
4) Cal. Constitution Art. I § 1
5) Intrusion Upon Seclusion
6) Unjust Enrichment

Plaintiff SHAHD ERAKAT ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant PNC BANK, NATIONAL ASSOCIATION, a national banking association ("Defendant" or "PNC Bank"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.pnc.com (the "Website"), a website that Defendant provides for public access and use.

2. Plaintiff personally used the Website during the class period and preserved an HTTP archive file, commonly known as a HAR file, of one of her own browsing sessions.

3. During her use of the Website, and as reflected in her HAR file, Plaintiff navigated to the following URLs, unaware that Defendant was causing and permitting Third Parties to intercept the content of her communications:

- https://www.pnc.com/insights/personal-finance/borrow/should-i-use-a-personal-loan-to-pay-off-my-credit-card-debt.html;
- https://www.pnc.com/insights/personal-finance/borrow/smart-ways-to-start-paying-down-debt-in-the-new-year.html;
- https://www.pnc.com/insights/tagged-results.html?tagId=pnc-thought-leadership:subhub-topic-sub-topic/personal-finance/borrow/debt-consolidation;
- https://www.pnc.com/insights/search-results.html?q=Debt.
- https://www.pnc.com/insights/personal-finance/borrow/what-is-debt-consolidation-and-how-does-it-work.html; and
- https://www.pnc.com/en/personal-banking/borrowing/understanding-loan-options/debt-consolidation-calculator.html.

4. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what she was browsing, the search term she entered on the Website, page titles and content categories associated with those URLs, the referrer URLs reflecting her navigation between debt-related pages, and structured commercial event data that Defendant's configuration composed and transmitted about her, including content-category codes authored by Defendant describing the subject matter of each page and "lead" conversion designations classifying her as a sales prospect for the debt products she was reading about, all of which were transmitted to the Third Parties during the page-load process itself.

5. As set forth in the Specific Allegations section of this Complaint below, and as is evidenced by screenshots from a forensic audit of the Website, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are searching and browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising.

6. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631 and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously.

## II. <u>GENERAL ALLEGATIONS</u>

7. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

8. When triggered, the pixel causes the user's browser to transmit data to third-

party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, page titles and session-level identifiers.

9. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Pinterest Tracker
- LinkedIn Tracker
- Twitter/X Tracker

10. The Trackers are operated by distinct third parties, including Pinterest, Inc. (as to the Pinterest Conversion Tag), LinkedIn Corporation (as to the LinkedIn Insight Tag), and X Corp. (as to the Twitter Pixel) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

11. When the Plaintiff's browser navigated to the Website, the resulting communications did not consist of a single, instantaneous request and response. The browser first issued an HTTP request to PNC for the page's HTML. As the browser received and parsed that HTML, it issued numerous additional HTTP requests to PNC and to third-party servers for the resources and services used to construct, display, and operate the webpage, including style sheets, JavaScript files, images, fonts, data files, and tracking and analytics resources. The browser also executed JavaScript associated with the webpage, which caused it to issue further outbound HTTP requests. These requests occurred sequentially and concurrently over multiple seconds as part of the same webpage visit and page-loading process. The terms "page load," "page-load

process," and "page-load window" as used in this Complaint refer to this multi-second collective communication process and not to the initial HTTP request and response alone.

12. The Trackers' code did not run after Plaintiff's communications with the Website were complete. On each page identified above, Defendant's servers continued transmitting the resources that composed the page, including Defendant's page HTML, its clientlib JavaScript libraries, its design libraries, its consent-management content, and its content-delivery resources, while Plaintiff's browser was simultaneously issuing the tracking requests described below to ct.pinterest.com, to platform.twitter.com, analytics.twitter.com and t.co, and to snap.licdn.com and px.ads.linkedin.com. Those tracking requests were issued during that continuing exchange and not after it.

13. Plaintiff's HAR file records that her search of the Website for the term "Debt" generated not one but two communications between her browser and Defendant's servers. Her browser first requested the search-results page itself, https://www.pnc.com/insights/search-results.html?q=Debt. Then, as the returned page's code executed, her browser transmitted her search query to Defendant's search backend in a second, separate communication: a request to https://www.pnc.com/bin/search?q=Debt&pointer=0&lang=en, which carried Plaintiff's search term "Debt" to Defendant's server and Defendant's search results back to Plaintiff.

14. Plaintiff's HAR file further records that each Tracker fired while that second communication, Plaintiff's communication with Defendant carrying her search term, was still in transit between her browser and Defendant's servers. While that communication remained in transit, Plaintiff's browser transmitted to ct.pinterest.com a request carrying the complete URL https://www.pnc.com/insights/search-results.html?q=Debt, including her search term, together with her encoded persistent Pinterest identifier, and separately transmitted to ct.pinterest.com Defendant's "event=lead" and "event=pagevisit" classifications of her search-results visit, alleged

below; transmitted to analytics.twitter.com and t.co requests carrying the same complete URL, her search term, the page title, and her persistent X Corp. identifier; and transmitted to px.ads.linkedin.com a request carrying the same complete URL together with her persistent LinkedIn advertising identifier. Each Tracker thereby acquired the contents of Plaintiff's communications with the Website while a communication between Plaintiff and Defendant containing those same contents, her search for "Debt," was in transit, and while Defendant's other first-party page-load transmissions to Plaintiff's browser were continuing.

15. Plaintiff's use of the Website's debt-consolidation topic page generated the same two-communication structure. Her browser first requested the tagged-results page identified above, and then, as that page's code executed, transmitted her request to Defendant's search backend in a second, separate communication, a request to https://www.pnc.com/bin/search?tagId=pnc-thought-leadership:subhub-topic-sub-topic/personal-finance/borrow/debt-consolidation&pointer=0&lang=en. While that second communication remained in transit between her browser and Defendant's servers, Plaintiff's browser transmitted to ct.pinterest.com and to px.ads.linkedin.com requests carrying the complete URL of that page, together with her persistent identifiers with those recipients.

16. The same was true of every page Plaintiff visited, not only her search. Plaintiff's HAR file records that on each of the pages identified above, at the moment each Tracker's request carrying the page URL was transmitted, multiple communications between Plaintiff's browser and Defendant's servers were simultaneously in transit, and those in-transit communications themselves carried the same page URL. They included requests to Defendant's own analytics service at analytics.pnc.com transmitting the full URL of the page Plaintiff was viewing; and Defendant-directed requests for page resources, each of which identified to Defendant's servers, in its referrer field, the full URL of the page Plaintiff was viewing. On every page at issue, the Trackers accordingly acquired the URL contents of Plaintiff's

communications while communications between Plaintiff and Defendant containing those same contents remained in transit between her browser and Defendant's servers.

17. Defendant's Tracker partners describe this multi-step page-load process in their own published implementation documentation:

- Pinterest's published developer documentation, Pinterest Developers, Pinterest tag, https://developers.pinterest.com/docs/track-conversions/pinterest-tag/, directs website operators to embed Pinterest's base code between the opening and closing head tags of every page on which conversions are tracked, and states that where a tracked action occurs at page load, that placement causes Pinterest's codes to run as soon as the page loads.
- Pinterest's published base code, reproduced in the same documentation, dynamically creates an additional script element within the loaded page, marks that script asynchronous, separately requests Pinterest's core.js resource from s.pinimg.com, and queues Pinterest's load and page commands for execution.
- LinkedIn's published Insight Tag documentation, LinkedIn Insight Tag, https://business.linkedin.com/advertise/ads/insight-tag, states that the tag automatically records one page-load conversion each time it loads, by calling the window.lintrk function.

18. Defendant's own published Terms and Conditions, applicable to the Website at all relevant times, expressly acknowledge that "Transmissions to and from this Website … are not sent in a secure form and can be intercepted by third parties."[1]

19. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization

[1] PNC Bank, Terms and Conditions, available at https://www.pnc.com/en/terms-and-conditions.html (last accessed June 30, 2026).

strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

20. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser because Defendant deliberately configured it to do so. The timing of the Trackers' transmissions is a design choice, not an accident: Defendant placed and configured the Trackers' code so that it would execute during the Website's page-load process, while communications between the visitor's browser and Defendant's servers remained in transit, and without any user interaction or authorization. That configuration operated on Plaintiff's device in California each time she loaded a page of the Website.

21. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. Defendant deployed OneTrust, a commercial consent-management platform, on the Website, serving OneTrust's scripts from Defendant's own www.pnc.com domain, demonstrating that Defendant possessed, had configured, and was actively operating the technical infrastructure for requesting and recording user consent. Yet the Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications, and the Trackers fired regardless. Defendant thus maintained the apparatus of consent while never seeking it, and did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

22. Plaintiff's browser, in its default configuration, enforced privacy protections that blocked third-party tracking cookies from being transmitted, and Plaintiff's HAR file confirms those protections were operating throughout her session: none of the requests her browser sent to third-party servers carried a cookie. The

Trackers obtained persistent identification of Plaintiff anyway, because Defendant's deployment routed around her browser's protections: the Trackers' persistent identifiers were transmitted as parameters within the tracking requests themselves and were stored through cookies written by code into Defendant's own website domain, mechanisms engineered to survive the very protections her browser was enforcing. Plaintiff's browser was actively protecting her privacy; Defendant's chosen tracking configuration was built to defeat that protection.

23. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

24. Plaintiff SHAHD ERAKAT is a California citizen residing in Solano County, CA and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on March 2, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

25. PNC Bank, N.A. is a national banking association chartered under federal law that owns, operates, and controls the Website, an online platform through which PNC Bank offers personal banking products, loan services, personal finance resources, and financial management tools to consumers nationwide.

26. PNC Bank is one of the largest banks in the United States, providing retail banking services, personal finance resources, loan products, and financial management tools to individual and institutional customers. PNC Bank is a national banking association chartered under federal law and maintains its principal executive offices in Pittsburgh, Pennsylvania. Through its Website and related digital platforms, PNC Bank serves millions of customers in California and throughout the United States.

27. PNC Bank conducts banking business nationwide and engages in product development, marketing, and commercial operations centered on its digital banking and financial services platform. PNC Bank's business activities include operating the

Website, through which consumers browse personal finance content, research debt management and borrowing options, and access banking, loan, and financial planning products.

28. The Website, including the mobile site, serves as a core component of PNC Bank's digital presence. The Website provides users with access to banking products, personal finance articles, loan information, debt management resources, and financial planning tools, and functions as the primary consumer-facing platform through which California users access PNC Bank's personal banking and financial services. The Website is integrated into PNC Bank's broader digital infrastructure and employs web-based technologies that operate in connection with page loads, navigation, and user interaction.

## IV. JURISDICTION AND VENUE

29. PNC Bank is subject to personal jurisdiction in this District. PNC Bank operates dozens of retail banking branches in more than forty California cities, including, within this District, Sacramento, Roseville, Elk Grove, Stockton, Modesto, Fresno, Clovis, Tracy, Manteca, Lodi, Turlock, and Merced, and elsewhere in California including Fremont, Walnut Creek, Sunnyvale, San Diego, and Riverside. On information and belief, PNC Bank also maintains Private Bank and regional banking offices in California, including in San Francisco, Century City, Irvine, and San Diego, dedicated to retail banking, commercial lending, wealth management, and regional banking operations. The Website itself integrates that California presence: it includes Defendant's branch locator, through which Defendant directs Website visitors to its California branches, including branches in this District.

30. PNC Bank has cultivated California as a significant banking market. The Website serves as a primary digital channel through which PNC Bank markets and provides banking products, loan services, and personal finance resources to California consumers. In furtherance of those operations, PNC Bank entered into and maintained commercial partnerships with California-based data companies, including Pinterest,

Inc., headquartered in San Francisco, LinkedIn Corporation, headquartered in Sunnyvale, and X Corp., historically headquartered in San Francisco.

31. Defendant's California contacts giving rise to this action are Defendant's own deliberate choices, not random, isolated, or fortuitous events, and not the mere happenstance of a California resident finding a passively available website. Defendant chose to embed each Tracker's code on the Website; chose the events each Tracker would capture, including the "lead" conversion designations alleged below; and chose to configure the Trackers to run inside the browsers of the Website's visitors, so that when Plaintiff, a California resident, used the Website from California, Defendant's chosen code executed on her device in California and transmitted the contents of her communications from California. Defendant knowingly serves millions of California consumers through the Website, profits from its California audience, and maintained commercial tracking partnerships with Pinterest, Inc., LinkedIn Corporation, and X Corp. in furtherance of that business. Plaintiff's claims arise out of and relate to those California contacts: the tortious interception alleged occurred on Plaintiff's device in California, in the course of Defendant's deliberate operation of a data-collection system directed at the visitors, including the millions of California visitors, whose browsing Defendant monetizes. The exercise of personal jurisdiction over PNC Bank in this Court is proper.

32. Defendant's Website is not indifferent to the states of its visitors, and does not operate uniformly for every visitor everywhere. During Plaintiff's session, and in the same page deliveries that preceded the Tracker transmissions at issue, Defendant's servers delivered to her browser a "Do Not Sell or Share My Personal Information" link, appearing on Defendant's debt-related pages including the debt-consolidation calculator page, through which Defendant maintains the compliance apparatus that California law requires of businesses that sell or share California residents' personal information, and through which Defendant addresses California residents specifically concerning the sale and sharing of their personal information, which is the conduct at issue in this action.

33. Defendant publishes a privacy notice addressed specifically to California residents, as California law requires of businesses that sell or share Californians' personal information. In it, Defendant discloses that it shares California residents' identifiers and "Internet or other similar network activity" with "Marketing and Advertising Partners, such as Social Media Platforms and Advertising Networks." The conduct challenged in this action is the conduct Defendant describes to California residents in that notice.

34. Also during Plaintiff's session, Defendant's servers delivered to her browser Defendant's own state-differentiated eligibility files, including files named pnc-zipcodes.js, stateLocales.js, and excluded-zips.js, which Defendant's lending tools use to differentiate the products and terms available to visitors by state and ZIP code, including in California. Defendant's Website is engineered to know and act upon the states of its visitors, and Defendant's digital operations, retail branch network, and Private Bank offices in California together serve a California consumer market that Defendant has deliberately cultivated for years. Injuries of the kind alleged in this Complaint, the interception of California residents' communications on their devices in California, are precisely the kind of injuries that tend to arise from Defendant's California contacts.

35. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

36. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy.

37. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and the

parties are minimally diverse.

38. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves millions of California residents, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, as Plaintiff and other Class Members browsed the Website from within this District; (3) Plaintiff resides in this District; and (4) Defendant derives substantial revenue from California customers in this District.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. *The California Invasion of Privacy Act (CIPA)*

39. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

40. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

41. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted "to protect the right of privacy of the people of this state.".

42. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code

§ 637.2(a)(1).

**2. *The Federal Wiretap Act***

43. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

44. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

45. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. <u>SPECIFIC ALLEGATIONS</u>

46. Plaintiff personally used the Website during the class period, including on March 2, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of one of her own browsing sessions. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses

received. Plaintiff's HAR file accordingly records the requests her browser transmitted to the Third Parties during that session, including the named parameters carrying the contents of her communications and the persistent identifiers her browser transmitted together with those contents. The figures reproduced below are from an independent technical investigation counsel commissioned, which replicated the URLs and user flows recorded in Plaintiff's HAR file, and are included as corroboration.

47. During her use of the Website, Plaintiff navigated to pages identifying personal and private subject matter, including the specific URLs identified above.

48. Plaintiff suffered concrete and particularized injuries as a direct and proximate result of Defendant's conduct. When Plaintiff visited the pages of the Website identified above, the URL contents of her communications with the Website were intercepted in real time and transmitted, together with persistent visitor identifiers associated with her browser, to Pinterest, Inc., LinkedIn Corporation, and X Corp., where the contents were incorporated into those entities' commercial profile and audience-targeting systems.

49. The URL contents intercepted from Plaintiff's communications identified, on their face, the specific subject matter a visitor to those pages was researching: whether to use a personal loan to pay off credit-card debt; strategies for paying down debt; debt consolidation, including through Defendant's debt-consolidation calculator; and a site search for the term "Debt." Each page is categorized under Defendant's own personal-finance-and-borrowing taxonomy on a national consumer-banking website. A reasonable person regards the fact that he or she is researching personal debt and debt consolidation at a bank as private, and does not expect a bank to disclose that fact to commercial advertising platforms.

50. The information intercepted here is materially different in character from mouse movements, scrolling, click positions, and other non-substantive browsing data characterized as non-sensitive. The interception and disclosure to three commercial advertising platforms of an individual's research into her personal debt circumstances

on a national consumer bank's website is closely analogous to the harms recognized at common law by the torts of intrusion upon seclusion and eavesdropping.

51. The injuries Plaintiff suffered include the invasion of her privacy in the contents of her electronic communications, the loss of control over the substantive content of her browsing activity, the commercial exploitation of her browsing data without compensation or consent, and the irreversible disclosure of those contents to three separate third-party commercial entities for advertising targeting and behavioral profiling. Plaintiff's injuries are ongoing and continue to occur each time the Trackers acquire and process the contents of communications between users and the Website.

***1. The Pinterest Tracker***

52. Defendant embedded and deployed a Pinterest Conversion Tag on the Website, a behavioral analytics and advertising platform operated by Pinterest, Inc. The Pinterest Conversion Tag monitors website visitor activity, transmits the full URL of pages visited together with a persistent visitor identifier to Pinterest's servers in real time, and enables cross-session visitor profiling and interest-based advertising targeting. During Plaintiff's session, Pinterest received the full URL of each debt-related page Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound requests. Each such request carried Defendant's own account identifier with Pinterest in a named parameter, identifying Defendant as the advertiser on whose behalf the transmission was made.

53. Figure 1 shows a Fiddler Classic raw request capture of a POST request to ct.pinterest.com. The request body contains the parameter ad, which carries a JSON payload including the field loc set to the complete URL of one of the debt-related pages Plaintiff viewed as identified above. The Fiddler session list reflects Pinterest Conversion Tag requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to PNC Bank's server.

/ / /

**Figure 1**



54. Likewise, Figure 2 shows a Chrome DevTools Network capture of the POST request payload transmitted to ct.pinterest.com. The payload contains the ad parameter encoding the loc field with the complete page URL, together with pin_unauth, a persistent Pinterest visitor identifier. The page URL and the persistent visitor identifier appear together in the same outbound tracker request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

/ / /

**Figure 2**



55. Pinterest's servers at ct.pinterest.com returned an HTTP 200 OK response to the POST request, confirming that Pinterest received the intercepted communications in real time, during transmission, before the page-load process completed. On information and belief, the pin_unauth identifier is a persistent, cross-session identifier that links each visit to the same Pinterest advertising profile. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions.

56. Plaintiff's HAR file preserves the executable JavaScript that the Pinterest Conversion Tag ran inside Plaintiff's browser (served from s.pinimg.com). That code reads the browser's then-current location.href and document.referrer, assigns those values to the Pinterest request's loc and ref fields, and dispatches the resulting request to ct.pinterest.com. Because the code reads those values and copies them into the request before the request is transmitted, the Pinterest Conversion Tag read the URL and referrer contents of Plaintiff's communications with the Website before transmitting them, and did so while PNC Bank's page-load transmissions to Plaintiff's browser were still continuing; that is, it read and learned the contents of those communications while they were in transit, and not from any record created after the communication ended.

57. The Pinterest Conversion Tag that Defendant deployed did not merely transmit page addresses. As preserved in Plaintiff's HAR file, on each debt-related page Plaintiff visited, Defendant's configuration caused her browser to transmit to ct.pinterest.com both an "event=pagevisit" transmission and a separate "event=lead" transmission. A "lead" is a sales prospect: by firing lead events, Defendant designated Plaintiff to Pinterest as a prospective customer for the debt products addressed on the pages she was reading. Each lead event carried a structured payload authored by Defendant's configuration, including a named "search_query" field identifying the page Plaintiff was viewing and a "promo_code" field containing Defendant's own editorial classification of that page's subject matter, naming in Defendant's taxonomy the article Plaintiff was reading. Plaintiff's HAR file preserves those lead-event transmissions from her session, including from each of the pages identified above and from Defendant's debt-consolidation calculator page.

58. The Pinterest Conversion Tag is designed and marketed to enable interest-based advertising and audience targeting from the data it receives. On information and belief, Pinterest, Inc. used the contents it received during Plaintiff's session for those purposes.

59. Pinterest's developer documentation, Pinterest Developers, Pinterest tag, https://developers.pinterest.com/docs/track-conversions/pinterest-tag/, establishes the relevant sequence. Pinterest instructs website operators that both the base code and the event code must be added to pages where conversions are tracked, and that the base code must run before the event code. Pinterest further states that where an action is known to occur when a page loads, the base code and event code should be placed between the page's opening and closing head tags.

60. Pinterest's Business Help article, Add event codes, https://help.pinterest.com/en/business/article/add-event-codes, confirms that page-placed event code fires during the page-load event. Pinterest distinguishes page-load firing from events triggered only after a later user action, such as clicking a button or

submitting a form.

61. Pinterest's Business Help article, View tag parameters and cookies, https://help.pinterest.com/en/business/article/pinterest-tag-parameters-and-cookies, identifies the resulting browser transmission to Pinterest. Pinterest states that the query string parameters in the address of a Pinterest tag network request carry data sent to Pinterest from the advertiser's website, and instructs the operator to confirm those transmissions in the browser's network tools by filtering for ct.pinterest. Pinterest identifies among the data automatically included in that request the parameter loc, carrying the location URL; the parameter ref, carrying the referrer URL; and cb, a current timestamp.

62. Pinterest's Business Help article, Add event codes, https://help.pinterest.com/en/business/article/add-event-codes, publishes the schema of event data Pinterest receives. Pinterest defines the named fields an operator may attach to an event, including promo_code and search_query, and states that all event data is available for audience targeting, while only the value and order_quantity fields are available for paid and organic conversion reporting. The named fields Defendant populated in the transmissions from Plaintiff's session are Pinterest's own fields, defined by Pinterest, for Pinterest's use.

63. Pinterest's design requires Pinterest to receive and process the values in those named fields in order to categorize each event and attribute it, which is what makes the event available for audience targeting as Pinterest describes. Pinterest is not indifferent to what is in the fields it defines: it distinguishes among them by what it does with each. Pinterest performed that processing on the contents of Plaintiff's communications as those contents arrived, during the page-load process described above, and not from any record created after that process ended.

64. Pinterest, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by

deliberately embedding and configuring the Pinterest Conversion Tag on the Website, and Plaintiff never consented to it.

65. By causing Pinterest, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### *2. The LinkedIn Tracker*

66. Defendant embedded and deployed a LinkedIn Insight Tag on the Website, a behavioral analytics and advertising platform operated by LinkedIn Corporation. The LinkedIn Insight Tag monitors website visitor activity, transmits the full URL of pages visited together with a persistent user identifier to LinkedIn's servers in real time, and enables cross-session visitor profiling and professional interest-based advertising targeting. During Plaintiff's session, LinkedIn received the full URL of each debt-related page Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound requests. Each such request carried Defendant's own account identifier with LinkedIn in a named parameter, identifying Defendant as the advertiser on whose behalf the transmission was made.

67. LinkedIn's published Insight Tag documentation, LinkedIn Insight Tag, https://business.linkedin.com/advertise/ads/insight-tag, instructs an operator installing the tag manually to place it in the website's global footer unless the site includes pages that collect or otherwise handle financial or other sensitive data of individual users, and directs that the code never be added to any such page. Defendant installed the LinkedIn Insight Tag on its debt and personal-finance pages, and caused the URL contents of Plaintiff's communications on those pages to be transmitted to LinkedIn.

68. Figure 3 shows a Fiddler Classic raw request capture of a GET request to px.ads.linkedin.com/collect. The request contains the query parameter url set to the complete URL of a debt-related page on the Website that is one of the debt-related pages Plaintiff viewed as identified above. The Fiddler session list reflects LinkedIn Insight Tag requests firing automatically during page load, establishing that interception occurs

simultaneously with the transmission of communications to PNC Bank's server.

**Figure 3**



69. Likewise, Figure 4 shows a Chrome DevTools Network capture of the same request. The request contains the parameter url set to the complete page URL, together with li_adsId, a persistent LinkedIn advertising identifier. The page URL and the persistent advertising identifier appear together in the same outbound tracker request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

/ / /

**Figure 4**




70. LinkedIn Corporation's servers at px.ads.linkedin.com returned an HTTP 200 OK response to the request, confirming that LinkedIn received the intercepted communications in real time, during transmission, before the page-load process completed. On information and belief, the li_adsId identifier is a persistent, cross-session identifier that links each visit to the same LinkedIn advertising profile. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions or to their LinkedIn profile.

71. Plaintiff's contemporaneous browser-session capture preserves the executable JavaScript that the LinkedIn Insight Tag ran inside Plaintiff's browser, served from snap.licdn.com. In LinkedIn's /collect process, that code reads the browser's then-current location, encodes its complete URL into the request's url parameter, and dispatches the request to px.ads.linkedin.com/collect. The capture preserves those requests for each of the debt-related pages Plaintiff viewed and establishes that each was initiated during the page-load process described above, while PNC-hosted requests comprising that same page-load process remained outstanding and continued to be issued or completed. LinkedIn's code therefore read, copied, and transmitted the URL

contents of Plaintiff's communications during the continuing page-load process, rather than retrieving those contents from storage after that process ended.

72. The preserved LinkedIn code also reads window.location.href and document.title, assigns those values to the url and pageTitle fields of a PAGE_VISIT event bearing a contemporaneous Date.now() timestamp, and dispatches that event to LinkedIn's /wa/ endpoint. The capture preserves the actual PAGE_VISIT events transmitted during Plaintiff's session, including events containing the complete URL and page title of each debt-related page she viewed. Together, the preserved code and events establish that LinkedIn's code read and copied both the URL and page title from Plaintiff's browser state before transmitting them during her live browser session.

73. The LinkedIn Insight Tag is designed and marketed to enable interest-based advertising and professional audience targeting from the data it receives. On information and belief, LinkedIn Corporation used the contents it received during Plaintiff's session for those purposes.

74. LinkedIn's published Insight Tag documentation, LinkedIn Insight Tag, https://business.linkedin.com/advertise/ads/insight-tag, states that the Insight Tag is JavaScript code used to track visitor activity on the advertiser's website, and that by default the tag tracks visits to that website, including the URL, buttons clicked, the referrer, the IP address, device and browser characteristics, and a timestamp.

75. The same LinkedIn documentation describes what LinkedIn does with what it receives. LinkedIn states that the Insight Tag relies on LinkedIn cookies that enable LinkedIn to match the operator's website visitors to their respective LinkedIn member accounts, and that once a visitor is matched, LinkedIn tallies that visitor's actions for the operator's campaign reporting.

76. Matching a website visit to a member account, and tallying that visitor's actions on the pages visited, requires LinkedIn to receive and process both the URL contents identifying the page and the persistent identifier transmitted with them, and to determine that the two belong together. That processing is what the transmission is for.

LinkedIn performed it on the contents of Plaintiff's communications as those contents arrived, during the page-load process described above.

77. Taken together, LinkedIn's own materials support the narrow timing proposition that, when the LinkedIn Insight Tag is installed on a webpage, the user's browser loads LinkedIn's tag code during the website's own loading process; the code calls window.lintrk() each time it loads to automatically track a page-load conversion; and LinkedIn receives a contemporaneous signal containing the URL, referrer, IP address, User-Agent/device/browser characteristics, and timestamp. Thus, LinkedIn receives a duplicated transmission of the URL through the LinkedIn Tracker's own network request during the same page-load process in which the user's browser is loading or visiting the Website.

78. LinkedIn Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the LinkedIn Insight Tag on the Website, and Plaintiff never consented to it.

79. By causing LinkedIn Corporation to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

***3. The Twitter/X Tracker***

80. Defendant embedded and deployed a Twitter Pixel on the Website, a behavioral analytics and advertising platform operated by X Corp. The Twitter Pixel monitors website visitor activity, transmits the full URL and page title of pages visited together with a persistent visitor identifier to X Corp.'s servers in real time, and enables cross-session visitor profiling and interest-based advertising targeting. During Plaintiff's session, X Corp. received the full URL and page title of debt-related pages Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound requests. Each such request carried Defendant's own account identifier with X Corp. in

a named parameter, identifying Defendant as the advertiser on whose behalf the transmission was made.

81. Figure 5 shows a Fiddler Classic raw request capture of a POST request to analytics.twitter.com. The request contains the parameters tw_document_href, set to the complete URL of one of the debt-related searches also made by Plaintiff on the Website as identified above, and pt, set to the corresponding page title, both carrying content from a page of the kind identified above. The Fiddler session list reflects Twitter Pixel requests firing automatically during page load, establishing that interception occurs simultaneously with the transmission of communications to PNC Bank's server.

**<u>Figure 5</u>**



82. X Corp.'s servers at analytics.twitter.com returned an HTTP 200 OK response to the POST request, confirming that X Corp. received the intercepted communications in real time, during transmission, before the page-load process completed. On information and belief, the twpid identifier is a persistent, cross-session identifier that links each visit to the same X Corp. advertising profile. Plaintiff and the Class Members did not consent to persistent identifiers linking their page visits or their communications with the Website across sessions.

83. Plaintiff's HAR file preserves the Twitter Pixel transmissions from her own session. On more than a dozen separate occasions during Plaintiff's visit, her browser transmitted requests to analytics.twitter.com carrying, in the same request, the parameter tw_document_href set to the complete URL of the page Plaintiff was viewing, including https://www.pnc.com/insights/search-results.html?q=Debt containing her search term, the parameter pt set to the page's title, and Plaintiff's persistent X Corp. identifier twpid. Parallel transmissions were made to X Corp.'s t.co domain. Each such request delivered the contents of Plaintiff's communications with the Website, paired with a persistent identifier linking those contents to a single advertising profile.

84. The Twitter Pixel is designed and marketed to enable interest-based advertising and audience targeting from the data it receives. On information and belief, X Corp. used the contents it received during Plaintiff's session for those purposes.

85. X Corp. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the Twitter Pixel on the Website, and Plaintiff never consented to it.

86. By causing X Corp. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

87. The Trackers' interceptions described above occur during the page-load process. When Plaintiff's browser issues an HTTP request to PNC Bank's servers, PNC Bank's servers return HTML markup that includes the JavaScript code Defendant has embedded for each of the Trackers. The Tracker JavaScript executes in the browser as the page is being rendered and, before the page-load process completes, causes the browser to issue separate outbound HTTP requests to the Trackers' servers carrying the URL contents of Plaintiff's communications together with persistent visitor identifiers. Each Tracker's server returned a response while the page-load process was still in

progress. The Trackers' acquisition and processing of the URL contents accordingly occurs within and during the same continuous transmission window as Plaintiff's underlying communications with PNC Bank's servers, that is, in real time, contemporaneously with the user-server communication, and not from any record stored or assembled after that transmission ended.

88. The requests the Trackers' code caused Plaintiff's browser to issue delivered nothing to Plaintiff. None of the responses from ct.pinterest.com, from analytics.twitter.com or t.co, or from px.ads.linkedin.com supplied any text, image, style sheet, script or other resource that Plaintiff's browser used to display any page of the Website. Two sets of code ran as part of Plaintiff's single attempt to load each page: Defendant's, which assembled the page she had asked for, and the Trackers', which assembled nothing for her and instead sent the contents of her communications elsewhere.

89. The Trackers did not obtain the contents of Plaintiff's communications from Defendant's stored records, and no separate transaction between Defendant and any Tracker delivered them. Each Tracker's code read the values from the state of Plaintiff's browser for the page then being loaded, and the values it read identified that page and no other.

90. None of this required any action by Plaintiff, and none of it was visible to her. She did not request the Trackers' code, was not asked to authorize it, and saw nothing on any page indicating that the contents of her communications were being duplicated and transmitted to three other companies as she read.

91. Defendant knew of and configured each of these transmissions. Defendant placed each Tracker's code on the Website, selected the events each Tracker would capture, and caused every such transmission to carry Defendant's own account identifier with the recipient in a named parameter.

92. Before any transmission occurred, each Tracker's own code, executing in Plaintiff's browser during the page-load process, read the contents of her

communications from her browser's live state and composed them into that Tracker's named fields. The reading and processing of those contents occurred at and during acquisition, and not from records stored and analyzed afterward.

93. Each of the Trackers has deployed its tag on tens of thousands of websites and apps; the data captured from each deployment is combined into a unified profile system that the Trackers monetize across entire ad networks. PNC's deployment of the Trackers is one of many data inputs the Trackers stitch together. The Plaintiff and Class Members' captured data has cross-property commercial value to the Tracker that is independent of any PNC-related function.

94. Each of the Trackers is operated as an advertising platform with a primary business model of selling targeted advertising inventory. The Trackers are deployed for each Tracker's commercial benefit, i.e., to feed user data into the Tracker's advertising platform; each Tracker offers it free of charge to deploying websites like PNC precisely because the data the Tracker receives is itself the consideration.

## VII. <u>CLASS ALLEGATIONS</u>

95. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members"), defined as follows:

> All California residents whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers between March 2, 2025 and the present.

96. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

97. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents

of visitors' HTTP requests to the Trackers;

- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to restitution.

98. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

99. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

100. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

/ / /

## VIII. FIRST CAUSE OF ACTION

**Violations of Cal. Penal Code § 631**

***By Plaintiff and the Class Members Against All Defendants***

101. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102. Plaintiff brings this cause of action on behalf of herself and the Class.

103. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

104. The full human readable URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, at the moment Plaintiff's browser transmitted each page request to the Website, the tracking code Defendant embedded and configured caused a duplicate of those URL contents to be transmitted to each Tracker contemporaneously with, and during, the transmission of Plaintiff's communications with the Website, and before the page-load process completed. The Trackers thereby acquired the contents of those communications in transit, by means of a contemporaneous duplicate transmission, and not from any stored or reassembled record created after transmission. As alleged above, Plaintiff's HAR file records that on every page at issue, each Tracker's acquisition of the contents of Plaintiff's communications occurred while separate communications between Plaintiff's browser and Defendant's servers carrying those same contents remained in transit, including, when Plaintiff searched the Website for "Debt," her browser's communication with Defendant's search backend at /bin/search?q=Debt carrying her search term itself. In the alternative, and in any event, each Tracker read and processed the contents of Plaintiff's communications in real time, during the same page-load and transmission

window in which those communications were transmitted between Plaintiff's browser and the Website.

105. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to the Trackers. The transmissions were associated with Defendant's accounts with the Third Parties, and Defendant permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website.

106. In the alternative, and to the extent Defendant is itself deemed a party to the communications at issue, Defendant aided, agreed with, employed, and conspired with the Trackers to read, attempt to read, and learn the contents of Plaintiff's and Class members' electronic communications with the Website while those communications were in transit, in real time, and to use the information so obtained, within the meaning of Cal. Penal Code § 631(a). Defendant's assistance was knowing, active, and specific, not the passive deployment of a standard tool: (a) Defendant configured the Pinterest Conversion Tag to fire "lead" conversion events on its debt and personal-finance pages, affirmatively designating visitors to those pages as sales prospects in the transmissions Pinterest received; (b) Defendant authored and populated the content-category codes transmitted to Pinterest, which named, in Defendant's own editorial taxonomy, the subject matter of each page Plaintiff was viewing, including the article addressing whether to use a personal loan to pay off credit-card debt; (c) Defendant installed the LinkedIn Insight Tag on its debt and personal-finance pages notwithstanding LinkedIn's published instruction that the tag not be added to pages that collect or otherwise handle financial or other sensitive data of individual users; (d) Defendant maintained the Trackers on the Website in a configuration that transmitted persistent identifiers through URL parameters and first-party cookies notwithstanding the third-party-cookie blocking that Plaintiff's browser actively enforced, as alleged above; and (e) Defendant composed, in Pinterest's own named event fields, the classifications Pinterest received: Defendant designated Plaintiff's visits to its debt and personal-finance pages as "lead"

conversion events, identifying her to Pinterest as a sales prospect for the products those pages describe, and populated Pinterest's promo_code and search_query fields with Defendant's own description of each page's subject matter. Defendant did not merely permit Pinterest's code to run; Defendant told Pinterest what Plaintiff's communications meant. Defendant's knowledge of the Trackers' own commercial use of the intercepted contents follows from the operator materials alleged throughout this Complaint: the same published documentation Defendant necessarily consulted to install and configure each Tracker discloses that each Tracker uses the data it receives for its own advertising business. Each Tracker's reading of the contents so obtained was the object of that assistance and agreement.

107. Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no other exception to § 631(a) applies.

108. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX. <u>SECOND CAUSE OF ACTION</u>

### Violations of 18 U.S.C. § 2511(1)(a)

***By Plaintiff and the Class Members Against All Defendants***

109. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

110. Plaintiff brings this cause of action on behalf of herself and the Class.

111. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

112. The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C.

§ 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the tracking code Defendant embedded and configured caused those URL contents to be duplicated and transmitted to each Tracker contemporaneously with, and during, the transmission of Plaintiff's communications with the Website, in real time and before the page-load process completed, such that the Trackers acquired the contents while the communications were in transit, and not from storage. As alleged above, Plaintiff's HAR file records that on every page at issue, each Tracker's transmission of the contents of Plaintiff's communications occurred while separate communications between Plaintiff's browser and Defendant's servers carrying those same contents remained in transit, including, when Plaintiff searched the Website for "Debt," her browser's communication with Defendant's search backend at /bin/search?q=Debt carrying her search term itself.

113. In the alternative, and in any event, each Tracker read and processed the contents of Plaintiff's communications in real time, during the same page-load and transmission window in which those communications were transmitted between Plaintiff's browser and the Website.

114. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to each Tracker. The transmissions were associated with Defendant's accounts with the Third Parties, and Defendant permitted each Tracker to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. In the alternative, and to the extent Defendant is itself deemed a party to the communications at issue, Defendant intentionally procured the Trackers to intercept the contents of Plaintiff's and Class members' electronic communications with the Website while those communications were in transit, within the meaning of 18 U.S.C. § 2511(1)(a). Defendant's procurement was active and specific: Defendant embedded each Tracker's code on the Website, selected the events each Tracker would capture, including designating visits to its debt and personal-finance pages as "lead" conversion events, and

authored the content-category codes transmitted to Pinterest describing the subject matter of each page. Plaintiff and Class members did not consent to this interception, and no other exception applies.

115. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X. THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

***By Plaintiff and the Class Members Against All Defendants***

116. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

117. Plaintiff brings this cause of action on behalf of herself and the Class.

118. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

119. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

120. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been

avoided by Plaintiff or Class members.

121. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Consumer browsing data is bought from consumers themselves in an established market: market-research firms such as Nielsen and SurveySavvy operate paid panels that compensate members for access to their everyday web-browsing activity. California law recognizes the same market, expressly permitting businesses to offer consumers financial incentives, including payments to consumers as compensation for the collection, sale, or sharing of their personal information. Cal. Civ. Code § 1798.125(b)(1). Defendant itself operates in that market: during Plaintiff's session, Defendant's servers delivered to her browser a "Do Not Sell or Share My Personal Information" link, the mechanism California law requires of businesses that sell or share California residents' personal information. The Trackers likewise monetized the intercepted contents, selling advertisers access to audiences identified by precisely this kind of browsing activity. Plaintiff's and Class members' browsing data was accordingly property with a market price in their own hands: data they could have withheld, conditioned, or sold themselves.

122. Plaintiff's and Class members' browsing data was property in their hands: they possessed it, controlled access to it, and could have withheld it, conditioned its disclosure, or sold it in the market described above. Defendant's undisclosed interception took that property without notice, consent, or compensation, and delivered it to three advertising platforms that monetized it. Plaintiff and Class members thereby lost money or property in at least the following ways: (a) they were deprived of the opportunity to withhold, condition, or sell their own browsing data in an existing market in which that data commands compensation; (b) the value of their browsing data was diminished by its undisclosed and irrevocable disclosure to third-party advertising platforms, because data already captured and incorporated into advertising profiles cannot be re-sold or re-controlled by the consumer; and (c) Defendant and the Trackers captured for themselves the full economic value of data taken from Plaintiff and Class

members without paying the compensation an authorized, disclosed acquisition would have required.

123. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5. Plaintiff lacks an adequate remedy at law for the equitable relief sought in this cause of action. The statutory damages available under Plaintiff's other causes of action neither reach the revenues Defendant obtained from the undisclosed commercial exploitation of Class Members' browsing data, nor prevent the ongoing and future interception, transmission, and monetization of Class Members' communications, which continues each day the Trackers remain deployed on the Website. Only restitution can restore the monies Defendant obtained through the practices alleged, and only injunctive relief can halt their continuation.

## XI. FOURTH CAUSE OF ACTION

**Violation of the California Constitution, Article I, Section 1**

***By Plaintiff and the Class Members Against All Defendants***

124. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

125. Plaintiff brings this cause of action on behalf of herself and the Class.

126. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

127. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity

is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

128. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting a personal banking and financial services website does not expect that the specific pages they browse will be covertly transmitted to multiple separate third-party commercial tracking companies in real time, linked to persistent cross-session user profiles, and used for advertising targeting, behavioral analytics, and commercial monetization.

129. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to Pinterest, Inc., LinkedIn Corporation, and X Corp., where they were linked to persistent cross-session profiles and used for commercial advertising and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the personal banking and financial services website, the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

130. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

***By Plaintiff and the Class Members Against All Defendants***

131. Plaintiff re-alleges and incorporates by reference all preceding paragraphs

as if fully set forth herein.

132. Plaintiff brings this cause of action on behalf of herself and the Class.

133. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

134. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding three third-party tracking technologies that intercepted the URL contents of those communications in real time and transmitted them to Pinterest, Inc., LinkedIn Corporation, and X Corp. without Plaintiff's knowledge or consent. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

135. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing on a personal banking and financial services website and transmitted it to three separate third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the nature of the Website and the sensitivity of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent cross-session identifiers to build comprehensive user profiles without disclosure all render the intrusion highly offensive to a reasonable person.

136. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

/ / /

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

***By Plaintiff and the Class Members Against All Defendants***

137. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

138. Plaintiff brings this cause of action on behalf of herself and the Class.

139. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

140. Defendant received a benefit by permitting Pinterest, Inc., LinkedIn Corporation, and X Corp. to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

141. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

142. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the

tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust.

143. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense. Plaintiff lacks an adequate remedy at law for the relief sought in this cause of action: no damages remedy reaches the revenues and commercial benefits Defendant obtained and retains from the undisclosed exploitation of Plaintiff's and Class Members' browsing data, which only restitution and disgorgement can restore.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution and disgorgement of all amounts by which Defendant was

unjustly enriched at Plaintiff's and Class Members' expense;

11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 12, 2026 **LAW OFFICES OF ROSS CORNELL, APC**

By: *Ross C. Cornell* /s/
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*