JONES DAY

Amanda Fitzsimmons*, Bar No. 258888
*Designation of Counsel for Service
amandafitzsimmons@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, CA 92121.3134
Telephone: +1.858.314.1200
Facsimile: +1.844.345.3178

Nathaniel P. Garrett, Bar No. 248211
ngarrett@jonesday.com
555 California St., 26th Floor
San Francisco, CA 94104.1503
Telephone: +1.415.626.3939
Facsimile: +1.415.875.5700

Rebekah B. Kcehowski
*Pro hac vice*
rbkcehowski@jonesday.com
500 Grant St., No. 4500
Pittsburgh, PA 15219.2514
Telephone: +1.412.391.3939
Facsimile: +1.412.394.7959

Attorneys for Defendant
PNC BANK, NATIONAL ASSOCIATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SHAHD ERAKAT, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PNC BANK, NATIONAL ASSOCIATION,

Defendant.

Case No. 2:26-cv-01364

**DEFENDANT PNC BANK, N.A.'s NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

Date: November 16, 2026
Time: 1:30 p.m.
Dept: Zoom conference
Judge: Hon. Dale A. Drozd

Second Amended Complaint filed: August 12, 2026

**NOTICE OF MOTION AND MOTION TO DISMISS**

PLEASE TAKE NOTICE THAT on November 16, 2026 at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Dale A. Drozd, United States District Judge, Eastern District of California, during his standing Zoom motions hearing, Defendant PNC Bank, N.A. will, and hereby does, move for an order dismissing the Second Amended Complaint (SAC) and each of the claims therein of Plaintiff Shahd Erakat under Federal Rule of Civil Procedure 12(b)(1) for lack of Article III standing, Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, and Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief may be granted. The Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, all pleadings and papers on file in this matter, and such other and further evidence and argument as may be presented at the time of the hearing or otherwise.

PNC moves to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(1) on the ground that Plaintiff fails to allege a concrete injury-in-fact sufficient to confer Article III standing.

PNC moves to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(2) on the ground that the Court lacks personal jurisdiction over PNC because there is no general jurisdiction over PNC, an out-of-state corporation, and there is no specific jurisdiction because the SAC fails to allege facts demonstrating that the at-issue behavior was knowingly aimed at this State.

PNC moves to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff fails to state: (1) a violation of Cal. Penal Code § 631(a); (2) a violation of 18 U.S.C. § 2511(1)(a); (3) a violation of Cal. Bus. & Prof. Code § 17200, *et seq.*; (4) a violation of California Constitution Art. I § 1; (5) a claim for intrusion upon seclusion; and (6) a claim for unjust enrichment. For each of these reasons, PNC's Motion should be granted.

Pursuant to the Court's standing order, Defendant submits this certification that meet and confer efforts have been exhausted. The parties met and conferred on several occasions regarding the allegations in the Complaint and the substance of contemplated motion practice but were unable to reach agreement on the issues addressed herein.

Dated: August 26, 2026

JONES DAY

By: */s/ Nathaniel P. Garrett*
Amanda Fitzsimmons
Nathaniel P. Garrett
Rebekah B. Kcehowski

Attorneys for Defendant
PNC BANK, NATIONAL ASSOCIATION

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

III. THE SAC SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING ..... 5

- A. Plaintiff Has Not Alleged a Concrete Injury ..... 6
- B. The Ninth Circuit's Decision in *Popa v. Microsoft* Confirms That Generic Browsing Data Does Not Confer Standing ..... 6
- C. Plaintiff Lacks Standing to Seek Injunctive Relief ..... 9

IV. THE SAC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION ..... 10

- A. PNC Has Not Purposefully Directed The At-Issue Conduct At California ..... 10
- B. Multiple Courts Have Dismissed Pixel Cases for Lack of Jurisdiction ..... 11
- C. Plaintiff Fails To Plead Any Other Basis For Personal Jurisdiction ..... 12

V. THE SAC FAILS TO STATE A CLAIM ..... 13

- A. Count 1 (CIPA § 631(a)) Fails to State a Claim ..... 13
  - 1. PNC Is a Direct Party to the Communications ..... 14
  - 2. The First Clause Does Not Apply to Internet Communications ..... 14
  - 3. Plaintiff Fails to Allege Any Violation Of Clause Two or Three ..... 15
  - 4. Plaintiff Fails to Allege Derivative Liability Under Clause Four ..... 20
  - 5. The Rule of Lenity Requires Narrow Construction ..... 21
- B. Count 2 (Federal Wiretap Act (18 U.S.C. § 2511)) Fails to State a Claim ..... 22
- C. Count 3 (UCL (Cal. Bus. & Prof. Code § 17200)) Fails to State a Claim ..... 22
- D. Counts 4 and 5 (State Constitutional Privacy (Art. I, § 1) and Intrusion Upon Seclusion) Fail to State a Claim ..... 23
  - 1. There Is No Legally Protected Privacy Interest in Browsing Data ..... 23
  - 2. There Is No Reasonable Expectation of Privacy ..... 24
  - 3. PNC's Conduct Does Not Constitute a "Serious Invasion" ..... 24
- E. Count 6 (Unjust Enrichment) Fails to State a Claim ..... 25

VI. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Abuelhawa v. Santa Clara Univ.*,
529 F. Supp. 3d 1059 (N.D. Cal. 2021) ... 25

*Archer v. United Rentals*,
195 Cal. App. 4th 807 (2011) ... 22, 23

*Arndt v. Gov't Emps. Ins. Co.*,
750 F. Supp. 3d 518 (D. Md. 2024) ... 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 13

*Birdsall v. PNC Bank, N.A.*,
No. 2:26-cv-00078 (W.D. Pa. Mar. 23, 2026) ... 1, 7

*Briskin v. Shopify, Inc.*,
135 F.4th 739 (9th Cir. 2025) ... passim

*Bristol-Myers Squibb v. Super. Ct.*,
582 U.S. 255 (2017) ... 12

*Brodsky v. Apple*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ... 15

*Bunnell v. Mot. Picture Ass'n*,
567 F. Supp. 2d 1148 (C.D. Cal. 2007) ... 18

*Butler v. U.S. Bancorp*,
2026 WL 883904 (D. Minn. Mar. 31, 2026) ... 7

*Byars v. Hot Topic*,
656 F. Supp. 3d 1051 (C.D. Cal. 2023) ... 9, 14

*Byars v. Sterling Jewelers*,
2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) ... 9, 14

*C.S. v. MindGeek*,
2026 WL 2372638 (C.D. Cal. July 22, 2026) .......... 13

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) .......... 17, 18

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .......... 10, 12

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) .......... 22, 25

*Doe v. Eating Recovery Ctr.*,
806 F. Supp. 3d 1109 (N.D. Cal. 2025) .......... 18, 20, 21, 25

*Erakat v. Skechers U.S.A.*,
No. 2:25-cv-03374 (E.D. Cal. Nov. 20, 2025) .......... 3

*Erakat v. U.S. Bank*,
No. 2:26-cv-01370 (E.D. Cal. Apr. 6, 2026) .......... 3

*Erakat v. Wells Fargo*,
No. 2:26-cv-01353 (E.D. Cal. Apr. 6, 2026) .......... 3

*Esparza v. UAG Escondido A1*,
2024 WL 559241 (S.D. Cal. Feb. 12, 2024) .......... 20

*Hale v. Morgan*,
22 Cal. 3d 388 (1978) .......... 21

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) .......... 16, 23

*Harrott v. Cnty. of Kings*,
25 Cal. 4th 1138 (2001) .......... 21

*Heiting v. Marriott Int'l*,
743 F. Supp. 3d 1163 (C.D. Cal. 2024) .......... 11, 12

*Heiting v. Taro Pharms.*,
728 F. Supp. 3d 1112 (C.D. Cal. 2024) .......... 22

*Heiting v. Taro Pharms. USA, Inc.*,
709 F. Supp. 3d 1007 (C.D. Cal. 2023) .......... 20

*Hernandez v. Hillsides*,
47 Cal. 4th 272 (2009) .......... 23, 24

*Herrera v. Citigroup*,
No. 2:26-cv-08905 (C.D. Cal. Aug. 11, 2026).......... 3

*Herzer v. Redstone*,
2018 WL 5094933 (C.D. Cal. 2018).......... 22

*Hill v. NCAA*,
7 Cal. 4th 1 (1994) .......... 23, 24

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024).......... 24

*Hughes v. Ben & Jerry's*,
2025 WL 2306840 (Cal. Sup. Ct. Aug. 1, 2025) .......... 11

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 23

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) .......... 23

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2014).......... 15, 16

*Jones v. Critchfield*,
803 F. Supp. 3d 1078 (D. Idaho 2025).......... 5

*Jones v. Tonal Sys., Inc.*,
751 F. Supp. 3d 1025 (S.D. Cal. 2024).......... 16, 17, 22

*Katz-Lacabe v. Oracle Am.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) .......... 22

*Khamooshi v. Politico*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) .......... 9

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994).......... 5

*Konop v. Hawaiian Airlines*,
302 F.3d 868 (9th Cir. 2022).......... 17

*Maghoney v. Dotdash*,
2026 WL 497402 (S.D. Cal. Feb. 23, 2026) .......... 8

*Magliocca v. United Healthcare Servs.*,
2026 WL 2444750 (E.D. Cal. Aug. 19, 2026) .......... 9

*Magliocca v. United Healthcare Servs.*,
2026 WL 878694 (E.D. Cal. Mar. 31, 2026) .......... 9

*Malko v. GNC Holdings, LLC*,
2026 WL 2218133 (C.D. Cal. July 29, 2026) .......... 6, 9

*Melchior v. New Line Prods., Inc.*,
106 Cal. App. 4th 779 (2003) .......... 25

*Mikulsky v. Bloomingdale's, LLC*,
713 F. Supp. 3d 833 (C.D. Cal. 2024) .......... 10, 16

*Mitchener v. CuriosityStream*,
815 F. Supp. 3d 845 (N.D. Cal. 2025) .......... 7, 24

*Moody v. Textron*,
2025 WL 2828109 (C.D. Cal. Sep. 24, 2025) .......... 11

*Nacarino v. KSF Acquisition Corp.*,
642 F. Supp. 3d 1074 (N.D. Cal. 2022) .......... 25

*Nevada Fleet LLC v. FedEx Corp.*,
2024 WL 199626 (E.D. Cal. Jan. 18, 2024) .......... 19

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... passim

*Pruchnicki v. Envision Healthcare Corp.*,
845 F. App'x 613 (9th Cir. 2021) .......... 23

*Ribas v. Clark*,
38 Cal. 3d 355 (1985) .......... 14

*Rodriguez v. Autotrader.com*,
2025 WL 1085787 (C.D. Cal. Apr. 4, 2025) .......... 9, 24

*Rodriguez v. Ford Motor Co.*,
722 F. Supp. 3d 1104 (S.D. Cal. 2024) .......... 20

*Rounds v. Case-Mate*,
2025 WL 1873999 (C.D. Cal. July 2, 2025) ........ 11, 12

*Shah v. Hilton Worldwide Holdings*,
2025 WL 1683577 (N.D. Cal. June 11, 2025) ........ 11, 12, 13

*Shah v. Talentbridge*,
2026 WL 1507888 (C.D. Cal. May 28, 2026) ........ 9

*Sisti v. Bosley*,
2026 WL 1223927 (C.D. Cal. Apr. 27, 2026) ........ 9

*Smith v. YETI Coolers, LLC*,
754 F. Supp. 3d 933 (N.D. Cal. 2024) ........ 20

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020) ........ 25

*Straight v. Edfinancial Servs.*,
2026 WL 2087412 (N.D. Cal. July 20, 2026) ........ 8, 9

*Thomas v. Papa Johns Int'l*,
2024 WL 2060140 (S.D. Cal. May 8, 2024) ........ 23, 24

*Torres v. Prudential Fin.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025) ........ 19

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ........ 5, 6

*U.S. v. Rosenow*,
50 F.4th 715 (9th Cir. 2022) ........ 24

*U.S. v. Steiger*,
318 F.3d 1039 (11th Cir. 2003) ........ 17

*Whitby v. Cerner Corp.*,
2026 WL 1520742 (W.D. Mo. Apr. 13, 2026) ........ 9

*Williams v. DDR Media*,
757 F. Supp. 3d 989 (N.D. Cal. 2024) ........ 19

*Williams v. What If Holdings*,
2022 WL 17869275 (N.D. Cal. Dec. 22, 2022) ........ 15

*Wooten v. BioLife Plasma Servs.*,
807 F. Supp. 3d 1139 (E.D. Cal. 2025) .......... 9

*Yoon v. Lululemon USA*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .......... 15, 16, 23

**STATUTES**

Cal. Bus. & Prof. Code § 17200 .......... 1, 22

Cal. Bus. & Prof. Code § 17204 .......... 22

Cal. Civ. Code § 1798.100 .......... 4

Cal. Civ. Code § 1798.135 .......... 4

Cal. Civ. Code § 1798.140 .......... 4

Cal. Civ. Code § 1798.125 .......... 5

Cal. Penal Code § 631 .......... passim

**OTHER AUTHORITIES**

Assem. Comm. on Priv. & Consumer Prot., Hearing on Sen. Bill No. 1121 (Aug. 28, 2018) .......... 4

Bd. of Gov's Fed. Res. Sys., *Changes in U.S. Family Finances from 2019 to 2022* at 25 (Oct. 2023), *available* https://www.federalreserve.gov/publications/files/scf23.pdf .......... 8

Federal Rule of Civil Procedure 12 .......... 1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Shahd Erakat ("Plaintiff") read six free articles on a bank's website—and now presses six causes of action and seeks sweeping relief for a statewide class. The Second Amended Complaint ("SAC") is her third attempt to turn that non-event into a class-action lawsuit against PNC Bank, N.A. ("PNC"), and the SAC fares no better than the first two. It fails on at least three independent grounds, and the Court should dismiss it with prejudice in its entirety.

***First***, Plaintiff has no standing to sue. Plaintiff fails to allege that PNC or any third party ever obtained any personal information (let alone sensitive information) about her. The SAC still alleges only that, while browsing free, publicly available articles about debt on PNC's website, standard analytics tools transmitted page URLs and generic identifiers about her visit to third-party platforms. That is not an injury—it is the digital equivalent of a store clerk observing which aisle a customer walked down. Under *Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025), "monitoring of [a plaintiff's] interactions with [a defendant's] website," without more, does not cause "harm that is remotely similar" to what was "actionable at common law," and it does not confer standing. Plaintiff never logged into an account, submitted personal information, or filled out a form. She read articles that anyone on the internet could read, the online equivalent of picking up a pamphlet at a bank branch. Crediting her theory would hand Article III standing to virtually every person who has ever visited a commercial website, a result no court has ever countenanced. A Pennsylvania federal court already rejected Article III standing for the same claims against PNC. *See Birdsall v. PNC Bank, N.A.*, No. 2:26-cv-00078 (W.D. Pa. Mar. 23, 2026), Dkt. 21 (Attachment 1). This Court should do the same.

***Second***, the Court lacks personal jurisdiction over PNC. The Ninth Circuit's en banc decision in *Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025), requires proof that PNC purposefully directed the at-issue conduct at California—*e.g.*, by using geolocation technology to determine a user is in California and then deploying the online tools knowing the user is in California. *Id.* at 745–47, 756. PNC did none of that. PNC is headquartered in Pennsylvania. By Plaintiff's own telling, analytics code "execute[d] automatically within [her] browser[] upon page

load and navigation," SAC ¶ 10—*i.e.*, before PNC could have known where any visitor was located. In her now-third attempt at pleading jurisdiction, Plaintiff alleges irrelevant contacts between PNC and California that improperly attempt to blur the distinction between general and specific jurisdiction. What matters is that Plaintiff does not allege PNC used geolocation or ever learned that Plaintiff was in California in order to aim the specific at-issue conduct there. That is not the purposeful direction *Briskin* requires, and courts have dismissed materially identical claims.

***Third***, even if the Court had jurisdiction, every cause of action fails on the merits. None can overcome two basic facts: Plaintiff voluntarily browsed public webpages, and the only data allegedly transmitted was generic routing information—URLs and visitor identifiers—that reveals nothing private about anyone. Count 1 (CIPA) fails many times over: PNC is a party to communications on its own website and cannot "eavesdrop" on itself; the data transmitted is routing information, not "contents"; there is no "reading" of any contents "in transit"; and the rule of lenity forecloses Plaintiff's expansive reading of a decades-old criminal statute. Count 2 (Federal Wiretap Act) fails for the same reasons and, independently, because one-party consent defeats it. Count 3 (UCL) fails for the same reasons, and also because Plaintiff lost no money or property. Counts 4 and 5 (California constitutional privacy and intrusion upon seclusion) both fail because no reasonable person expects anonymity while browsing a public website, and using industry-standard analytics tools is neither "highly offensive" nor an "egregious breach of social norms." Count 6 (unjust enrichment) fails because California does not recognize it here as a standalone claim.

Crediting Plaintiff's thrice-edited theories would criminalize the way nearly every commercial website in America operates. The Court should dismiss this action with prejudice.

## II. BACKGROUND

Strip away the rhetoric and the key allegations in this case are simple: a California resident spent a few minutes reading free articles on a bank's website—content anyone could access without creating an account, entering a password, or handing over a shred of personal information—and now presses six claims seeking sweeping relief because that website used standard online analytics tools. The facts below, drawn from the SAC and accepted only for purposes of this Motion, confirm that this lawsuit belongs nowhere near federal court and fails on the merits regardless.

**A. The Parties**

PNC is a banking association headquartered in Pittsburgh, Pennsylvania. SAC ¶ 26. Its website, www.pnc.com, is open to anyone with an internet connection and offers a range of information about banking products, personal finance, and financial management tools. *Id.* ¶ 26.

Plaintiff Shahd Erakat is a California citizen, SAC ¶ 24, and a serial litigant in digital privacy cases. In November 2025, Plaintiff sued Skechers alleging that it "surreptitiously … operates tracking software on [its] Website without providing users … adequate notice." *Erakat v. Skechers U.S.A.*, No. 2:25-cv-03374 (E.D. Cal. Nov. 20, 2025), Dkt. 1, ¶ 2. The same day she sued PNC, Plaintiff filed a materially identical complaint against Wells Fargo, alleging a visit to debt-related pages on its website five weeks before she visited PNC's site. *See Erakat v. Wells Fargo*, No. 2:26-cv-01353 (E.D. Cal. Apr. 6, 2026). Another Erakat family member represented by the same lawyers filed a cut-and-paste lawsuit against U.S. Bank, alleging a visit to its website roughly a week before Plaintiff's visit to PNC's site. *See Erakat v. U.S. Bank*, No. 2:26-cv-01370 (E.D. Cal. Apr. 6, 2026). Plaintiffs voluntarily dismissed those lawsuits less than three months after filing. Most recently, Plaintiff's counsel alleged nearly identical claims against Citibank on the same debt-site visit theory. *Herrera v. Citigroup*, No. 2:26-cv-08905 (C.D. Cal. Aug. 11, 2026).

**B. Plaintiff's Alleged PNC Website Visit**

On a single occasion—March 2, 2026—Plaintiff allegedly visited PNC's public website and browsed six pages of generic personal finance content, while (conveniently) creating, storing, and maintaining a HAR file recording her visit. SAC ¶¶ 24, 46. She did not log in, create an account, apply for a loan, or access any banking service. She entered no name, Social Security number, financial information, or any other personal data. She simply accessed free articles available to anyone on earth at the URLs below:

- https://www.pnc.com/insights/personal-finance/borrow/should-i-use-a-personal-loan-to-pay-off-my-credit-card-debt.html
- https://www.pnc.com/insights/personal-finance/borrow/smart-ways-to-start-paying-down-debt-in-the-new-year.html
- https://www.pnc.com/insights/tagged-results.html?tagId=pnc-thought-leadership:subhub-topic-sub-topic/personal-finance/borrow/debt-consolidation
- https://www.pnc.com/insights/search-results.html?q=Debt
- https://www.pnc.com/insights/personal-finance/borrow/what-is-debtconsolidation-and-how-does-it-work.html

- https://www.pnc.com/en/personal-banking/borrowing/understanding-loanoptions/debt-consolidation-calculator.html

SAC ¶ 3. That is the entirety of Plaintiff's interaction with PNC. She communicated nothing private or personal—she simply visited a few webpages.

**C. The Alleged Online Technologies**

The SAC identifies three third-party analytics tools allegedly deployed on PNC's website: (1) the Pinterest Conversion Tag; (2) the LinkedIn Insight Tag; and (3) the Twitter/X Pixel—standard, widely deployed online measurement tools used by millions of websites across every industry. SAC ¶¶ 9–10, 93. Plaintiff alleges that when she loaded PNC's webpages, these tools automatically transmitted technical data—specifically "the full URL of pages visited together with a persistent visitor identifier"—to the respective third-party platforms. *Id.* ¶ 52 (Pinterest), ¶ 66 (LinkedIn), ¶ 80 (Twitter/X). Critically, the SAC's own allegations assert that these tools "execute automatically" and uniformly to every visitor, and there is no claim that the tools ever consider location. *Id.* ¶ 10. Plaintiff herself thus alleges that the tools activated "automatically" when any person, anywhere, requested a page, *id.*—before PNC could possibly know the visitor's location.

**D. Plaintiff Admits that PNC Complies with the California Consumer Privacy Act**

All of this is commonplace, *see id.* ¶ 93 ("tens of thousands" of websites use these tools), and in fact, has been blessed by the California legislature. California has a statute that "provide[s] … comprehensive internet privacy … protection." Assem. Comm. on Priv. & Consumer Prot., Hearing on Sen. Bill No. 1121 (Aug. 28, 2018) at p. 5. It is called the California Consumer Privacy Act ("CCPA"). *See* Cal. Civ. Code § 1798.100 *et seq.* And the CCPA expressly permits businesses to engage in the routine commercial analytics activity alleged here, *see id.* § 1798.100(a), including the collection of "personal information" such as "unique personal identifier[s,] [IP] address[es]," and "commercial information, including records of … products or services purchased, obtained, or considered, or other purchasing or consuming histories or tendencies," *id.* § 1798.140(v)(1)(A), (D). The CCPA requires businesses that do so to meet certain requirements, like allowing opt outs. *See id.* § 1798.135. But Plaintiff does not proceed under this internet-age statute—nor could she. Plaintiff admits that PNC complies with the CCPA, allowing opt outs and including required links

and notices. *See* SAC ¶ 121 (alleging PNC complies with Cal. Civ. Code § 1798.125(b)(1)); *see id.* ¶ 32 (PNC "maintains the compliance apparatus that California law requires").

### E. Procedural Background

Instead, purportedly concerned that the collection of a few URLs was an "invasion of privacy," Plaintiff filed this putative class action on April 6, 2026 in her own name—without any attempt to hide her identity—alleging publicly that she visited those URLs. *See Jones v. Critchfield*, 803 F. Supp. 3d 1078, 1087 (D. Idaho 2025) (noting Ninth Circuit's "lenient approach to pseudonyms"). She asserts six causes of action, including two telephone wiretapping statutes from the 1960s. *See* SAC, Counts 1–6, ¶¶ 101-143.

The parties first "met and conferred regarding the allegations in the [first] Complaint and the substance of contemplated motion practice" on June 12, 2026. *See* Dkt. 11 at 2 (Stipulation). On July 1, 2026, "and as a result of those meet-and-confer discussions," *id.*, Plaintiff filed her first amended complaint ("FAC"). Dkt. 13. After PNC filed a motion to dismiss, Dkt. 14, Plaintiff amended yet a second time (without leave), realleging the same key underlying facts and adding a glut of technical jargon to conceal the few details that matter. Each claim still rests on the same core allegation: that standard analytics tools transmitted generic data to third-party platforms. The SAC seeks statutory damages of $5,000 per violation under CIPA and up to $10,000 per violation under the Wiretap Act—all for routine operation of a commercial website. SAC, Prayer ¶¶ 4–5.

## III. THE SAC SHOULD BE DISMISSED FOR LACK OF ARTICLE III STANDING

This Court lacks subject matter jurisdiction because Plaintiff has failed to allege a concrete injury. "Federal courts are courts of limited jurisdiction," and the "party asserting jurisdiction" has the burden of establishing it. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Article III standing requires "(i) ... an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) ... would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A statutory violation alone "does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm." *Id.* at 426. "An injury in law is not an injury in fact." *Id.* at 427.

### A. Plaintiff Has Not Alleged a Concrete Injury

The concreteness inquiry is demanding. The "central" question is "whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as … a basis for a lawsuit in American courts." *Id.* at 424. A plaintiff must identify a "close historical or common-law analogue for their asserted injury." *Id*. at 424–25. Plaintiffs' claims are measured against the traditional common law privacy torts that require a "highly offensive" invasion into the privacy of a "reasonable person." *See Popa*, 153 F.4th at 791 (discussing intrusion upon seclusion and public disclosure of private facts) (citing Restatement (Second) of Torts §§ 652D).

Plaintiff's third-and-best attempt to allege a concrete injury fails that test. She does not allege disclosure of any intimate or offensive personal facts—only that she voluntarily visited a bank's public website and read content about debt management available to anyone on the internet. *Id.* (no "embarrassing, invasive, or otherwise private information"). Allegedly transmitting URLs and other generic data to third parties is not a harm "'traditionally' recognized as … a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 424.

### B. The Ninth Circuit's Decision in *Popa v. Microsoft* Confirms That Generic Browsing Data Does Not Confer Standing

*Popa* controls, and it forecloses standing here. *Popa* held that "monitoring of [a plaintiff's] interactions with [a] website" by itself is not the "highly offensive" injury standing requires. 153 F.4th at 791. The *Popa* plaintiff alleged something far more invasive than this case: session-reply technology that tracked not just "URLs of web pages visited," but mouse movements, clicks, scrolls, and keystrokes—"recreat[ing]" the "entire visit to the website," down to where "her mouse [was] hover[ing]." *Id.* at 786. Even that did not confer standing. Here, Plaintiff alleges only the transmission of less revealing page URLs and generic identifiers. SAC ¶¶ 3–4. If granular behavioral tracking was no injury in *Popa*, the alleged generic URL logging cannot create one here.

District courts have followed *Popa*'s lead, and since then, "[g]enerally, courts have concluded that the collection of this data, without more, is inadequate to establish an injury in fact." *Malko v. GNC Holdings, LLC*, 2026 WL 2218133, at *3 (C.D. Cal. July 29, 2026). In *Dawidzik v. Tesla*—brought by Plaintiff's counsel against a website deploying the same Twitter pixel—the

court held that IP addresses, browser metadata, and URL data implicate no cognizable privacy interest under *TransUnion* and *Popa*. 2025 WL 3786963, at *5 (C.D. Cal. Dec. 29, 2025). Similarly, in *Birdsall v. PNC*, No. 2:26-cv-00078 (W.D. Pa. Mar. 23, 2026), Dkt. 21 (attached), the court found no Article III standing on claims against PNC arising from the use of the same LinkedIn Insight Tag at issue here. Numerous courts agree.[1] The mere logging of publicly accessible web addresses cannot support standing.

To avoid that conclusion, the SAC (at ¶¶ 49–50) argues that this case is different because the "subject matter" of the articles Plaintiff visited on March 2 related to debt management. But this case is not different. The "subject matter" of these websites does not transform the alleged routine website monitoring into the disclosure of actual personal information necessary to show a "highly offensive" intrusion. *Popa* rejected a "broad theory [of] common law protected privacy rights—pitched at a high level of generality" as inconsistent with *TransUnion*, and instead demanded a comparison to specific common law privacy torts. 153 F.4th at 792. Applying that comparison, the court found that "tracking of [plaintiff's] … interactions with the … website" was not "remotely similar" to a "highly offensive" interference "actionable at common law." *Id.* at 791. That conduct, the court explained, "seems most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular"—an ordinary feature of commercial life that inflicts no cognizable injury. *Id.* at 791. It is not "remotely" close to the offensive intrusions that create a concrete privacy harm—for example, "taking intimate pictures" through a bedroom window. *Id.* (quoting Restatement (Second) of Torts § 652B cmt. b, illus. 2).

Reading publicly available debt-management advice reveals nothing stigmatizing or sensitive about Plaintiff. In fact, it reveals nothing at all—not whether she has debt, let alone its amount or nature. She could have visited the pages for any reason unrelated to her own finances—

---

[1] *See, e.g.*, *Arndt v. Gov't Emps. Ins. Co.*, 750 F. Supp. 3d 518, 528 (D. Md. 2024) ("Plaintiff cannot establish a concrete injury based on Defendant's alleged collection of mere website activity, such as mouse movements, keystrokes and clicks, search terms, or content viewed by Plaintiff on Defendant's website," comparing this to "public shopping behavior in the physical world"); *Butler v. U.S. Bancorp*, 2026 WL 883904, at *4 (D. Minn. Mar. 31, 2026) (no standing without some allegations of "personal information they inputted"); *see also Mitchener v. CuriosityStream*, 815 F. Supp. 3d 845, 851 (N.D. Cal. 2025) (no standing for claims based on TikTok software capture of, *inter alia*, "referral tracking, and URL tracking").

research for a friend or relative, or simple curiosity. *See Maghoney v. Dotdash*, 2026 WL 497402, at *1 (S.D. Cal. Feb. 23, 2026) ("[A]nyone from a schoolteacher writing a lesson plan for a sex-ed class or a researcher looking to analyze potential findings could enter these searches into an informational health website."). And even if Plaintiff were looking for herself, there is nothing stigmatizing about debt. Approximately 77.4% of Americans have debt, the undersigned included. Bd. of Gov's Fed. Res. Sys., *Changes in U.S. Family Finances from 2019 to 2022* at 25 (Oct. 2023), *available* https://www.federalreserve.gov/publications/files/scf23.pdf. Debt consolidation can be a responsible method of paying down the debt that most of us carry; that is why PNC publishes articles about it. Plaintiff's visit to PNC's publicly accessible debt-management pages cannot establish the type of "highly offensive" intrusion required for concrete harm under *Popa* and *TransUnion*. Nor does it matter that PNC's Pinterest configuration labeled Plaintiff's visit a "lead" event, SAC ¶¶ 14, 57: "lead" and any associated PNC descriptions of Plaintiff's URL visit are just labels for the fact that someone visited a webpage, not new or actual personal information about the visitor. The sharing of such URL data from that innocuous visit is not "close[ly]"—or even tangentially—"analog[ous]" to the common law injuries recognized in *Popa*. 153 F.4th at 789.

*Maghoney* is a vivid example. The plaintiff alleged he visited a medical advice website and entered "search terms" regarding "symptoms, contraction, and the treatment of chlamydia" and "genital warts" and that third-party tools captured those searches alongside "page navigation history" and persistent "device identifiers." 2026 WL 497402, at *1–2. The court rejected standing: "Plaintiff merely ***searched*** sensitive health related terms," but without any connection to personal medical information, mere "searches on [a w]ebsite do not constitute a legally protectable privacy interest." *Id.* at *5. Similarly, in *Straight v. Edfinancial Servs.*, 2026 WL 2087412, at *1 (N.D. Cal. July 20, 2026), the plaintiff alleged that "as soon as users have logged into their [loan] account portals" with a financial services company, it disclosed information to Google including "IP addresses [and] device information," along with details about "when users make" and "how users allocate payments," and "reasons users request [certain] repayment options." The court rejected standing: While the company disclosed some information associated with an IP address, and "Google 'matche[d] … such information to an individual's specific identity,'" the plaintiff

failed to allege the defendant actually "shared any specific information" about her to Google. *Id.* at *3. *Maghoney* and *Straight* are part of a burgeoning consensus of courts rejecting the theory of standing-by-inference on health or financial topics similar to those at issue here.[2]

All of this is particularly true for a serial privacy plaintiff like Erakat. That she filed other pixel-related claims—against Skechers and Wells Fargo based on earlier website visits—"casts doubt on any suggestion that she was surprised" by the alleged operation of PNC's website upon her later visit. *Byars v. Sterling Jewelers*, 2023 WL 2996686, at *3 n.4 (C.D. Cal. Apr. 5, 2023); *Byars v. Hot Topic*, 656 F. Supp. 3d 1051, 1059 (C.D. Cal. 2023) (describing plaintiff and counsel as "serial litigants bringing numerous 'cookie cutter' lawsuits under CIPA"). A plaintiff who interacts with websites "expecting the information to be accessed ... cannot claim an injury when her expectations [a]re ultimately met." *Rodriguez v. Autotrader.com,* 2025 WL 1085787, at *1 (C.D. Cal. Apr. 4, 2025). Plaintiff admits that she captured a "HAR file" from her March 2 visit, SAC ¶ 46—hardly something a normal internet user does—but, more to the point, the advance-planning file save is proof that she voluntarily visited the PNC website with every expectation that PNC.com would do what every website does: harmlessly capture which pages a user visits.

### C. Plaintiff Lacks Standing to Seek Injunctive Relief

Plaintiff also lacks standing to seek injunctive relief. Plaintiff does not allege she intends to return to PNC's website, and even if she did, "continued use of [PNC's] website, now that Plaintiff has notice of" PNC's analytics tools, "would constitute consent" to those practices.

---

[2] *See also Sisti v. Bosley*, 2026 WL 1223927, at *3 (C.D. Cal. Apr. 27, 2026) (fact that a plaintiff filled out form on a surgical hair-loss website does not reveal sensitive health information); *Shah v. Talentbridge*, 2026 WL 1507888, at *3 (C.D. Cal. May 28, 2026) (search term "felon-friendly jobs" does "not disclose Plaintiff's specific criminal history, or even necessarily his status as a felon"); *Magliocca v. United Healthcare Servs.*, 2026 WL 2444750, at *4 (E.D. Cal. Aug. 19, 2026) ("the mere collection of plaintiff's generic insurance browsing data is not enough to demonstrate … concrete harm" even disclosure of a "click[] on a specific AARP-endorsed Medicare health insurance plan associated with her ZIP code in Yuba County"); *Magliocca v. United Healthcare Servs.*, 2026 WL 878694, at *4 (E.D. Cal. Mar. 31, 2026) (same); *Malko*, 2026 WL 2218133, at *4 ("Merely looking for a health-related product does not … reveal anything about Plaintiff's own health information."); *Whitby v. Cerner Corp.*, 2026 WL 1520742, at *6 (W.D. Mo. Apr. 13, 2026) (reporting "pages viewed and buttons clicked" to Google insufficient for standing, even when plaintiff was logged into a patient portal, as "no actual medical information" was sent); *Wooten v. BioLife Plasma Servs.*, 807 F. Supp. 3d 1139, 1144 (E.D. Cal. 2025) (dismissing case related to blood donations as not "highly offensive"); *Khamooshi v. Politico*, 786 F. Supp. 3d 1174, 1182 (N.D. Cal. 2025) (no "legally protected privacy interest" in visit to political news site).

*Mikulsky v. Bloomingdale's, LLC*, 713 F. Supp. 3d 833, 846 (C.D. Cal. 2024). Absent future harm, injunctive relief is off the table. Any such relief should be dismissed with prejudice.

## IV. THE SAC SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

Even if Plaintiff had standing, the SAC fails for a second, independent reason: the Court lacks personal jurisdiction over PNC. PNC is not "at home" in California for general jurisdiction—it is headquartered in Pittsburgh, Pennsylvania (SAC ¶ 26). *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Plaintiff must therefore establish specific jurisdiction, which requires: (1) PNC "purposefully direct[ed]" its activities at California; (2) the claim arises out of or relates to those forum-related activities; and (3) jurisdiction would be reasonable. *Briskin*, 135 F.4th at 750–51. For tort claims, the "purposeful direction analysis" asks whether the defendant committed (1) an intentional act (2) "expressly aimed at the forum state," (3) causing harm "the defendant knows will be suffered in the forum state." *Id.* at 751. And in the context of the internet, "'something more' than just a foreseeable effect" in the state is required. *Id.* at 753. Plaintiff bears the burden of demonstrating "purposeful direction," *id.* at 751, and Plaintiff does not clear that bar.

### A. PNC Has Not Purposefully Directed The At-Issue Conduct At California

*Briskin* governs personal jurisdiction in digital privacy cases in this Circuit, and it compels dismissal here. *Briskin* held that courts "do not look only to where [a plaintiff] was located at the time" of a website visit, but must also ask whether the defendant's conduct at issue was "expressly aimed at California or its residents" or was "mere happenstance arising from the California consumers' choice" to interact with a widely accessible website. *Id.* at 752, 756 & n.12 ("mere passive nationwide accessibility" insufficient). The Ninth Circuit found jurisdiction over Shopify on a specific and unusual set of facts: Shopify operates as a hidden intermediary in purchase transactions and sells data on "consumers for its own commercial gain." *Id.* at 756. The moment a person "first view[s]" an item on a merchant's website, Shopify "install[s] tracking cookies …, enabling it to track" a consumer, including with "geolocation data." *Id.* at 747–48. At that point, based on the geolocation data, Shopify "kn[ows] that the consumer is in California." *Id.* at 756 n.13. Then, when a consumer buys the item, Shopify processes the payments and gathers additional personal information, all while "knowing [the] device was in California." *Id.* at 756 n.12.

Because—and only because—Shopify "knew the location of consumers" before transacting payments did the court find express aiming sufficient for jurisdiction. *Id.* at 756 & n.13.

PNC's circumstances are the opposite of *Briskin*'s in every material respect. Nothing in the SAC suggests PNC knew Plaintiff was in California before the pixels allegedly fired. Instead, the SAC's own allegations show the opposite: According to Plaintiff, the third-party tools "execute automatically within users' browsers upon page load and navigation." SAC ¶ 10. That means the tools activated ***automatically*** and uniformly to ***every visitor anywhere***—before PNC had any opportunity to learn the visitor's location, let alone aim conduct at them knowing they were in California. SAC ¶ 20 (alleging this "timing" was built into the very "design" of the website). *Briskin*'s jurisdictional finding turned on Shopify's use of geolocation technology to pinpoint the plaintiff's California location ***before*** payment processing and subsequent data use and tracking. *See* 135 F.4th at 756 & nn.12–13. Here, the opposite is alleged: The code fired before it could know anything about Plaintiff's whereabouts. A defendant cannot "expressly aim" alleged online conduct at California before knowing the user was in California.

**B. Multiple Courts Have Dismissed Pixel Cases for Lack of Jurisdiction**

Courts before and after *Briskin* have dismissed nearly identical pixel claims for lack of personal jurisdiction. *See, e.g., Shah v. Hilton Worldwide Holdings*, 2025 WL 1683577, at *2 (N.D. Cal. June 11, 2025) (no personal jurisdiction where "[t]here are no allegations that Hilton Holdings knew the location of particular devices"); *Rounds v. Case-Mate*, 2025 WL 1873999, at *7–8 (C.D. Cal. July 2, 2025) (no jurisdiction over TikTok pixel claims); *Moody v. Textron*, 2025 WL 2828109, at *5 (C.D. Cal. Sep. 24, 2025) (similar); *Heiting v. Marriott Int'l*, 743 F. Supp. 3d 1163, 1171–72 (C.D. Cal. 2024) (similar); *Hughes v. Ben & Jerry's*, 2025 WL 2306840, at *4 (Cal. Sup. Ct. Aug. 1, 2025) ("Nothing in the Complaint suggests that Defendant's contact with California did not merely arise when a California consumer sought information from Defendant….").

*Shah* is particularly instructive. Distinguishing *Briskin*, the court explained that "[t]here are no allegations that Hilton Holdings knew the location of particular devices" and "no allegations that Hilton Holdings compiled data on any particular California consumer and 'marketed' that profile to California merchants." 2025 WL 1683577, at *2. That reasoning applies here. PNC is

a Pennsylvania-based bank that is not alleged to use geolocation data in deploying the three at-issue pixels on the relevant URLs or to operate a business model around extracting and exploiting California consumers' personal website-related information. Its alleged use of standard analytics tools on a publicly accessible bank website is indistinguishable from the conduct that *Shah*, *Rounds*, *Moody, Heiting*, and *Hughes* all found insufficient for personal jurisdiction.

**C. Plaintiff Fails To Plead Any Other Basis For Personal Jurisdiction**

The SAC attempts but fails to fix its jurisdictional problem with new allegations relating to PNC's general presence in California and features of the website not at issue, SAC ¶¶ 29–34, as these allegations improperly blur the distinction between specific and general jurisdiction. Specific jurisdiction requires a connection between "'the forum and the underlying controversy,' not all of [PNC's] conduct in California." *Heiting*, 743 F. Supp. 3d at 1170–71 (quoting *Bristol-Myers Squibb v. Super. Ct.*, 582 U.S. 255, 262 (2017)). The specific "contacts from which the alleged harm arose" here are PNC's alleged "role in operating" six webpages and the alleged use of three third-party tools on those pages, *id.* at 1171, which must have been "expressly aimed" at California, *Briskin*, 135 F.4th at 750–51. The fact that "Plaintiff … used the [w]ebsite from California" is not enough to demonstrate express aiming. SAC ¶ 31; *see Heiting*, 743 F. Supp. 3d at 1170. Nor is the fact PNC "know[s]" that Californians have access to the publicly available website generally. *Id.*; *Briskin*, 135 F.4th at 752 ("no court has ever held that an Internet advertisement alone is sufficient [for] jurisdiction"); *id.* at 753 (requiring "'something more' than … foreseeable effect").

PNC's other alleged California activities do not create the requisite specific personal jurisdiction either. That PNC's website has a "branch locator" and consumers can buy "banking products" and "loan services" on other parts of the website, SAC ¶¶ 29–30, is irrelevant because those pages are not at issue. And "privacy notice[s]" about "compliance [with] California law," *id.* ¶¶ 32–33, are not "sufficient to establish personal jurisdiction." *Shah*, 2025 WL 1683577 at *2. "Retail banking branches," SAC ¶ 29, also do not create "general jurisdiction" alone, *Daimler AG*, 571 U.S. at 137, and Plaintiff does not allege any issue with retail branches. Nor do third-party vendors create jurisdiction. *Rounds*, 2025 WL 1873999, at *7 ("[J]urisdiction must arise out of the contacts that 'defendant himself creates with the forum state,' and not defendant's contacts with

entities that … reside there.”). Lastly, while certain “eligibility files” can allegedly differentiate “visitors by state and ZIP code” when using “lending tools,” SAC ¶ 34, Plaintiff does not allege she ever used “lending tools” on the website or that her webpage visits were state- or ZIP-delimited. *Id.* ¶ 3 (alleging only visits to advice pages). As *Shah* explains, accepting these arguments “would undermine the very notion of specific jurisdiction.” *Shah*, 2025 WL 1683577, at *2.

In any event, the generic eligibility-file allegations still fail because of the same central flaw: They do not show that PNC “knew [the] device was in California,” before any of the three at-issue pixels fired on the URLs Plaintiff visited. *Briskin*, 135 F.4th at 760. The SAC vaguely alleges only that these files were delivered sometime “[d]uring [her] session.” SAC ¶ 34. So, after three tries, Plaintiff still fails to allege PNC expressly aimed the challenged conduct at California.[3]

## V. THE SAC FAILS TO STATE A CLAIM

Even if the Court had both subject matter and personal jurisdiction—it has neither—the SAC fails to state a plausible claim. A complaint must contain “enough facts to state a claim to relief that is plausible on its face.” *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). “[C]onclusory statements” parroting the elements of a claim “do not suffice.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Count 1 (CIPA § 631(a)) Fails to State a Claim

Section 631(a) is a criminal statute enacted in 1967 to stop surreptitious telephone wiretapping. It was never designed for, and does not reach, the routine operation of analytics tools on a commercial website. The relevant provision contains four clauses. Cal. Penal Code § 631(a). The first three clauses require plaintiffs to show a defendant: (1) “intentionally taps, or makes any unauthorized connection … with any telegraph or telephone wire, line, cable or instrument”; (2) “willfully and without the consent of all parties … reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit …”; or

[3] It is clear from the SAC that, even accepting her allegations as true, Plaintiff has not alleged specific jurisdiction. But key allegations on the issues are misleading or incorrect, and if the Court has any doubts, PNC has attached a declaration from Michael G. Thompson establishing, *inter alia*, that PNC does not know locations of visitors to unauthenticated webpages—including the at-issue URLs—and jurisdiction is improper. *See C.S. v. MindGeek*, 2026 WL 2372638, at *4 (C.D. Cal. July 22, 2026).

(3) "uses, or attempts to use … information so obtained" through activity prohibited in clauses one and two. Cal. Penal Code § 631(a). But a party to the at-issue communication is not liable under these three clauses based on the well-established "direct party exemption." *See Byars*, 656 F. Supp. 3d at 1066–67. And, while the fourth clause creates some aiding-and-abetting liability, such claims fail without an underlying violation of one of the first three clauses. *Id.* (citing § 631(a)).

Plaintiff's CIPA claim fails multiple times over. First, PNC is a direct party to the communications so cannot "eavesdrop" on messages sent to itself. The SAC also fails to allege any underlying violation of the first three clauses. The first clause of § 631(a) does not apply to the internet, and Plaintiff's claim under either clause two or three has multiple flaws, including: (a) the information allegedly transmitted is routing data, not protected "contents," and (b) the SAC's conclusory allegations do not show any third party read, attempted to read, or learned any contents of the relevant URL communications while they were "in transit" to their intended recipient (here, PNC). Independently, the SAC fails to plausibly allege any facts demonstrating aiding and abetting under clause four. Finally, CIPA is a criminal statute, and the rule of lenity compels narrow construction for any ambiguous provisions. Each ground warrants dismissal.

**1. PNC Is a Direct Party to the Communications**

Section 631(a) targets "eavesdropping, or the secret monitoring of conversations by ***third parties***." *Ribas v. Clark*, 38 Cal. 3d 355, 359 (1985) (emphasis added). It does not prohibit a party to a communication from processing that communication. PNC is the intended recipient of every HTTP request a visitor makes to www.pnc.com. The SAC itself alleges that Plaintiff navigated to PNC's website and browsed its pages, SAC ¶¶ 3, 24—in other words, she communicated with PNC. Deploying analytics tools on its ***own*** website to analyze traffic is not "eavesdropping" any more than a homeowner reading mail delivered to her own mailbox is. *See Byars*, 656 F. Supp. 3d at 1065 (C.D. Cal. 2023) (acknowledging a "direct party exemption" from § 631). Any claim under the first three clauses thus fails to the extent it targets PNC's own actions as wiretapping.

**2. The First Clause Does Not Apply to Internet Communications**

The first clause of § 631(a) prohibits unauthorized connections to "any telegraph or telephone wire, line, cable, or instrument." "[T]he first clause … concerns telephonic wiretapping

specifically, which does not apply to the … internet." *Williams v. What If Holdings*, 2022 WL 17869275, at *2 (N.D. Cal. Dec. 22, 2022). Plaintiff's claim cannot proceed under the first clause.

**3. Plaintiff Fails to Allege Any Violation Of Clause Two or Three**

Without a viable clause one claim, a substantive clause two violation is a necessary prerequisite to any remaining CIPA claim here. *See* Cal. Penal Code § 631(a) (clause three applies to information "so obtained" in clauses one and two; clause four prohibits aiding "any of the acts … mentioned above in this section"). The SAC's clause two claim fails for two separate reasons.

**(a) The Information Allegedly Disclosed Is Not "Contents"**

The second clause of § 631(a) requires the interception of "contents"—not "record information regarding the characteristics of the message … generated in the course of the communication." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014) (Federal Wiretap Act); *Brodsky v. Apple*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act"). "Contents" means the "substance, purport, or meaning" of a message—what the person said. "[R]ecord information" is routing and addressing data that delivers the message without revealing its substance. *Id.*; *see* 18 U.S.C. § 2510(8) (defining "contents" as "information concerning the substance, purport, or meaning of [a] communication"). A broad "body of caselaw" holds CIPA "protects only the internal, user-generated material of a message, not routine identifiers, whether automatically generated or not." *Yoon v. Lululemon USA*, 549 F. Supp. 3d 1073, 1082 (C.D. Cal. 2021).

The SAC is clear about what the supposed "contents" are here: "page URLs identifying what the user is browsing, refer[]er URLs reflecting prior navigation, page titles and session-level identifiers." SAC ¶ 8; *see* ¶ 104 (focusing on URLs). None of these are plausibly described as a "user-generated … message" of any kind, *Yoon*, 549 F. Supp. 3d at 1082, and caselaw agrees. A URL is an ***address***—it tells a server which page to serve. *Zynga*, 750 F.3d at 1108–09 ("the address of the … webpage the user was viewing" is not "contents"). The Ninth Circuit has held "referer" URLs of this kind are "basic identification and address information"—"record information," not protected "contents"—because they do not include "communication[s] by the user." *Id.*; *cf. Dawidzik*, 2025 WL 3786963, at *5 ("referer" URLs "do not per se implicate a privacy interest"

and are "record information" under *Zynga*). Session and visitor identifiers are even more obviously routing data—arbitrary alphanumeric strings that identify a browser session, not the substance of a communication. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092–93 (N.D. Cal. 2022) ("customer information such as a person's name, address, and subscriber number … is record information"); *see Jones v. Tonal Sys., Inc.*, 751 F. Supp. 3d 1025, 1038 (S.D. Cal. 2024) (similar).

Courts consistently hold that this kind of navigational and behavioral metadata is not "contents." It verges on the incoherent to describe "clicks" and "pages viewed" as "contents" because they do not "constitute[] message content in the same way that the words of a text message or an email do." *Yoon*, 549 F. Supp. 3d at 1082–83. A click on a link has no "substance, purport, or meaning." *In re Zynga*, 750 F.3d at 1105; *see also Hammerling*, 615 F. Supp. 3d at 1092–93 ("URLs are record information" unlike "personal search engine queries" that "could provide 'significant information regarding the user[]'"); *Mikulsky*, 713 F. Supp. 3d at 845 ("'[B]utton clicks' … are more akin to record information [than] the contents of an online communication."). Plaintiff's contrary theory would make ***every*** click and ***every*** HTTP request to ***any*** website a "communication" with protected "contents"—criminalizing the internet's basic functionality.

The SAC's allegation that a one-word query ("?q=Debt") was embedded in a URL changes nothing. There is no allegation that the contents of a search box were captured as such, only that a one-word artifact appeared at the end of a single URL. SAC ¶ 13–14. A URL "search" like this is functionally identical to clicking a link for a page titled "Debt"—it tells the server which pages to serve. It does not convey any substantive communication from the user. While some "search terms" for "specific information" may rise to "contents," *In re Zynga*, 750 F.3d at 1106–9, this one-word entry is more like browsing a website than sending a substantive communication. *See Hammerling*, 615 F. Supp. 3d at 1093 (requiring "significant information" about the user for a search to become "contents"); *Dawidzik*, 2025 WL 3786963, at *5 (similar).

**(b) Plaintiff Does Not Allege Any "Reading" while "In Transit"**

The second clause of § 631(a) separately requires that a third party "reads, or attempts to read … any … communication while the same is ***in transit***"—that is, while the communication is still traveling between the sender and receiver, before it arrives at its destination. "In transit" plainly

means "contemporaneous" with the communication—*i.e.*, between "being sent" and "received." *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 1001 (N.D. Cal. 2024); *Konop v. Hawaiian Airlines*, 302 F.3d 868, 878 (9th Cir. 2002) ("[I]t must be acquired during transmission, not while … in electronic storage," applying identical federal standard); *U.S. v. Steiger*, 318 F.3d 1039, 1048–50 (11th Cir. 2003) ("a contemporaneous interception—*i.e.*, an acquisition during 'flight'"). The SAC's own allegations defeat this element. They describe an alleged sequence of separate communications showing that the relevant communications—requests for "page URLs" related to debt, *see* SAC ¶ 4—started and completed before any third-party pixel or tag did anything at all, *see id.* ¶¶ 11–14.

The SAC describes what allegedly happens when a user loads the webpages at issue. According to Plaintiff, the process involves not one but many "separate communications" that occur "sequentially" over several seconds. *Id.* ¶¶ 11, 104. First, the browser sends a request for the webpage itself. *Id.* ¶ 11. Then, after that request completes and the page begins loading, "numerous additional … requests" go out for resources like images, fonts, and—eventually—the third-party pixels. *Id.* ¶¶ 11, 17. The third-party pixels arrive on the website and fire only after the initial page request has already been sent and received back by the user. *Id.* ¶ 11. The fact that these events occur during one webpage visit does not turn them into one communication captured in transit. *See Tonal Sys.*, 751 F. Supp. 3d at 1036 ("[O]nce a [communication] has been received by the … server, a communication becomes 'stored' and contemporaneous interception is no longer possible.").

The SAC focuses on two particular and "separate communication[s]" in an attempt to show in-transit capture. *Id.* ¶ 13. Communication 1 is the initial webpage request: "[h]er browser first requested the search-results page itself, https://www.pnc.com/insights/search-results.html?q=Debt," the URL of the page she visited. *Id.* ¶ 13. This is the communication whose URL the pixels allegedly captured. *Id.* ¶¶ 13–14. "Then," there was a "second, ***separate*** communication." *Id.* (emphasis added). Communication 2 is a later "request" to PNC's "search backend," at https://www.pnc.com/bin/search?q=Debt&pointer=0&lang=en," which allegedly sent a copy of the "Debt" search term to PNC and returned "search results back to Plaintiff." *Id.* ¶ 13. Communication 2 thus follows Communication 1—two separate, sequential requests. *Id.*

That distinction matters because to plausibly plead "in transit" interception, the timing must be right—the pixel must read the at-issue communication while it (not some other communication) is in transit. And, here, the SAC itself supplies the timing: "each Tracker fired while [the] second communication … was in transit." SAC ¶ 14. But the fact that "each Tracker fired while [the] second communication … was in transit" is irrelevant because the SAC also makes clear that Communication 1 was the only communication allegedly "transmitted" to the third parties: "Plaintiff's browser transmitted to [Pinterest] a request carrying the complete URL, https://www.pnc.com/insights/search-results.html?q=Debt." *Id.* There is no allegation that Communication 2 was ever transmitted to any third parties. *See id.* ¶ 14 (alleging Communication 2 was transmitted only "between her browser and [PNC's] servers"). So, in plain terms, the SAC alleges that the third-party pixels captured and transmitted a completed message (Communication 1) only after that message had already been delivered to the Plaintiff. The third-party pixels allegedly acted while a "separate," later message (Communication 2) was in transit. *Id.* ¶¶ 13–14. This is like someone reading a text message conversation after it is completed: If a person has an ongoing text message conversation with a friend, and her husband peeks at the phone, he has not read the first message in the chain "in transit." Once the text message (Communication 1) arrives, it is no longer "in transit." *See Cody*, 718 F. Supp. 3d at 1001.

The SAC's label for this collection of activity as a "multi-second collective communication process," SAC ¶ 11, does not change the timing of the separate communications it identifies. "[F]orward[ing] messages in milliseconds or days, it makes no difference." *Bunnell v. Mot. Picture Ass'n*, 567 F. Supp. 2d 1148, 1154 (C.D. Cal. 2007). Plaintiff's framing says nothing about "how the technology works" but merely asserts legal conclusions about "how it should be characterized." *Doe v. Eating Recovery Ctr.*, 806 F. Supp. 3d 1109, 1117 (N.D. Cal. 2025). Stripping away the conclusory framing, the SAC alleges a page-load sequence in which Communication 1 was complete before the pixels even arrived, let alone allegedly did anything. SAC ¶¶ 11, 13–14.

This fundamental deficiency is clear from the SAC, but Plaintiff's prior pleading drives home this sequence. The FAC included "figures and screenshots" from a "technical investigation" that "replicated" Plaintiff's visit. FAC ¶ 2. The SAC incorporates that same technical investigation

by reference and includes similar "figures." SAC ¶ 46. But the SAC omits a key part of that record: FAC Figure 1. *See* SAC ¶ 46. Figure 1 visualizes the "multi-step page-load process" described in the SAC, *see* SAC ¶ 17, and confirms that the relevant URLs were not captured while Communication 1 was in transit, as PNC explained in its prior motion to dismiss. Dkt. 14 at 18.

FAC Figure 1 lays out the separate communications in the page-load process, and places the full URL request (Communication 1) at Line 1. *See* Attachment 2 at Line 1. Communication 1 finishes in "384 ms [milliseconds]." *Id*. The figure shows no other communication running until Communication 1 is complete. *Id*. The sequence then continues with separate requests to PNC.com. *Id*. The at-issue third-party tools do not appear until Line 31—almost a full second after Communication 1 fired and completed. *Id*. Communication 2 appears at Line 44, roughly four seconds after Communication 1. *Id.* The figure thus visually confirms the sequential timing alleged in the SAC: Communication 1 ends first; the third-party pixels come later; and Communication 2 comes later still. SAC ¶¶ 11, 13–14; FAC Fig. 1. Because the SAC incorporates the same technical investigation by reference, its omission of Figure 1 does not change what the investigation shows. SAC ¶ 46; FAC Fig. 1.[4] *See also* SAC Figs. 2 & 4 (Pinterest pixels occurred around 50,000 milliseconds, LinkedIn 20,000 milliseconds).

Beyond these timing issues, there is another flaw in the "in transit" allegations. Nothing in the SAC's "page-load" window amounts to an "attempt" by a "person" "to read, or ... learn the contents or meaning" of the communications in the sense of "human cognition," rather than simply "input[ting] data … based on an algorithm." SAC ¶¶ 11, 17. *Williams v. DDR Media*, 757 F. Supp. 3d 989, 995–97 (N.D. Cal. 2024); *see also Torres v. Prudential Fin*., 2025 WL 1135088, at *7 (N.D. Cal. Apr. 17, 2025) (same). The SAC alleges that the third-party tools take "the browser's then-current "location.href" (*i.e.*, the current page's web address) and "document.refer[]er" (*i.e.*, the address of the prior page visited), assign those values to the "loc" and "ref" fields, and dispatch the resulting request. SAC ¶ 56; *see id.* ¶¶ 71–72. Taking pre-assigned values and copying them

[4] FAC Figure 1 has been reproduced as Attachment 2 for convenience. Because a plaintiff "cannot amend pleadings to directly contradict an earlier assertion made in the same proceeding," courts can take "judicial notice of an attachment to plaintiff's prior amended complaint." *Nevada Fleet LLC v. FedEx Corp.*, 2024 WL 199626, at *9 n.7 (E.D. Cal. Jan. 18, 2024) (**Drozd, J.**) (reviewing multiple exhibits that were "filed … on the docket" with an FAC and later omitted).

into predetermined fields "can't fairly be characterized as an effort at understanding the meaning of the communication." *Eating Recovery*, 806 F. Supp. 3d at 1117. The SAC alleges that this data is later used for "audience segmentation" and ad targeting by PNC, SAC ¶ 5—a description of alleged downstream, after-the-fact commercial use, not an effort to understand the "substantive meaning" of any communications while they were en route to their destination.

Because the SAC does not plausibly allege that any third party read or attempted to learn the substantive "contents" of Plaintiff's communications while they were "in transit," any claim under clause two or three fails several times over. SAC ¶¶ 13–14, 56, 71–72.

**4. Plaintiff Fails to Allege Derivative Liability Under Clause Four**

Plaintiff cannot show any underlying violation of the first three clauses of CIPA, and that ends the analysis. There is no CIPA derivative liability without a violation of the first three clauses. *See Esparza v. UAG Escondido A1*, 2024 WL 559241, at *6 (S.D. Cal. Feb. 12, 2024). But even if she could allege a clause two or three violation, the SAC also fails to allege any plausible aiding-and-abetting theory under clause four. That theory requires (a) "know[ledge that] the other's conduct constitute[s] a breach of duty" and (b) "substantial assistance" of that breach. *Esparza*, 2024 WL 559241, at *6. In other words, "the defendant must be acting with the third party ***in order to*** have the third party perform acts that violate the statute." *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 942 (N.D. Cal. 2024). And, while some courts find that embedding "code into a website" may support the assistance prong, that alone is insufficient to show knowledge. *Esparza*, 2024 WL 559241, at *6. So, courts reject aiding-and-abetting CIPA theories built on the use of a third-party program, absent some plausible allegation that the defendant acted "with knowledge or intent" to aid in CIPA violations. *See Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1017 (C.D. Cal. 2023); *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1124 (S.D. Cal. 2024).

Beyond legal conclusions, the SAC adds five alleged steps PNC took to "assist" the owners of the third-party pixels at issue, but none plausibly demonstrate knowledge. To start, none of the allegations concern Twitter/X, and the only allegations concerning LinkedIn say that PNC "installed the Insight Tag on its debt and personal-finance pages" ***against*** LinkedIn's instructions, SAC ¶ 106(c), which cannot plausibly be understood as PNC knowingly "aiding" LinkedIn. Any

aiding-abetting claim regarding these two tools thus fails as a matter of law. As to Pinterest, several allegations focus on the fact that PNC "configured the Pinterest Conversion Tag" by using content codes like "promo_code" and event codes such as "lead," SAC 106(a), (b), (e)—but as Plaintiff's own incorporated materials show, this is just a description of how to set up the Tag in the first place. *See* https://developers.pinterest.com/docs/track-conversions/pinterest-tag/ (cited at SAC ¶ 59, explaining how to embed the Tag and use codes to follow "actions people take on your website after viewing your ad on Pinterest"). Finally, the suggestion that because Plaintiff's "***third-party***-cookie blocking" tool failed to block "***first-party*** cookies," SAC ¶ 106(d) (emphases added), that somehow shows PNC knowingly aided and abetted a CIPA violation is facially implausible.

At most, the SAC states PNC uses third-party software to "accomplish its commercial objectives, including … audience segmentation, and the monetization of users' browsing activity through targeted advertising." SAC ¶ 5. PNC did so by following the third-party instructions. PNC is not a party that has knowingly aided any third party's violation of CIPA.

**5. The Rule of Lenity Requires Narrow Construction**

CIPA is a criminal statute carrying imprisonment and fines. Cal. Penal Code § 631(a). "When courts are called upon to interpret ambiguous criminal statutes in California, the rule of lenity applies—even when the statute is being invoked in a civil action." *Eating Recovery*, 806 F. Supp. 3d at 1112 (citing *Harrott v. Cnty. of Kings*, 25 Cal. 4th 1138, 1154 (2001)). A similar principle applies to civil statutes that impose punitive civil penalties. *Hale v. Morgan*, 22 Cal. 3d 388, 401 (1978) ("narrowly constru[ing]" civil penalty statutes). "Did the Legislature really intend to subject companies … to criminal liability for using third-party software to track website activity … [and] web traffic data?" *Eating Recovery*, 806 F. Supp. 3d at 1119. Under the rule of lenity, the answer is no—particularly since "[t]he Legislature has never, in over four decades, amended Section 631 to adapt its language to the digital age" and has instead enacted the CCPA to address data sharing through separate, more tailored legislation. *Id.* "[U]sing a third-party company to perform data analytics for web traffic is worlds different from wiretapping …." *Id.* That is all Plaintiff alleges PNC did. Any ambiguity in CIPA's application must be read in PNC's favor.

**B. Count 2 (Federal Wiretap Act (18 U.S.C. § 2511)) Fails to State a Claim**

Plaintiff's Federal Wiretap Act claim fails for the same reasons as her CIPA claim, since the Wiretap Act claim "mirrors" CIPA on several issues, including the "contents" and "in transit" requirements. *Heiting v. Taro Pharms.*, 728 F. Supp. 3d 1112, 1124–25 & n.9 (C.D. Cal. 2024).

Additionally, unlike CIPA, the Federal Wiretap Act is a one-party consent statute. 18 U.S.C. § 2511(2)(d). Consent is a "complete defense." *Katz-Lacabe v. Oracle Am.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023). PNC is a party to every communication with www.pnc.com—the SAC alleges Plaintiff "accessed and used" PNC's website, SAC ¶ 1, making PNC the intended recipient of each HTTP request. PNC consented to processing of communications on its own website through its allegedly chosen analytics tools. SAC ¶ 105. That consent satisfies § 2511(2)(d). *Katz-Lacabe*, 668 F. Supp. 3d at 945. There is no aiding-and-abetting liability under the Wiretap Act. *Herzer v. Redstone*, 2018 WL 5094933, at *7 (C.D. Cal. 2018) (holding "secondary liability is not recognized under [Wiretap Act]").

**C. Count 3 (UCL (Cal. Bus. & Prof. Code § 17200)) Fails to State a Claim**

Plaintiff's UCL claim fails at the threshold because she lacks statutory standing. Private UCL plaintiffs must show they "suffered injury in fact and … lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. This requirement is "over and above the demands of Article III." *Katz-Lacabe*, 668 F. Supp. 3d at 940.

Plaintiff does not allege she paid any money to PNC or parted with anything of tangible value, but instead suggests that "[c]onsumer browsing data" might count as a loss of "money or property." SAC ¶ 121. Plaintiff is wrong. "[A]n invasion of … privacy," standing alone, cannot be arbitraged "into a loss of money or property." *Archer v. United Rentals*, 195 Cal. App. 4th 807, 816 (2011); *Jones*, 751 F. Supp. 3d at 1041 ("[C]ourts in this Circuit have not extrapolated from the fact that a user's data has economic value to ***someone*** that its collection constitutes an economic loss to the user."). What market research firms like Nielsen might pay for data is irrelevant, SAC ¶ 121; Plaintiff alleges neither that she participates in such programs nor that the programs would pay less because of the alleged conduct. *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 845 (N.D. Cal. 2024) (such a theory fails to explain why plaintiff "could not still sell their data in the market"); *cf.*

*Pruchnicki v. Envision Healthcare Corp.*, 845 F. App'x 613, 614–15 (9th Cir. 2021) ("[T]he … information may have value in general, [but plaintiff] failed to adequately allege that ***her*** personal information actually lost value."). Browsing free, publicly available articles involves no exchange of money or property. She cannot satisfy the UCL's economic injury requirement. *See Archer*, 195 Cal. App. 4th at 816 (loss of privacy does not "translate[] into a loss of money or property").

Regardless, Plaintiff's UCL claim fails because it is based on the CIPA and Federal Wiretap Act claims, SAC ¶ 119, and thus fails with them. *See Hammerling*, 615 F. Supp. 3d at 1094.

### D. Counts 4 and 5 (State Constitutional Privacy (Art. I, § 1) and Intrusion Upon Seclusion) Fail to State a Claim

"Given the inherent nature of the internet, a number of courts have found that consumers do not have a reasonable expectation of privacy over their activity in that space." *Thomas v. Papa Johns Int'l*, 2024 WL 2060140, at *2 (S.D. Cal. May 8, 2024). For that reason, both common law privacy claims fail. A claim under the California Constitution's right to privacy requires: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy; and (3) conduct constituting a "serious invasion" amounting to an "egregious breach of the social norms." *Hill v. NCAA*, 7 Cal. 4th 1, 35–40 (1994). Intrusion upon seclusion requires much the same: (1) an "intru[sion] into a place, conversation or matter as to which the plaintiff has a reasonable expectation of privacy," and (2) "in a manner highly offensive to a reasonable person." *Hernandez v. Hillsides*, 47 Cal. 4th 272, 286 (2009).[5] The SAC fails these elements—as many courts in similar privacy cases have held. *See Hammerling*, 615 F. Supp. 3d at 1090 ("Courts in this district have held that data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy"; collecting cases).

#### 1. There is No Legally Protected Privacy Interest in Browsing Data

Courts have consistently rejected the notion "that users have a cognizable privacy interest in browsing data collected only while users interact with the website of the defendant company." *See Yoon*, 549 F. Supp. 3d at 1086 (dismissing constitutional claim); *In re Google Location Hist.*

[5] *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 828–29 (N.D. Cal. 2020) ("Because the common law and constitutional sources of privacy protection under California law are closely related, the Court treats them together.") (citing *Hernandez*).

*Litig.*, 428 F. Supp. 3d 185, 199 (N.D. Cal. 2019) (dismissing along similar lines). Plaintiff thus has no legally protected privacy interest in information she willingly transmitted to PNC while on its website. *See Popa*, 153 F.4th at 791 (no interest in "monitoring of … interactions with [a] website"). Her common law privacy claims fail for this reason alone.

**2. There Is No Reasonable Expectation of Privacy**

Moreover, contrary to her bare assertion otherwise, SAC ¶ 128, no reasonable person who browses publicly available internet content expects complete privacy over the URLs they visit. "Contemporary internet browsing involves the collection of users' data, including by tracking users across the internet, ***and a reasonable user should expect as much***." *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024); *Dawidzik*, 2025 WL 3786963, at *5 (no objectively reasonable expectation of privacy in browsing data sent to third-party pixels); *Thomas*, 2024 WL 2060140, at *2 ("Given the inherent nature of the internet, a number of courts have found that consumers do not have a reasonable expectation of privacy over their activity in that space."); *Mitchener*, 815 F. Supp. 3d at 851 ("Internet users have no expectation of privacy in ... the IP addresses of the websites they visit."); *U.S. v. Rosenow*, 50 F.4th 715, 738 (9th Cir. 2022) ("'no expectation of privacy in … IP addresses' or basic subscriber information because [users] 'should know that this information is provided to and used by internet service providers.'"). Plaintiff's claimed expectation is particularly farfetched given she is a serial litigant who browses the web capturing HAR files of her website visits as she goes. *Cf. Autotrader.com,* 2025 WL 1085787, at *1 (A "tester" plaintiff "cannot claim an injury when her expectations were ultimately met[.]").

**3. PNC's Conduct Does Not Constitute a "Serious Invasion"**

Finally, the alleged conduct is not a "serious" invasion amounting to an "egregious breach" of social norms. *Hill*, 7 Cal. 4th at 37; *Hernandez*, 47 Cal. 4th at 290, 294–95 ("highly offensive" breaches include acts like "covert … video recording" in a "dressing room"). As Plaintiff admits, using analytics tools on a commercial website is a near-universal practice. *See* SAC ¶ 93 ("tens of thousands of websites"). Virtually every major website—banks, retailers, news organizations, governmental bodies, and even federal courts—uses these tools. As Judge Chhabria observed: "[U]sing a third-party company to perform data analytics for web traffic is worlds different from

wiretapping and eavesdropping." *Eating Recovery*, 806 F. Supp. 3d at 1119; *see also Popa*, 153 F.4th at 791 (comparing website tracking to "a store clerk's observing shoppers in order to identify aisles that are particularly popular"); *Dawidzik*, 2025 WL 3786963, at *5 (finding collection of browsing data by third-party pixels was not "highly offensive" as a matter of law). What is ubiquitous cannot be "egregious." What is industry-standard does not breach "social norms."

**E. Count 6 (Unjust Enrichment) Fails to State a Claim**

Plaintiff's final claim fails because "there is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003); *see also Abuelhawa v. Santa Clara Univ.*, 529 F. Supp. 3d 1059, 1070 (N.D. Cal. 2021) (collecting many California state cases on this point). Unjust enrichment is a "general principle, underlying various legal doctrines and remedies," not an independent cause of action. *Melchior*, 106 Cal. App. 4th at 793. Plaintiff's unjust enrichment claim should be dismissed for this reason alone.

To the extent unjust enrichment is treated as a quasi-contractual remedy "underlying" other claims, it requires a showing that the defendant obtained a benefit "through mistake, fraud, coercion, or request." *Doe I*, 741 F. Supp. 3d at 849. The SAC alleges none of this. Plaintiff's unjust enrichment theory is entirely derivative of her statutory and tort claims. If those claims fail—as they must—this claim fails with them. *Id.*

Even if unjust enrichment were an independent claim, it would be barred because Plaintiff has not plausibly "alleged that [she] lack[s] an adequate remedy at law." *See Nacarino v. KSF Acquisition Corp.*, 642 F. Supp. 3d 1074, 1087 (N.D. Cal. 2022) (dismissing claim under the Ninth Circuit's binding opinion in *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)). Her conclusory allegations otherwise fail. *Id.*; *compare, e.g.*, SAC ¶ 115 (seeking "profits" or $10,000 statutory damages under Wiretap Act), *and* ¶ 108 ($5,000 per violation statutory damages), *with id.* ¶ 143 (seeking "revenues and commercial benefits" as restitution).

**VI. CONCLUSION**

For these reasons, PNC respectfully requests that the Court dismiss the SAC in its entirety with prejudice. Plaintiff's theory—built from reading a few free articles on a public website—finds no support in Article III, the Due Process Clause, or the substantive elements of her claims.

Dated: August 26, 2026

JONES DAY

By: */s/ Nathaniel P. Garrett*

Amanda Fitzsimmons
Nathaniel P. Garrett
Rebekah B. Kcehowski

Attorneys for Defendant
PNC BANK, NATIONAL ASSOCIATION